## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
WARREN FAIRLEY (04),
LAWRENCE MCMANAMON (05),
KATHY STAPP (06),
CULLEN JONES (07),

        Defendants.

Case No. 24-20070-DDC

### MEMORANDUM AND ORDER

This Order rules the government's Motion for Abrogation of Attorney-Client Privilege by Waiver (Doc. 107). The motion crops up in the middle of a longer story about document production in this case. So, before taking up the current motion, the court outlines the beginning of that longer story.

In May 2025, the United States invoked Fed. R. Crim. P. 17(c) and served a subpoena on the International Brotherhood of Boilermakers union—IBB, for short. This subpoena sought all the contents of nine "Email accounts" maintained on IBB's email network. *See* Doc. 111-1. The nine designated accounts consisted of the seven defendants in this action, an eighth person charged in another criminal case pending before our court, and one other person. IBB once employed all nine people.

IBB—the subpoena's recipient—filed a Motion to Modify Subpoena or in the Alternative to Quash the government's Rule 17(c) subpoena. Doc. 111. Summarizing at a high level, IBB contended that the government's subpoena didn't comply with Rule 17(c)'s standard, so the court

should modify or quash it.  IBB's motion also announced that it voluntarily would provide much of the material sought by the government's subpoena—but that it wasn't waiving any privileges protecting certain material from disclosure.  *Id.* at 7–8.  At a hearing on the Rule 17(c) issue, IBB emphasized, yet again, that it wasn't waiving any privileges.  So, it planned to filter and withhold from production materials within IBB's attorney-client privilege and materials arguably within the privilege owned by any defendant in this case.  The court decided the Rule 17(c) controversy in late July, concluding that the government's subpoena didn't comply with Rule 17(c).  So, the court quashed the disputed portions of the government's subpoena.  *See* Memorandum and Order of July 29, 2025, Doc. 138.

About the same time the subpoena to IBB had issued, the government filed the motion decided here—the Motion for Abrogation of Attorney-Client Privilege by Waiver (Doc. 107).  It takes aim at those materials filtered and withheld by IBB on privilege grounds.  Summarizing, again at a high level, the abrogation motion claims that IBB broadly has waived its attorney-client privilege.  And so, the motion seeks an order "abrogating the attorney-client privilege" and "defining the scope of that waiver."  Doc. 107 at 1.

Since filing its abrogation motion, the government also has filed two more requests, both billed as "Supplements" to the abrogation motion.  Doc. 112; Doc. 154.  Taken together, the government's three filings seek substantially different forms of relief.  The first filing—the government's motion—seeks an order finding that IBB waived its attorney-client privilege over all communications between IBB's former outside counsel and IBB employees "concerning" the following subjects:  (a) "standards for expenditure of union funds" under IBB's "Constitution, by-laws, and policies, and federal law;" and (b) the "subject of any [of] the Indictment['s] allegations," no matter when made.  Doc. 107 at 23.

In contrast, the government's first Supplement focuses on the privilege belonging to the defendants—seven former IBB employees charged here. *See* Doc. 112 at 10 (seeking "declaratory judgment holding that defendants retain no attorney-client privilege protecting "communications with personal attorneys housed on the Boilermakers Email System"). This first Supplement also asks the court to direct IBB "to refrain from conducting a filter review" segregating those communications from others. *Id.* at 10–11. The United States claims that any such filter review "constitutes rank interference of a non-party holding evidence relevant in this case." *Id.* at 5.

The government's second Supplement presents another new dispute over attorney invoices. The government argues that IBB waived its attorney-client privilege over "several invoices from Attorney David Elbaor who was hired specifically to respond to the first grand jury subpoena in the investigation preceding this case." Doc. 154 at 1–2. Apparently, the government just learned of a filing by IBB in a separate case—one brought by Attorney Elbaor in the state Circuit Court in Charlottesville, Virginia. *See* Doc. 155. The government argues that IBB "disclosed a critical element of its attorney-client communication with Attorney Elbaor" in the newly-discovered filing. Doc. 154 at 3. And so, the government contends, IBB no longer can "maintain that its communications with Attorney Elbaor are privileged." Doc. 154 at 3.

