## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 24-20070-DDC |
| NEWTON JONES (01),<br>WILLIAM CREEDEN (02),<br>KATERYNA JONES (03),<br>WARREN FAIRLEY (04),<br>LAWRENCE McMANAMON (05),<br>KATHY STAPP (06), and<br>CULLEN JONES (07), | |
| Defendants. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE CERTAIN EXPERT TESTIMONY

Defendants Newton Jones, William Creeden, Kateryna Jones, Warren Fairley, Lawrence McManamon, and Cullen Jones ("Defendants"), by and through their undersigned counsel, hereby oppose the Government's "Response in Opposition to Defendant's Expert Designations and Motion in Limine to Preclude Certain Expert Testimony" (Doc. 212). In short, the opinions of all four of Defendants' experts are reliable, relevant, and necessary to assist the jury in grappling with the multitude of complex topics raised in the sweeping 65-page, 57-count Indictment.

## LEGAL STANDARD[1]

The Court has broad discretion when deciding whether to admit or exclude expert testimony. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1498 (10th Cir. 1996) (quoting *Orth v.*

---

[1] Defendants' quote largely from the legal standard in *United States v. Adams*, 14-40005-DDC, 2017 WL 607381, at *4 (D. Kan. Feb. 15, 2017) (Crabtree, J.), without further attribution.

*Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)). The admissibility of expert testimony is governed by Federal Rule of Evidence 702. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [the proponent demonstrates to the court that it is more likely than not that]:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court must apply a two-part test to determine admissibility under this rule. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, it must decide "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702)). Second, the Court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id.* (quoting *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (further citations omitted)).

"'[R]ejection of expert testimony is the exception rather than the rule.'" *United States v. Reulet*, 14-40005-DDC, 2015 WL 7776876, at \*2 (D. Kan. Dec. 2, 2015) (quoting Fed. R. Evid. 702 advisory committee's note to 200 amendments). Challenges are usually better left to "'cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).

KC 25512732.3

## ARGUMENT

I.    **Jeffrey P. Gaia's Opinions Are Reliable and Relevant to the Bank of Labor Allegations.**[2]

    A.    **Mr. Gaia's Methodology Is Reliable.**

In assessing reliability, the Court first looks to the four non-exhaustive factors listed in *Daubert*: "(1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the theory's general acceptance in the scientific community." *Adams*, 2017 WL 607381, at *4. However, "testimony need not conform to all of the factors listed in *Daubert* to be admissible," given that some experts may appropriately base their opinions "upon personal knowledge or experience," as Mr. Gaia has done here. *Reulet*, 2015 WL 7776876, at *2, *10 (rejecting a "blanket argument" to exclude experts just because they didn't meet the factors).

The Government's main challenge to Mr. Gaia is no different from the improper "blanket argument" this Court rejected in *Reulet*. The Government nominally lists the factors but then sidesteps any meaningful analysis, opting instead to claim in conclusory fashion that Gaia is "disguised as an expert" because his opinions amount to a "speculative" "reimagining" of how the Government views the facts. (Doc. 212 at 4-5.)  Needless to say, these arguments go to weight, not admissibility. *See id.* at *11 (rejecting a similar argument that an expert's methods were "speculative and unreliable" as going "to the weight of the evidence and not admissibility").

Turning, as this Court has instructed, to Mr. Gaia's "'principles and methodology, not the conclusions that they generate,'" *Adams*, 2017 WL 607381, at *4 (quoting *Daubert*, 509 U.S. at 594-95), Mr. Gaia based his opinions "on direct testimony of certain individuals, documents and

---

[2] The Government does not contest the qualifications of Defendants' experts, only the reliability and relevance of their opinions. All of the experts' qualifications are supported by the curricula vitae attached to their reports, which are attached hereto as Exhibits 1-4.

KC 25512732.3

records produced in this case, as well as [his] direct professional experience" from 29 years in the banking industry. (Ex. 1, Gaia Rep. at 3.)  He reviewed, for example, the Grand Jury testimony of the Government's lead witnesses, including the DOL's lead investigator, Jeremy Newman, and IBB Vice President John Fulz; FBI 302 reports detailing the proffered testimony of the current Bank of Labor president, Robert McCall, and a board member with personal knowledge, Rick Worner; and bank examination reports from the FDIC and the State of Kansas.  (*Id.* at 26-27.)