To recap, then, the government's motion and second Supplement assert that IBB has abrogated its attorney-client privilege by disclosing various communications. And the government's first Supplement asserts that defendants have abrogated their attorney-client privilege over email communications with their personal attorneys that still reside on the IBB email system. The court held a hearing on October 15, 2025, on the government's abrogation motion and supplements. The hearing whittled down the disputes, taking several contested

issues off the table. For starters, IBB represented that, on further review, it had determined Attorney Elbaor's invoices weren't privileged, mooting the government's second-supplement concerns. IBB also represented that no privilege dispute persists for another category of documents: IBB's International Executive Committee (IEC) meeting minutes. And, IBB also clarified, it had produced for the government—voluntarily—the requested non-privileged emails.

So, here's the current state of play: there's no outstanding, formal demand obligating IBB to provide anything to the government.[1] IBB voluntarily produced some requested documents, and the court quashed the other, opposed parts of the government's subpoena. *See* Doc. 138. But the government and IBB agree that IBB's release of certain communications has waived IBB's attorney-client privilege—at least in some measure. And so, even absent any formal production demand, the government asks the court for an order that defines the scope of that waiver. The government also seeks an order outlining any waiver by defendants so that IBB is at liberty to produce defendants' privileged emails, as well. This set of circumstances triggers an avoidance question for the court: Where there's no enforceable mechanism requiring IBB to provide things to the government, should the court decide whether events or conduct have abrogated (or not) purportedly privileged documents in IBB's possession? Though it's a reasonably close call, the court's convinced that it nonetheless should decide the government's abrogation motion. That's because a ruling on the abrogation motion may help inform the parties' efforts to litigate the case efficiently. Also, it might influence IBB's voluntary production

---

[1]      The court granted defendants' Unopposed Motion for Issuance of a Rule 17(c) Subpoena Duces Tecum to IBB (Doc. 126) and directed the Clerk to issue a subpoena. Doc. 140 at 4. Also, the court ordered that defendants must provide the United States with access to all documents secured from IBB under that subpoena. *Id.* So, in a sense, there is something of an active, formal production mechanism, but it doesn't obligate IBB to provide anything to the government. Instead, the government stands as a beneficiary of IBB's production to defendants. And so, no outstanding, formal demand currently obligates IBB to produce anything directly to the government.

to the government—though the court has no role to play enforcing any outcome in IBB's purely voluntary exercise.  The court thus decides the outcome of the relief sought by the government's Motion for Abrogation (Doc. 107) and its first Supplement (Doc. 112), below, starting with the initial motion.[2]

### *Analysis*

### A.  What's the scope of IBB's waiver of attorney-client privilege?

The government's abrogation motion seeks an "order abrogating the attorney-client privilege" of IBB.  Doc. 107 at 1.  More specifically, the government asks the court to "defin[e] the waiver of the Boilermakers Union's attorney-client privilege" by ruling the following communications now are unprivileged:

> 1)  any communications between Boilermakers Union officers or employees and any of its attorneys concerning the standards for expenditure of union funds under the Boilermakers Union Constitution, by-laws, and policies, and federal law; and
>
> 2)  any communications between Boilermakers Union officers or employees and any of its attorneys concerning the subject of any the Indictment allegations, regardless of when the communications were made.

*Id.* at 23.

IBB readily agrees that it has waived the attorney-client privilege over certain communications.  *See, e.g.*, Doc. 122 at 11 (conceding privilege waived over September 2022 Memorandum).  But this concession hardly ends the fight.  Indeed, it merely leads to more daunting questions.  The Epstein treatise on attorney-client privilege identifies the questions guiding this inquiry.

> Once a waiver has been found to have occurred . . . the second question that often arises is how broadly does the waiver cut?  With respect to which parties will the

---

[2]      The court doesn't address the government's second Supplement (Doc. 154).  IBB represented at the hearing that it had determined Attorney Elbaor's invoices weren't privileged.  And the government trained its second-supplement attention on those invoices.  *See* Doc. 154 at 1–2.  With the invoice dispute now behind us, the court sees no reason to opine about the scope of any waiver premised on IBB's filings in the Charlottesville, Virginia case.

waiver be deemed effective?  For how long?  Just how much of the privileged communication or document or confidences exchanged thereby becomes discoverable?

Edna Selan Epstein, *Attorney-Client Privilege and the Work-Product Doctrine* § 1.IV.X (6th ed.