The Government has not articulated, and cannot articulate, any valid basis to challenge Mr. Gaia's methods. It first claims he should have stated in his report "whether those records were the totality of records he relied on" or "whether other records aided his opinions."  (Doc. 212 at 5.) However, the Government fails to cite any authority to support this argument or explain why it matters. Neither *Daubert* nor Fed. R. Cr. P. 16 requires a defendant to disclose *all* the facts or data relied on by an expert. *Cf.* Fed. R. Civ. P. 26(a)(2)(B)(ii). An opinion need only be "based on *sufficient* facts or data" to support it.[3] Fed. R. Evid. 702(b) (emphasis added).

To support his opinions, Mr. Gaia analyzes the information gleaned from the documents listed at the end of his report in 21 pages using charts, graphs, and 49 footnotes with citations. (*E.g.*, *id.* at 18-21.)  Thus, the Government's claim that Mr. Gaia "never provides a basis for his opinions" is plainly inaccurate. (Doc. 212 at 5.)  The same is true of its argument that he does not explain "how his experience in the banking industry assisted his analysis of the evidence in this case."  (*Id.*)  Obviously, Mr. Gaia's decades-long tenure in the banking industry informed his analysis, and he also explicitly discusses how his shifting responsibilities as a Chairman and President of a bank mirrored those of Defendants Newton Jones and William Creeden. (Gaia Rep. at 3.)  Mr. Gaia's methodology is sound, and the Government has no basis to challenge it.

---

[3] The documents relied on are also listed on pages 26-27 of the report and available upon request.

KC 25512732.3

### B.    Mr. Gaia's Opinions Are Relevant.

Evidence is relevant under *Daubert* if "'it would tend to aid the trier of fact in [its] search for truth.'" *Reulet*, 2015 WL 7776876, at *2 (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)). Mr. Gaia's testimony will aid the jury in understanding the truth about the five BOL-related issues referenced by the Government in its motion, i.e., whether Defendants Newton Jones and William Creeden ("Jones and Creeden") improperly (1) extended unauthorized loans to the BOL without consulting the IBB Executive Council or Board of Trustees; (2) leveraged employment positions using the IBB's partial ownership of the BOL; (3) demanded full-time employment; (4) performed no work despite collecting salaries; and (5) received retirement payments without being eligible. (Doc. 212 at 3 (citing ¶¶ 40-44 of the Indictment).)  Mr. Gaia's testimony is also relevant to the Government's allegations that the loans were "not necessary to achieve the union's interests or for its benefit" as part of the RICO charge (Doc. 1 at 24-25, Indictment Count 1, ¶ 40) and that they amounted to embezzlement (*id.* at 44, Count 48).

Mr. Gaia summarizes his opinions on page five of his report. To boil down the first seven bullet points, the BOL was a "slow-growth bank, with an uneven earnings history" until it brought in Jones and Creeden, who devised and implemented a new growth strategy, rebranded the BOL as a national franchise, and developed a professional operations management team, all of which had positive long-term impacts for the BOL. This is plainly relevant to helping the jury understand what their jobs were and to contest the Government's allegation that Defendants "performed no work."  Its argument that Gaia improperly "merged" the roles of Chairman with CEO and Board Member with VP is inaccurate and clearly goes to weight, not admissibility.

The Government also misconstrues the rule against expert testimony about the "credibility" of other witnesses. That rule provides that an expert cannot vouch for another witness or tell the

KC 25512732.3

jury not to *believe* another witness about *facts*, not that an expert cannot challenge the *reliability* of another witness's *opinion*. *See United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) (quoting *United States v. Gonzalez–Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997) ("An expert's opinion that another witness is *lying or telling the truth* is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion.") (emphasis added)); Black's Law Dictionary (defining "credibility" as "[t]he quality that makes something (as a witness or some evidence) worthy of *belief*") (emphasis added). If experts could not comment on the reliability of another person's opinions, then they certainly could not comment on the "reliability of eyewitness identifications," which the Tenth Circuit has repeatedly allowed. *See, e.g.*, *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124 (10th Cir. 2006).