2025) [hereafter, "Epstein"].  The Epstein treatise then summarizes the approach federal courts

have used to answer these questions.

> As a rule, waiver of the privilege regarding some communications waives the privilege [for] all other communications *relating to the same subject matter only*. This rule seeks to avoid the unfairness that might result from selective disclosure while, at the same time, upholding the privilege and preserving the interests it protects from disclosure that is not necessary to resolve the matter in dispute and placed into issue.
>
> In practice, the interpretation given to the term "same subject matter" varies from case to case.  In some instances, everything involving a particular transaction or series of transactions may be put into issue and thereby become discoverable.  In other cases, a far more circumscribed discovery is ordered.  General principles are not susceptible to facile formulation other than that a party voluntarily disclosing some privileged communications, should not be permitted to cherry pick those that support its position while protecting from disclosure those that do not do so.

*Id.* § 1.IV.X.2 (emphasis added).  So, with IBB having conceded waiver of attorney-client

privilege over specified communications, the court must determine the waiver's scope by

defining the subject matter of those communications.  Then, any communications "relating to the

same subject matter" will fall within the scope of that waiver.  *Id.*

IBB and the government each presented—in their papers and at the hearing—an

interpretation of the waiver's scope.  But both proposed interpretations wander from the law's

middle ground:  IBB's interpretation proves far too narrow and the government's far too broad.

IBB, for its part, argues that the four corners of its released communications define the limits of

its waiver.  Doc. 122 at 11.  And so, it contends, any waiver is confined to "those documents

already produced."  *Id.*  At the other extreme, the government suggests the court should find

privileged but waived "any communications" between IBB or its employees and "any of its

6

attorneys" concerning "any [of] the Indictment allegations[.]"  Doc. 107 at 23.  IBB and the government each have assumed positions simply untenable under the law.

In contrast to these two extremes, the Tenth Circuit has staked out the middle ground.  It has explained that any "voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." *Burke v. Regalado*, 935 F.3d 960, 1023 (10th Cir. 2019) (quotation cleaned up).  In other words, the four corners of a disclosed document don't define the scope of a waiver—as IBB suggests.  But neither does the scope reach all communications, all attorneys, and all allegations—as the government argues.  To be sure, the waiver spreads wider than IBB suggests, but not nearly in the unbounded fashion suggested by the government. Instead, the waiver encompasses "all communications relating to the same subject matter"—but sprawls no further.  Federal Rule of Evidence 502 similarly occupies this middle ground.  For those communications intentionally disclosed "in a federal proceeding[,]" Rule 502(a) provides that "the waiver extends to an undisclosed communication or information" as well.  But that waiver doesn't extend endlessly.  Instead, Rule 502 provides that waiver is proper when the disclosed and undisclosed communication "concern the same subject matter" and "ought in fairness be considered together." Fed. R. Evid. 502(a).  IBB and the government both diverge from this centrist approach.  IBB propounds an overly restricted scope and the government an overly broad one.  The right answer lies somewhere in between.

Below, the court applies these overarching scope-of-waiver principles to communications where IBB has abrogated its attorney-client privilege.  The court defines—to the best extent currently possible—the scope of its waiver.  But first, the court addresses—and explicitly rejects—another scope-of-waiver argument advanced by the government.

To support its overly broad waiver request, the government posits a novel theory of cumulative waiver.  Under its scheme, each instance of privilege waiver by IBB piles up, accumulating one on top of the other, producing what the government terms a cumulative waiver.  So, when IBB waives attorney-client privilege on subject one, subject two, and subject three, for example, the waivers snowball and their critical mass produce a waiver of privilege on all subjects.  According to the government's argument at the hearing, this cumulative approach is appropriate because IBB can't pick and choose repeatedly the subject matters over which it waives privilege.  At some point, the government contends, a "cumulative effect" inheres and waives all privilege on all subjects.  When the court inquired at the hearing asking for any legal authority endorsing this view, the government couldn't provide any assistance.