Thus, nothing prohibits Mr. Gaia from challenging the reliability of Megan Elder's opinion that Defendant Newton Jones had a "no show job" (even assuming that proposed testimony were admissible—it isn't). Likewise, Mr. Gaia's observations that BOL President Robert McCall could have reported any concerns he may have had to internal auditors or regulators, objected directly to Mr. Jones, or resigned—but did none of these things—are not aimed at whether Mr. McCall has the facts wrong, but whether his opinion is reliable. This is relevant and permissible. The absence of any report from Mr. McCall, moreover, is evidence that Defendants lacked the requisite fraudulent intent to embezzle or the knowledge and willfulness required to form a conspiracy to commit wire fraud. *See United States v. Hart*, 417 F. Supp. 1314, 1317 (S.D. Iowa 1976) (fraudulent intent required for union embezzlement); Eleventh Circuit Pattern Jury Instructions, § O54 (willfulness and knowledge required for wire fraud conspiracy).

Finally, the fact that the *IBB* approval process is outside the scope of Mr. Gaia's report does not mean his opinion about the loan transactions is irrelevant. (Ex. 1, Gaia Rep. at 15-16.) The Government has apparently forgotten it seeks to prove that the loans were "not necessary to achieve the union's interests or for its benefit." (Doc. 1 at 24-25, Indictment Count 1, ¶ 40.) The IBB owns a controlling interest in the BOL, so obviously maintaining its health serves the IBB's interests and works to its benefit. (Ex. 1, Gaia Rep. at 4 & n.3.) Mr. Gaia also specifically explains in his report that the BOL used the loan proceeds to satisfy increased capital-base requirements, that the FDIC viewed the infusion "very favorably," and that this resulted in an increased equity position and dividend payments for the IBB. (*Id.* at 15-16.) This goes to show an intended and actual benefit to the IBB. Accordingly, this and all the other topics in Mr. Gaia's report are relevant to the issues in this case.

## II.     Dr. David Macpherson's Proposed Testimony Is Reliable and Relevant.

Citing Fed. R. Evid. 702, the Government moves to exclude the testimony of David Macpherson for the following reasons: (i) his methodology is insufficient and unreliable; and (ii) his opinions are not relevant to the trier of fact. (Doc. 212 at 7-9). Because the Government's argument fails under both (i) and (ii), David Macpherson should be permitted to provide testimony of his opinions to the jury, which will aid in the jury's understanding of the element of each Defendant's intent to defraud.

(i)     The Government claims Macpherson's methodology is insufficient and unreliable because his "repot [sic] lacks reference to records from this case or specific records of the Boilermakers Union."    (Doc. 212 at 7.) Perhaps confused, the Government's motion argues unionstats.com is unreliable, but the data aggregated on the website is verbatim copied from the source that the Government itself treats as the most valid: the Bureau of Labor Statistics. As the Government should be aware, those statistics necessarily include data from IBB union members.

7

Unionstats.com relies on that most-valid data, as accumulated by the Government, in this area. Unionstats.com then reaggregates and organizes this data for additional subgroups of data, including sectors involving IBB trades. The methodology used by unionstats.com is also the exact same as the Government's standards employed by the Bureau of Labor Statistics. Further, David Machperson is the author and creator of unionstats.com itself. If there is any concern the Government has with its statistical validity, the appropriate time to ask him would be during cross-examination at trial.

The Government also argues that Dr. Macpherson's sources are not "from this [specific] case," so they cannot be relevant. (Doc. 212 at 7). Experts frequently rely on sources from outside of the case itself, which often includes sources that are reasonably relied upon in that field of expertise. Here, the sources Macpherson cites are generally accepted and relied upon in his field and recognized for formulating statistical opinions in this case. The Government's motion further argues Opinion 1 is unsupported simply because *two* of ten sources are from the 1980's and a third source includes Norwegian wage comparisons, rather than the United States. The best evidence of the validity of these sources is that they have been repeatedly used to formulate opinions by experts like the one rendered here—for decades. Additionally, several sources are frequently cited for expert opinions in this field, including *Freeman and Medoff* (1981), which received 34 citations since 2022. Likewise, *Gaston and Trefler* (1994), which received 15 citations since 2022. This argument is also unavailing because these sources are the most widely accepted in this field, as Dr. Macpherson's testimony at trial will confirm.