The government's newfangled theory picks up on a familiar theme.  It evokes hints of the impermissible cherry-picking that undergirds the waiver doctrine.  As the Epstein treatise explained, a party can't elect to disclose some privileged communications about a given subject and then claim privilege over other communications about the same subject.  Epstein, § 1.IV.X.2.  Nor can a party "be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others[.]"  *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1187 (10th Cir. 2006).  In one sense, then, the government is right.  Cherry-picking when asserting privilege is problematic.  But the government's cumulative effect doctrine relies on a party choosing to waive privilege on several wholly different subjects and then—at some undefined tipping point—losing privilege over all subjects, in toto.  Such a proposition reinvents prevailing law, including the law our Circuit has adopted.  Our court isn't free to cast aside such precedent.  What's more, the government's theory doesn't make sense.

The fairness doctrine that undergirds the scope of waiver analysis doesn't support the government's cumulative argument.

Fairness dictates the scope of a waiver, as Rule 502 explicitly requires. Fed. R. Evid. 502(a)(3) (clarifying that waiver extends to undisclosed communication when the disclosed and undisclosed communication "ought in fairness to be considered together"); *see also* Epstein, § 1.IV.X (explaining that scope of waiver conforms with fairness doctrine). Such a fairness doctrine doesn't allow a party to cull communications within a given subject area or single out an audience for a given communication. When a party can elect to waive privilege over one communication on a subject matter but not another—or disclose to one party and not another—it opens the door for the oft-referenced sword-and-shield problem. *See Balakrishnan v. TTEC Digital LLC*, No. 23-CV-01204-CNS-NRN, 2024 WL 4213759, at *5 (D. Colo. Sept. 17, 2024) (explaining fairness principle is "intended to ensure the party holding the privilege cannot use it both offensively and defensively." (quotation cleaned up)). In sum, fairness dictates the full sphere of communications on a given subject matter must come to light. But this same fairness rationale doesn't support the government's cumulative effect doctrine. Fairness doesn't require waiver of privilege for all subjects simply because a party has waived some aspects of its privilege. Indeed, such a sweeping interpretation of waiver would inhibit fairness considerably. It would force the disclosing party to make an all-or-nothing decision, thereby kneecapping viable arguments allowed by a more circumspect waiver doctrine. Thus, neither prevailing law—nor the fairness rationale that justifies it—supports the government's cumulative effect theory. And so, the court rejects it here.

With that conclusion in mind, the court returns to the main event: applying the scope-of-waiver governing principles to the abrogation of privilege at issue here. By the court's

accounting, only two IBB-attorney communications demand the court's attention, post-hearing. Recall that IBB conceded that the IEC meeting minutes and Attorney Elbaor's invoices weren't privileged. Still at issue, therefore, are the September 2022 Memorandum and communications about engaging a forensic surveillance firm, Mandiant. The court considers the alleged waivers—and their attendant scope—in turn, below. The court defines the scope of each waiver first and then addresses together the practical implications of those waivers for the current state of play.

### i.  September 2022 Memorandum

The September 2022 Memorandum is a 15-page memorandum prepared by IBB's outside counsel, Michael G. Stapp and Jason McClitis. *See* Doc. 107-1 (copy of September 2022 Memorandum). The first page of the Memorandum contains the logo of the Blake Uhlig, PA law firm and the IBB. It identifies Mr. Stapp as "GC" and Mr. McClitis as "AGC." The papers submitted with the government's motion identify Blake Uhlig as IBB's outside General Counsel. And, the court infers, the "GC" designation behind Mr. Stapp's name identifies him as IBB's General Counsel. Likewise, the "AGC" identifies Mr. McClitis as the union's Assistant General Counsel.

The government represents that IBB's Vice President introduced the September 2022 Memorandum on May 30, 2023, "during the Article 17 proceeding[,]" an internal IBB tribunal convened to consider disciplinary measures. Doc. 107 at 2. About two weeks later, IBB's acting President "filed an affidavit under oath in the federal court [civil litigation known as *IBB v. Baca*, No. 23-2250-EFM-TJJ, Doc. 36-1 at 2–3 (D. Kan. June 16, 2023)]." *Id.* at 3. The acting President's affidavit asserted that a "majority of the [IBB's] Executive Council agreed that we would waive any claim of privilege" protecting this Memorandum. *Id.* at 3. Later, on an

unspecified date, the "Government thereafter received a copy of the September 2022 Memorandum." *Id.* Neither the IBB nor the government challenges these assertions.