Last, the Government's argument concerning disqualifications again misses the mark. The Government's motion argues Macpherson's purported disqualifications in "five" cases from more than ten years ago render him disqualified in this case. (Doc. 212 at 9). Notably, the Government

states there are five instances, but only cites three cases. But the difference between five and three is irrelevant because the Government's motion fails to mention the forty instances in which he was permitted to provide expert testimony. (See Ex. 5, Dr. Macpherson Trial Testimony 2000-2025.)

(ii)    The Government claims Dr. Macperson's opinions are not relevant to the trier of fact because it "is not required to prove any particular theft amount or particular amount of loss to the union." (Doc. 212 at 8). Caught in a Cartesian circle, the *Government's case theory necessarily assumes that every single expenditure (and even Defendants' salaries and benefits themselves) were "embezzlement"* (see Docs. 1, 212 at 8), but the statistical analysis Dr. Macpherson provides confirms that across labor unions, the IBB was better at maintaining wages and membership at rates higher than peer unions. In short, his testimony defeats the fundamentally flawed assumption the Government has built into its case. Moreover, Dr. Macpherson's proposed testimony that union membership in the manufacturing sector declined nationwide—and more so than the IBB's membership over Defendants' tenure—will contradict Brian Opland's opinion that Defendants were responsible for the decline in IBB membership.[4]

The Government's motion fails to appreciate that Dr. Macpherson's testimony is directly relevant to the reasonableness of the actions of the Defendants, including the reasonableness of their expenditures in areas like the historic preservation department where Cullen Jones worked, which promoted the union and worked to retain and recruit members. The department still operates and employs people to this day. The IBB's comparative health for union density, wage premiums, and export markets directly refutes the Government's broad conclusion that the Defendants all knowingly and intentionally conspired to commit fraud (by receiving a salary and submitting

---

[4] Defendants are willing to provide the relevant portion of Mr. Opland's Grand Jury testimony *in camera* or under seal, should the Court so request.

expenses for items related to their full time jobs). Therefore, this testimony is relevant to each Defendant's intent to defraud. The element of intent is a "dead giveaway" that Macpherson's statistical analysis is, in fact, relevant. (Doc. 212 at 8). The Government's motion to exclude the testimony of David Macpherson should be denied.

### III.    Dr. Jamie K. McCallum's Opinions Are Reliable and Relevant.

#### A.    Dr. McCallum's Methodology Is Reliable.

Again, in assessing reliability, the Court analyzes the expert's "'principles and methodology, not the conclusions that they generate.'" *Adams*, 2017 WL 607381, at *4 (quoting *Daubert*, 509 U.S. at 594-95). Dr. McCallum bases his opinions on "the knowledge, skill, experience, training, and education discussed in [his] CV, gained through [his] work as a sociologist, and obtained in researching and preparing []his report." (Ex. 3, McCallum Rep. at 4.) This satisfies Fed. R. Evid. 702(a) (expert opinion may be based on "scientific, technical, or other specialized knowledge"). Throughout his report, Dr. McCallum provides 51 footnotes with citations to facts and authorities relied upon, many of which are peer-reviewed sociological publications and studies, and some of which are based on his own widely lauded research. This satisfies Fed. R. Evid. 702(b)-(c) ("sufficient facts or data" and "reliable principles and methods") and at least three of the four *Daubert* factors: "(1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; . . . and (4) the theory's general acceptance in the scientific community." *Adams*, 2017 WL 607381, at *4. For each of his opinions, Dr. McCallum sets forth the background principles underpinning his analysis and explains how they apply to the relevant facts. This satisfies Fed. R. Evid. 702(d) (reliable application of "the principles and methods to the facts of the case"). All *Daubert* requirements are satisfied.

The Government fails to articulate why it believes this is insufficient and fails to cite *any* authority to support its arguments about Dr. McCallum. (Doc. 212 at 10-12 (no citations to any authority). The motion can and should be denied for that reason alone. *See, e.g.*, *Rezac Livestock Comm'n Co., Inc. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1174 (D. Kan. 2017) (Crabtree, J.) (collecting cases and denying a motion to dismiss for lack of supporting authority or adequate briefing). Nonetheless, Defendants will respond to what can be discerned.