Thus, IBB concedes that it long ago forfeited any privilege that once applied to the September 2022 Memorandum. *See* Doc. 122 at 11. But it urges the court to confine the scope of its waiver to the Memorandum's "four corners[.]" *Id.* As already explained, this request doesn't comport with prevailing law. IBB waived its privilege for this communication intentionally, meaning that either Fed. R. Evid. 502(a) or the Circuit's voluntary disclosure principles apply. [3] *See* Fed. R. Evid. 502(a) (providing that when a party intentionally waives its attorney-client privilege, "the waiver extends to an undisclosed communication" when "the disclosed and undisclosed communications concern the same subject matter" and "they ought in fairness to be disclosed together"); *see also Burke*, 935 F.3d at 1023 ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." (quotation cleaned up)). Under either approach, the governing law waives the privilege beyond the September 2022 Memorandum itself to reach other same-subject-matter communications. *See Rains v. Westminster College*, 627 F. Supp. 3d 1267, 1278 (D. Utah 2022) (applying Rule

---

[3] The court's uncertain whether Rule 502(a) would apply to the September 2022 Memorandum because it lacks sufficient facts to determine when IBB forfeited the privilege protecting that Memorandum. IBB's filing explains how the Memorandum was handled, noting that first it was presented to an internal IBB tribunal called the "Article 17 Committee." *See* Doc. 122 at 6–7. Later, when related civil litigation commenced before our court, an IBB Vice-President prepared a declaration. The September 2022 Memorandum was attached to this declaration and submitted as part of that federal civil case. *Id.* at 9. The court doesn't know who participated in the Article 17 proceeding. And so, the court can't discern whether IBB first forfeited its attorney-client privilege over this Memorandum by: (a) using it in the Article 17 proceeding; or (b) submitting it to our court as part of the civil litigation. This question's outcome could determine whether Rule 502 applies because, by its terms, this rule applies to disclosures "made in a federal proceeding or to a federal office or agency." Fed. R. Evid. 502(a). But, as the court explains above, IBB's interpretation of the waiver's scope doesn't square with either Rule 502 or our Circuit's voluntary disclosure principles. So, the result remains the same under either analysis.

502(a) same-subject-matter and fairness principles to disclosure outside scope of federal proceeding because "the rule provides useful guidance for considering whether this first disclosure . . . operated as a subject matter waiver"). And so, IBB's "four corners" argument is unavailing.

Instead, the court determines the scope of IBB's privilege waiver by using the subject matter of the Memorandum. It considers the Memorandum's stated purpose and context. Attorney Stapp, the Memorandum's author, specified the legal advice he sought to provide at the Memorandum's outset:

> I believe this memorandum should aid you as you decide on recommendations to President Jones regarding the various expense reporting and reimbursement issues discussed on September 13, 2022. Please consult with me and/or AGC McClitis regarding specific recommendations before you submit those to President Jones.
>
> This memorandum addresses the subject of the salary, benefits, and other expenses that a union is permitted to pay its officers and employees under the LMRDA and other applicable laws. Please note that while the Title II LMRDA reporting requirements are also briefly addressed, a full discussion of those requirements is beyond the scope of this memorandum.

Doc. 107-1 at 1. Also, Attorney Stapp concluded the Memorandum by identifying its most important take away: "it is in the best interest of the IBB for the International President to recommend and IEC to adopt a clear, concise and comprehensive 'Expense Policy.'" *Id.* at 15. The court derives from these explicit statements of purpose that the Memorandum's subject matters include: the "expense reporting and reimbursement issues discussed on September 13, 2022[,]" the salary, benefits, and other expenses that a union is permitted to pay its officers and employees" under the law, and any "Expense Policy" that the IEC may have adopted. So, the scope of IBB's waiver premised on its disclosure of the September 2022 Memorandum falls within those subject-matter parameters—but it reaches no further.