First, the Government provides no basis for its claim that Dr. McCallum's opinions are "self-serving" or any explanation for why that would result in exclusion under *Daubert* even if it were true. (Doc. 212 at 10-11.)  It isn't, but again, this goes to weight, not admissibility. So does the Government's argument that the "modest[y]" of academic literature about how many unions have historic preservation departments means his conclusions are somehow "unfounded."  (*Id.* at 11.)  *See Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996) (so "long as a logical basis exists for an expert's opinion the weaknesses in the underpinnings of the opinion [if any] go to the weight and not the admissibility of the testimony."), *abrogated on other grounds by Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Likewise, the length of Dr. McCallum's discussion of financial reporting has no bearing on whether his conclusion is "unfounded" or "self-serving."  (*Id.*)  The "two sentences" in his report simply pack a punch that the Government does not like: that he reviewed the IBB Executive Council's minutes from a ten-year period, observed that they contained financial reports with specific line items for travel expenditures (along with virtually every other category of allegedly unlawful spending at issue in this case), and concluded that the travel expenditures were transparently reported to the Executive Council during its regular financial reporting process. (Ex.

11

KC 25512732.3

3, McCallum Rep. at 16.)  Plainly, the Government's complaint is not about Dr. McCallum's methods but about how much weight the jury should give his conclusions.

Finally, the Government does not explain how it could be considered "speculative" or "unreliable" for Dr. McCallum to deduce from several examples that the IBB produced positive results for its members during Defendants' tenure. (Doc. 212 at 10.)  *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (per curiam) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 855–56 (Fed. Cir. 2010) ("The existence of other facts . . . does not mean that the facts used failed to meet the minimum standards of relevance or reliability."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) (holding that an expert's failure to include all relevant flight-test variables goes to weight, not admissibility); *Corzo v. Brown Univ.*, No. 22 C 125, 2025 WL 2753400, at *7 (N.D. Ill. Sept. 29, 2025) (noting that whether the expert "used the wrong data, or even incorrect or incomplete data, goes to the weight to be afforded to his model") (collecting cases)).  Accordingly, Dr. McCallum's methodology is reliable, and the Government has no basis to challenge it.

### B.  Dr. McCallum's Opinions Are Relevant.

The Government's relevance arguments about Dr. McCallum are largely fallacious. It first argues that evidence of whether the IBB was a "successful or meritorious representative of its members" won't be part of its case in chief, so that must mean it's irrelevant. (Doc. 212 at 11.) However, the Government has alleged that several of Defendants "performed little or no productive work."  (Doc. 1 at 26 ¶ 46, 34 ¶ 2, 35 ¶ 2.)  To contest that allegation, Defendants will adduce evidence of the IBB's success generally during their tenure as leaders and employees of the organization, along with evidence linking Defendants' specific actions to those successes. (*See,*

KC 25512732.3

*e.g.*, Ex. 3, McCallum Rep. at 10-12 (discussing the benefits provided to members by the BOL, which was driven Jones and Creeden as discussed above).)

The Indictment also alleges Defendants' overseas travel was "not necessary to achieve the union's interests or for its benefit." (Doc. 1 at 20 ¶ 27.) To contest that allegation, Dr. McCallum's testimony will plainly be relevant. Dr. McCallum notes that "[t]he IBB's participation in networks such as IndustriALL is increasingly necessary, beneficial, and aligned with the globalized nature of the industries in which its members work," and as an example, he describes how these groups "strengthened the union's bargaining position" and "helped the Boilermakers secure a more favorable outcome for their members" in a dispute with a Missouri plant. (Ex. 3, McCallum Rep. at 21-22.)

The Government claims Dr. McCallum's discussion of "political issues" is irrelevant and will confuse the jury. (Doc. 212 at 11-12.) This argument is so vague that it hardly engenders a response, but Defendants will assume the Government is talking about Dr. McCallum's explanation of the reasons for the overall decline in unionization. (Ex. 3, McCallum Rep. at 6-8.) As discussed above, this is relevant to contesting Brian Opland's opinion that Defendants were responsible for the decline in IBB membership. Surely, if the Government is allowed to adduce that testimony at trial, the jury will not be confused about why Dr. McCallum is discussing the reason membership declined for all American unions.