### ii. Communications engaging a forensic surveillance firm

Next up are communications about IBB's engagement of a forensic surveillance firm named Mandiant. The government asserts that IBB has waived its attorney-client privilege over six memoranda where Attorney McClitis was—using the terminology of IBB's privilege log—one of the "Participants." *See* Doc. 107-8. This alleged waiver occurred when IBB "provided the grand jury with attorney-client emails concerning unauthorized surveillance tending to incriminate JONES, CREEDEN, [and] Defendant McMANAMON." Doc. 107 at 17. The government asserts that the "release of those emails demonstrates that the appropriate scope of the Boilermakers Union's waiver of privilege should transcend generalized memoranda and reach . . . the specific allegations within the Indictment." *Id.*

IBB responds, explaining that it asserts no privilege over "the engage[ment] of the surveillance firm[.]" Doc. 122 at 11. But IBB also argues that the "scope of any waiver" attendant with the production of the surveillance firm emails "is limited to those documents already produced." *Id.* So, it seems that IBB contends the emails weren't privileged or, alternatively, if privileged, then the scope of the waiver is exceedingly narrow. Before addressing scope, the court begins with the threshold question: Were the communications about IBB's engagement of a forensic surveillance firm protected by attorney-client privilege?

The Tenth Circuit defines attorney-client privilege as protecting "confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor." *In re Grand Jury Proc.*, 616 F.3d 1172, 1182 (10th Cir. 2010) (quotation cleaned up). The Circuit clarifies, however, that simply because an attorney participates in a communication that "does not automatically render the communication subject to the attorney-client privilege[.]" *Id.* (internal quotation marks and citation omitted). Instead, "the communication between a lawyer and client must relate to legal advice or strategy

sought by the client[.]" *Id.* (internal quotation marks and citation omitted).  It's clear.
"Underlying *facts* are not protected by the privilege."  *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684-JWL, 2015 WL 11121850, at *3 (D. Kan. June 25, 2015) (emphasis in original) (quotation cleaned up).  Nor is "information concerning the *activities of the attorney*." *Id.* (emphasis in original) (quotation cleaned up).  In a nutshell, to qualify as a protected communication, a communication must "involve[] the exchange of information to effectuate the giving or receiving of legal advice" such that it possesses "legal substance."  *Id.*

The government submitted the disclosed forensic surveillance emails as part of their abrogation motion, and the court has reviewed them.  *See* Doc. 107-3.  The emails primarily contain descriptions of underlying facts and attorney activities—not legal advice.  *See, e.g.*, *id.* at 23 (Attorney McClitis outlining his role as go-between in having IBB sign an amendment to Mandiant's Statement of Work): *id.* (Attorney McClitis recounting when and to whom he provided downloaded forensic report); *id.* at 26 (Attorney McClitis explaining his attempts to access Mandiant's portal).  But the email chain arguably includes some legal advice on one subject—securing and maintaining privilege over the Mandiant report.  For instance, on June 16, 2023, Attorney McClitis wrote to IBB about the draft report, saying:  "The version of the report . . . is a draft version and it is privileged so I would suggest it remain privileged (at the very least—I would strongly suggest we discuss before anything is disseminated from the draft report)." *Id.* at 6.  Because Attorney McClitis provided this guidance in his capacity as a legal advisor, attorney-client privilege protects that email.  And IBB's disclosure of this attorney-client communication waives attorney-client privilege over other communications that "concern the same subject matter" and "ought in fairness be considered together" with these emails.  Fed. R. Evid. 502(a).

Practically speaking, the next step requires the court to determine whether any of the six memoranda concern that same subject matter and, if so, whether fairness dictates those memoranda warrant consideration alongside the emails.  To discharge this responsibility, the court could review the six memoranda in camera.  Indeed, IBB offered as much at the hearing.  But there's no pending request requiring IBB to produce those six memoranda.  And the court doesn't know whether the government remains interested in their production, now that the waiver's scope is clear.  The court thus defines the scope of IBB's abrogation of privilege and leaves it there—at least for now.

The court has completed its review of IBB's attorney-client privilege waiver.  The court has outlined the parameters of the waiver based on the September 2022 Memorandum and the emails about the forensic surveillance firm.  With no pending formal production mechanism in place, the court goes no further.  The government may choose whether to set any such mechanism in motion.  Should the government choose to do so, the court reiterates that any future production request remains subject to the *Nixon* factors:  relevancy, admissibility, and specificity.  *See United States v. Gonzalez–Acosta*, 989 F.2d 384, 389 (10th Cir. 1993) ("[T]he movant must show that the subpoenaed document was relevant, admissible, and specific."); *see also United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) (affirming district court's suppression of a subpoena under Rule 17(c) where defendant failed to show specificity, though defendant arguably established relevance and admissibility).