The Government's next argument, that Dr. McCallum's opinion "does nothing to aid the jury in understanding whether these defendants embezzled money by lavish international travel in the charged counts that lacked benefit to the Boilermakers' Union" is circular, incorrect, and goes to weight, not admissibility. (Doc. 212 at 12.) This argument is circular because it assumes its own conclusion: there was no benefit, so Dr. McCallum's opinion must be irrelevant to whether

there was a benefit. But Dr. McCallum's testimony will *demonstrate* the intended and actual benefit to the IBB from the international travel. This is relevant to contesting the "no benefit" argument and the requisite "fraudulent intent."[5] *Hart*, 417 F. Supp. at 1317.

Finally, the Government mischaracterizes its own expert's opinion. Ms. Stojak does not "merely . . . compare the Boilermakers Union composite spending on international travel with those of other similar unions." (Doc. 212 at 12.) She attempts to do that, but she also makes unreliable claims about what the comparison shows, i.e., that the IBB's expenditures were atypical, unnecessary, lacking a union benefit, and "a prominent indicator of embezzlement." (Doc. 175-1 at 9.) In drawing these conclusions, Ms. Stojak conducts no analysis whatsoever of the variations in *need* for union travel among the unions she compared. (Ex. 3, McCallum Rep. at 27-28.) She also uses a metric (per-member spending) that artificially inflates the IBB's numbers when compared to larger unions, given that "most trips are taken by a small leadership/staff subset regardless of union size." (*Id.* at 27.) Cross-examination alone would be inadequate given Ms. Stojak's apparent lack of knowledge on these two subjects, neither of which would be within the common knowledge of jurors. Everything in Dr. McCallum's report will be relevant, helpful, and necessary to assist the jury in confronting the Government's misunderstandings and mischaracterizations of the facts and issues in this case.

## IV.    Daniel J. Welsh's Proposed Testimony Is Reliable and Relevant.

Defendants' forensic accounting expert, Daniel J. Welsh, is qualified by specialized knowledge, applies reliable methods to sufficient facts and data, and will offer opinions that will assist the trier of fact. The Tenth Circuit's standards confirm that the Court's gatekeeping inquiry

---

[5] The Government also mischaracterizes Dr. McCallum's opinion. His opinion is not that "globalization can harness the power of the world's population and resources" (Doc. 212 at 12), but that unions must globalize because employers have globalized. (Ex. 3, McCallum Rep. 19; *see generally id.* at 6, 18-27).

KC 25512732.3

is focused on reliability and relevance, not on the weight or persuasiveness of the conclusions, which are matters for cross-examination and competing proof.

First, Mr. Welsh's qualifications satisfy Rule 702. The record shows that Mr. Welsh has extensive training and experience in forensic accounting, including over forty-eight years of accounting experience including work as an auditor, income tax return planner and preparer, and business consultant. He earned a Master of Science in Accountancy and passed all examinations and continuing education requirements to be a Certified Public Accountant. In the last five years, Mr. Welsh has either been deposed or testified as an expert witness in fifteen matters. The Tenth Circuit recognizes that "expert qualification" is a flexible inquiry and that practical experience may be as probative as academic credentials in establishing specialized knowledge, with any alleged gaps going to weight, not admissibility. *See Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (explaining that the court's role is to ensure the expert is qualified and the testimony reliable and helpful, while adversarial testing addresses weaknesses).

Second, Mr. Welsh's methodology is reliable. He employed standard forensic accounting techniques in making certain observations, including: (a) identification and collection of relevant financial records; (b) review of the testing of internal controls and transaction-level tracing; and (c) review of the use of generally accepted audit procedures to detect anomalies and potential misstatements. Mr. Welsh's Opinion 1, for example, documents the accounting and auditing standards he relied upon to support his conclusions which are tied to sufficient facts and data, and are based on these recognized professional standards. (Ex. 4, Welsh Rep. at 3-4.) *See Nacchio*, 555 F.3d at 1241 (emphasizing the district court's discretion to assess whether the principles and methods are reliably applied to the facts and distinguishing admissibility from persuasiveness). The Government's criticism that "Welsh's testimony is affirmative expert testimony masquerading

KC 25512732.3

as rebuttal" does not render him unqualified or even assert that his methodology unreliable. *See Nacchio*, 555 F.3d at 1241. Further, whether or not his opinions rebut a particular witness, it is anticipated that in Defendants' case in chief his observations will be offered to buttress arguments that go to Defendants' intent and knowledge.