The court turns next to the other privilege issue raised by the government in its first Supplement:  defendants' attorney-client privilege over personal-attorney communications residing on IBB's email system.

**B.  Did defendants here waive their attorney-client privilege by sending, receiving, or storing communications with their personal attorneys on IBB's email system?**

15

The government contends that defendants waived the attorney-client privilege protecting communications with their personal counsel by using IBB's email system to communicate with those attorneys. As one would suspect, this issue isn't one of first impression. Indeed, it has surfaced many times since email became a prominent part of American life. *See generally* Epstein, § 3.IX.E (Chapter E, "Personal Use of Employer's Computer System—Is It Privilege Protected?"). And closer to home, our court reached this very question in a criminal case more than a decade ago. *United States v. Hudson*, No. 13-20063-01-JWL, 2013 WL 4768084 (D. Kan. Sept. 5, 2013).

In *Hudson*, a criminal defendant asserted that "certain documents on his workplace computer [at a local school district were] protected by" the attorney-client privilege, among other privileges. *Id.* at *9. The government disagreed, arguing—as here—that defendant waived his privilege by storing the documents "on his workplace computer." *Id.* Judge Lungstrum resolved this dispute by applying the four-factor test adopted by *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005). These four factors ask the following questions:

> (1) does the corporation [employer] maintain a policy banning personal use or other objectionable use, (2) does the company monitor the use of the employee's computer or email, (3) do third parties have a right of access to the computer or emails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*Hudson*, 2013 WL 4768084, at *9 (citing *Asia Global*, 322 B.R. at 257). Judge Lungstrum found that *Hudson*'s defendant held a reasonable expectation of privacy in the privileged documents he had stored on his workplace computer. He so concluded because: (1) his employer didn't prohibit personal use of its technology equipment, and the government hadn't shown that defendant's use of his workplace computer system amounted to "objectionable use" of that system; and (2) the government didn't establish that the employer, in practice, monitored

employees' personal use of the employer's email system or computers. *Id. Hudson*'s outcome comported with the "majority view" that employees "do not waive the privilege in material on their work computer simply because the employer can monitor their communications." *Id.*

*Hudson*'s approach to this problem tracks the one suggested by the Epstein treatise. It reasons:

> The Supreme Court has suggested than an employee has a reasonable expectation of privacy in his office, desk, and files. That reasonable expectation may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. In light of the variety of work environments, the Supreme Court suggested that whether the employee has a reasonable expectation of privacy must be decided on a case-by-case basis.

Epstein, § 3.IX.E (citing *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987)). This case-by-case approach is the right one to use, Epstein concludes, because "[n]othing is more common than for employees to use an employer's e-mail for personal communications." *Id.*

The court finds *Hudson* highly persuasive. It comports with the weight of authority and honors the principles identified by the Supreme Court in *O'Connor*. Unfortunately, trying to apply the *Hudson* test in this case yields more questions than answers. That's so because the record here contains none of the information *Hudson* deemed important. And the absence of a request for specific documents has deprived defendants of an opportunity to make a showing on the four *Hudson* factors. For instance, the court doesn't know whether IBB maintained a policy banning personal use of its computers or email. It doesn't know whether IBB monitored employee use of its computers or email system. Nothing informs the court whether "third parties have a right of access to" IBB's computers (or, more precisely, the ones used by defendants). And the court doesn't know whether IBB notified the pertinent employees—defendants here— about any use and monitoring policies (or whether defendants otherwise were aware of them). Lacking information essential to the fact-finding required by these decisive factors, the court

must deny this aspect of the government's motion. The court does not abrogate, at least not now (on this record), any privilege defendants hold over communications with their individual attorneys sent, received, or stored on IBB's email system. This ruling doesn't forever foreclose the issue, however. If the government can support its request with a properly supported record, the court will return to the issue anew.

### *Conclusion*

The court grants in part the government's motion to abrogate privilege and defines the scope of IBB's waiver. It also denies significant portions of the motion, as explained in this Order.

**THEREFORE, THE COURT** grants in part and denies in part the United States' Motion for Abrogation of Attorney-Client Privilege by Waiver (Doc. 107).

**IT IS SO ORDERED.**

**Dated this 28th day of October, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