Third, the testimony is relevant and will assist the trier of fact. The expert's analysis addresses issues beyond the knowledge of lay jurors, including interpreting complex accounting records, and evaluating internal and external control applications under accepted forensic approaches. The Tenth Circuit requires a valid connection between the expert's specialized analysis and the issues to be decided. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (requiring that expert testimony be both reliable and relevant to assist the trier of fact). One of the issues in this prosecution will be whether the government can prove *mens rea* or fraudulent intent beyond a reasonable doubt. The expected testimony will assist the jury on this issue.

Mr. Welsh's testimony will assist the jury in understanding the facts, including the scope and nature of the audits conducted by Legacy Professionals. Contrary to the Government's assertion, Mr. Welsh's testimony is *not* geared to an accounting or tax fraud prosecution of Legacy Professionals. In fact, Mr. Welsh has no criticism of Legacy Professionals. Rather, Mr. Welsh will explain the work performed by Legacy Professionals, and specifically that Legacy reviewed Defendants' expenses treated by IBB as business expenses. As reflected in the Legacy audit working papers produced to Defendants by the Government, Defendants' expenses were regularly reviewed and found to be properly accounted for by IBB as business expenses. This is of particular assistance to the jury since it does not appear that Ms. Stojak reviewed the Legacy working papers. If Legacy uncovered a fact or questionable expense, further inquiry would have been undertaken

16

by the auditors. Mr. Welsh, after review of the working papers, will testify that no red flags were raised or brought to the attention of any of the Defendants. In short, it is expected that Mr. Welsh's expert testimony will be adduced to identify how the expenses, including travel expenses, were accounted for and treated and reviewed by Legacy. The payment of the expenses was done in an open manner, subject to periodic audits by Legacy Professionals. The Legacy audits noted the officer expenses, identified them, discussed the expenses in the work papers, and did not suggest any changes or concerns. Further, Mr. Welsh will identify the nature of the Legacy audits and whether any opinions were qualified within the meaning of that term in the industry. These observations from an experienced accountant will help illustrate that fraudulent intent cannot be proven beyond a reasonable doubt.

Of course, some of the underlying facts may be extracted from witnesses through cross-examination or other testimony, including the accounting records, Legacy audits, and representatives of Legacy. But, an expert in the field of accounting will assist the juror in understanding the facts and the application of generally accepted accounting and auditing principles to those facts.

To be clear, the proposed accounting expert will not be asked if a particular defendant acted knowingly. However, the observations of the accountant as to how the expenses were recorded, accounted for, or disclosed, and the review conducted by auditors will help illustrate that the expenses were in accord with generally accepted accounting principles. Accountants are frequently called upon to testify about the nature of an audit, including the opinions of auditors, accounting terms of art, or the meaning of financial reports and documents or inferences that can be drawn from them. *See United States v. Bhula,* 645 F.Supp.3d 1228 (D. New Mexico 2022) (forensic accounting and reconstruction of financial records is likely beyond the knowledge of average lay

jurors and therefore the jury would benefit from witness' expertise.). Certainly, the accounting for and reporting of expenses including international travel expenses is an issue the jury must consider when deciding the intent or good faith of a subject who incurs such expenses.

Finally, exclusion is unwarranted because the Defendants have shown by a preponderance that Rule 702 is satisfied. The court's gatekeeping function is not intended to replace the adversarial process; weak points in the expert's analysis are to be exposed through cross-examination and contrary evidence, not pretrial exclusion, where the expert is qualified, the methods are reliable, and the opinions are tied to the facts. *Conroy,* 707 F.3d at 1168. The Tenth Circuit caselaw underscores that the district court's role is to ensure a reliable application of sound methods to the case-specific facts, not to resolve the merits of competing expert views. *Nacchio,* 555 F.3d at 1241. The relevance requirement is satisfied where, as here, the testimony addresses complex matters beyond ordinary experience and bears directly on issues the jury must decide. *Rodriguez-Felix,* 450 F.3d at 1122.

Because Mr. Welsh's qualifications, methodology, and relevance to the issues in dispute comport with Tenth Circuit standards, the testimony is admissible. The Government's *Daubert* motion should be denied, and any objections go to weight, not admissibility.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the Government's Response in Opposition to Defendant's Expert Designations and Motion in Limine to Preclude Certain Expert Testimony (Doc. 212), find that Defendants have demonstrated that it is more likely than not that Rule 702(a)-(d)'s requirements are satisfied as to all four of Defendants' experts, and grant such other relief as the Court deems just and proper.

KC 25512732.3

Respectfully submitted,

SPENCER FANE LLP

/s/ *Patrick A. M<sup>c</sup>Inerney*
Patrick A. M<sup>c</sup>Inerney # 22561
Daniel M. Nelson KS Fed # 79203
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106-2140
Tele: 816-474-8100
Fax: 816-474-3216
pmcinerney@spencerfane.com
dnelson@spencerfane.com
Attorneys for Newton Jones

/s/ *Kurt Kerns*
Kurt P. Kerns # 15028
KERNS LAW GROUP
328 N. Main Street Wichita, KS 67202
Tele: 316-265-5511
kurtpkerns@aol.com

Federico Andino Reynal, *pro hac vice*
THE REYNAL LAW FIRM, PC
917 Franklin Street, Sixth Floor
Houston, TX 77002
Tele: 713-228-5900
areynal@frlaw.us
Attorneys for William Creeden

/s/ *Mark Molner*
Mark D. Molner # 24493
EVANS & MULLINIX, P.A.
7225 Renner Road, Suite 200
Shawnee, KS 66217
Tele: 913-962-8700
Fax: 913-962-8701
mmolner@emlawkc.com

John T. Davis, *pro hac vice*
KESSLERWILLIAMS LLC
1401 S. Brentwood Blvd., Suite 950
St. Louis, MO 63144
Tele: 314-455-5555
Fax: 314-727-2869
john.davis@kesslerwilliams.com
Attorneys for Kateryna Jones

19

/s/ *J.R. Hobbs*
James R. Hobbs KS Fed # 70169
Marilyn Keller # 15444
WYRSCH HOBBS & MIRAKIAN, P.C.
One Kansas City Place
1200 Main St., Suite 2110
Kansas City, Missouri 64105
Tele: 816-221-0080
Fax: 816-221-3280
jrhobbs@whmlaw.net
mbkeller@whmlaw.net
Attorneys for Warren Fairley

/s/ *Branden Smith*
Branden Smith # 22761
SMITH LEGAL, L.L.C.
719 Massachusetts Street, Suite 126
P.O. Box 1034
Lawrence, Kansas 66044
Tele: 785-856-0780
Fax:  785-856-0782 branden@smithlegalllc.com

Kevin M. Spellacy, *pro hac vice*
James Wooley, *pro hac vice*
Erin E. Hanson, *pro hac vice*
323 W. Lakeside Ave., Suite 200
Cleveland, OH 44113
Tele: 216-344-9220
Fax: 216-664-6999
kspellacy@spellacylaw.com
jwooley@spellacylaw.com
ehanson@mghslaw.com
Attorneys for Lawrence McManamon

/s/ *Kathleen Fisher Enyeart*
Jackson Hobbs # 28191
Kathleen Fisher Enyeart # 25203
Brody Sabor KS Fed # 79098
LATHROP GPM
2345 Grand Blvd., Suite 2200
Kansas City, Missouri 64108
Tele: 816-292-2000
Fax: 816-292-2001
jackson.hobbs@lathropgpm.com
kathleen.fisherenyeart@lathropgpm.com
brody.sabor@lathropgpm.com
Attorneys for Cullen Jones

20

KC 25512732.3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed on January 20, 2026, with the Clerk of the Court for delivery to interested parties.

/s/ Patrick A. McInerney
Attorney for Newton Jones

KC 25512732.3