# Exhibit 1

**Expert Report of Jeffrey P. Gaia**

*In the matter of:*

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**NEWTON JONES,**

**WILLIAM CREEDEN,**

**KATEREYNA (KATE) JONES,**

**WARREN FAIRLEY,**

**LAWRENCE McMANAMON,**

**KATHY STAPP, and**

**CULLEN JONES**

**Defendants**

**Criminal Case No. 2:24-cr-20070-DDC-TJJ**

**Report dated November 25, 2025**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ 2

PREFACE ........................................................................................................................... 3

SECTION I.  SUMMARY OF OPINIONS .......................................................................... 5

SECTION II.  THE ROLES OF NEWTON JONES AND WILLIAM CREEDEN ..................... 6

SECTION III.  THE CRITICISMS OF NEWTON JONES ...................................................... 8

SECTION IV.  JONES' AND CREEDEN'S POSITIVE IMPACT AT BOL ............................ 18

EXHIBIT (I)....................................................................................................................... 22

    General Summary: ......................................................................................................... 22

    Selected Professional Accomplishments: ...................................................................... 22

    Business Experience: ..................................................................................................... 22

EXHIBIT (II) ..................................................................................................................... 26

KC 25368576.1

## PREFACE

Spencer Fane, acting as counsel for Defendant Newton Jones ("Jones") in the above-referenced matter, and F. Andino Reynal, counsel for William Creeden ("Creeden"), have retained me to provide expert witness testimony in this case. Specifically, I have been retained to render professional opinions relating to certain actions, procedures, and management practices of Jones in his capacity as Chairman and President of the Bank of Labor (FDIC Certificate Number 01874, and herein after identified as "the Bank" and/or "BOL"), and William Creeden in his capacity as Senior Executive Vice President and Board member. I will base these opinions on direct testimony of certain individuals, documents and records produced in this case, as well as my direct professional experience.

*Qualifications of This Expert*

I have a 34-year professional background, including 29 years in the banking industry. My professional assignments have included both line and staff positions in several of the largest financial institutions in the world, including Citicorp and Bank One. In 2003, I was co-founder of a start-up community bank – The Biltmore Bank of Arizona – in the position of Chairman and President. The focus of this community bank was to serve small and mid-sized businesses with revenues up to $10 million, a market segment that was not well-served by the large regional and national banks.

In my role as Chairman, I devised the small business strategy and acted as the "public face" of the bank. Early in its existence, I was also involved in the daily operations of the bank in my capacity as President due to the nascent nature of the business. As a start-up bank, Biltmore had a $3.6 million annual expense run rate and no revenue. Naturally, there was little room to segregate strategy from operations until the revenue dynamics improved. We achieved "break-even" operations in our 11th month, and my responsibilities evolved away from operational matters and returned to strategy, governance, and business development, similar to the role of most Chairmen. As such, my responsibilities, broadly speaking, were similar to those of Newton Jones and William Creeden at Bank of Labor.

A more extensive description of my professional qualifications is provided in Exhibit (I) herein.

*The Scope of This Report*

The Department of Justice ("DOJ") brought an indictment[1] against Jones and Creeden, alleging criminal actions undertaken by Jones and Creeden during their tenure as International President ("IP") and International Secretary Treasurer ("IST") of the International Brotherhood of Boilermakers Union ("IBB"), as well as their respective roles at BOL. Although these were separate operating entities, there was significant historical overlap of IBB employees also performing duties at BOL. For example, there are numerous examples of IBB employees serving dual roles at both entities.[2] This cross-pollination appears to be the result of the Union's majority

---

[1] *See* case no. 2:24-cr-20070-DDC-TJJ (D.Kan.), indictment filed August 21, 2024.
[2] *See* FBI form FD-302 interview of Bridget Martin dated 01/31/2024.

KC 25368576.1

ownership[3] of the Bank.  Importantly, the IBB's ownership position in BOL represented its single largest investment and explains  IBB's historical involvement in BOL's governance.

Hence, BOL's Board of Directors ("BOD") was majority controlled by the IBB.  In particular, it was normal and customary for the Chairman's position to be occupied by the then-current IBB IP apparently as far back as the 1920s.  In the 1980s, Jones' father was elected Chairman of BOL's predecessor, Brotherhood Bank & Trust, concurrent with his election as IBB IP.  Upon his father's retirement, Jones was elected as his replacement in 2003.  And Creeden joined the BOL board in 2006.

As a result of this historical relationship, the DOJ indictments naming Jones and Creeden involve their actions both as international officers of the IBB, as well as their roles with the BOL.  ***This report, and its conclusions and opinions, address only those issues relating to Jones' and Creeden's roles with BOL.***

Specifically, DOJ's charges against Jones and Creeden, acting in their respective roles at BOL, can be broadly categorized as questioning their leadership and time commitments to BOL.

This report consists of ***FOUR SECTIONS*** which are described below:

- **SECTION I.** is a ***SUMMARY OF OPINIONS*** which outlines my professional opinions concerning certain claims against Jones and Creeden as noted in the referenced action.
- **SECTION II.** examines ***THE ROLES OF NEWTON JONES AND WILLIAM CREEDEN*** in their respective capacities at BOL during the period from approximately 2003 to 2022, and describes the managerial approach exhibited by both during this timeframe.
- **SECTION III.** contains analysis of ***THE CRITICISMS OF NEWTON JONES AND WILLIAM CREEDEN*** presented by the DOJ which resulted in the criminal charges against both parties.
- **SECTION IV.** entitled ***JONES/CREEDEN POSITIVE IMPACT AT BOL,*** this section summarizes the impact of the "Jones Era" on BOL.

There are also several Exhibits, located at the end of the report, which contain a curriculum vitae of the author, followed by a summary of documents relied on to support the opinions contained herein.

**Please be advised that I reserve the right to change, modify, or retract any or all of these opinions based on subsequent discovery that may impact the opinions contained herein.**

---

[3] Through its subsidiary (Bank of Labor Bancshares, Inc) the International Brotherhood of Boilermakers IBB maintains a 56% controlling ownership position in BOL.

KC 25368576.1

## SECTION I.  SUMMARY OF OPINIONS

- Based on my review, it is my opinion that BOL had been a slow-growth bank, with an uneven earnings history.  This lack of meaningful profits had been a continuous concern of regulators, and its uneven performance history prompted a strategic "rethinking" of the franchise.

- Newton Jones, in his capacity of Chairman and President of Bank of Labor, defined his role as responsible for developing a growth strategy for BOL.

- During the period in question, Jones and Creeden implemented the strategy designed to reposition BOL from a small community bank serving the Kansas City market, to a national franchise targeting labor organizations and their members.

- Jones and Creeden were uniquely qualified to conceive and implement this strategy based on their reputations and contacts in the labor union community, both nationally and internationally.

- Jones and Creeden devised and implemented the Labor Strategy.  This strategy, and their individual and collective actions to implement it, had a meaningful, beneficial and long-term impact on the institution.

- Because he focused on strategic issues, Jones developed a professional management team responsible for the daily operations of the bank. The existence of a professional operating team allowed him to implement his strategy by leveraging his industry contacts with labor leaders throughout the world.

- Over the period from 2012 through 2022, the Labor Strategy grew, both in absolute dollars as well as its relative contribution to BOL results.  During that period, the Labor Division became the fastest growing profit center in BOL.

- Both Jones' and Creeden's compensation growth in the last four years of their tenure was proportional to the success of the Labor Strategy.

- McCall's criticism of Jones' alleged unchecked influence on the Board is inconsistent with regulatory exam results.  It is my opinion that if regulators had such concerns, these concerns would have been noted in FDIC annual exam reports and would have been negatively reflected in regulatory ratings.

- The loan transactions from BOL to the IBB were arms-length.  These transactions were never criticized by regulators over the course of multiple annual regulatory exams.

- The $7 million transaction which down streamed cash from the holding company to BOL was a normal and customary equity injection.  Regulators approved of the financial support shown by the IBB, noting that the Bank's majority shareholder was recognized as an important "Source of Strength" for the bank.

<u>**SECTION II.  THE ROLES OF NEWTON JONES AND WILLIAM CREEDEN**</u>

*Background*

The DOJ investigation, and subsequent formal charges, allege that Jones and Creeden were generally uninvolved[4] with BOL during their tenure[5] as Chairman and President, and Senior Executive Vice President.  As such, the indictment concludes that their compensation was unearned.

To begin, these charges must be viewed in the context of how Jones and Creeden executed their roles at BOL.  Due to the majority ownership position of IBB, the role of Chairman had historically been filled by the IP of IBB.  In fact, Jones's father, Charles Jones, predated Jones as both IP of IBB and Chairman of BOL.  There is no evidence to suggest that the role of Chairman and President of BOL was ever involved operationally at the bank.  In fact, exactly the opposite is true.  A consistent theme in numerous documents, most notably in FDIC and Kansas state banking regulatory exams, included descriptions noting the role of Jones as developing and "driving" the Labor Strategy.[6]  Most notably, the 2015 Report of Examination by the Office of the Kansas State Banking Commissioner explicitly notes:

**"The Board of Directors is led by Chairman/Chief Executive Officer Newton B. Jones, who initiates strategic policy and is instrumental in labor union and business development."**

This report continues:

**"President McCall oversees the daily operations of the bank.  He is supported by a competent senior management staff."**

The regulators explicitly understood the line of demarcation in responsibilities between Jones and McCall. That line of demarcation clearly separated strategy from daily operations.  Jones was the author of a revised strategy which repositioned BOL from a community bank focused on serving a limited market in the greater Kansas City area to a national banking franchise addressing the needs of the labor market and its members.  This refocus was necessary because the community bank model had resulted in a low-growth, low margin bank whose profit performance was chronically deficient relative to its peer institutions and was the subject of continued concern from regulators.

Jones was elected Chairman of BOL in 2003 and in 2010 introduced this new strategy (herein after referred to as the "***Labor Strategy***" or "***Strategy***") which focused on expanding relationships with local and national labor movement organizations and their members.  His role in this strategy was to leverage his knowledge and labor movement relationships as IP of IBB to assist the business development efforts of BOL.  That activity included introductions to labor leaders, attending union

---

[4] *See, i.e.*, ¶¶ 42-43 charging that Jones' and Creeden's work at BOL was essentially "No Show Employment."
[5] Jones' tenure as Chairman and President of BOL ran from 2003 to mid-2023.
[6] See RD3_JONES_0000091 (FDIC 2022 Exam) and IBB17c_0438452 (2015 Kansas State Banking Exam)

KC 25368576.1

conferences and gatherings, and generally being visible as the "face" of the bank. It did not, however, require permanent – or even significant – time in the bank's headquarters.

Similarly, Robert Worner, an independent outside board member, described Jones' role to the FBI as "strategic." Worner was a career investment banker and had been a BOL board member for over 30 years.[7] He was a member of several board committees, including sitting as Chairman of the Compensation Committee. Worner described that in 2010 Jones introduced a "vision"[8] for BOL designed to accelerate its growth trajectory.

When asked by an FBI investigator, Worner described Jones' strategic vision for BOL as more in alignment with a chairman role, and further described Jones' responsibilities as business development-related, primarily using his long-standing relationships with other labor leaders to generate new business for BOL.

In a complimentary manner to Jones, Creeden performed an important "second chair" role. Living, as he did, in Kansas City, he was much more visible within the bank. But more important than his office presence was his general level of credit and investment experience. Creeden was a 40+ year IBB member who had risen to become International Secretary-Treasurer of the IBB in 2005.

Whereas Jones was responsible for strategy development and acting as the "face of the bank," Creeden played a crucial role as an interface between Jones' strategy and implementation within BOL. Richard Worner described Creeden as active in the bank, consistently attending Loan Committee and Board meetings,[9] noting that:

**"He attended a lot of the meetings outside of the Board...and Creeden had an institutional knowledge of some of the loans that Jones didn't have, and because he was the chief financial officer...he also brought some perspective to investments."**

Essentially, Jones was portrayed as the "visionary leader"[10] while Creeden was the interface between Jones' vision and the implementation of that strategy.

---

[7] Robert Worner 302 dated July 30, 2024 page 1 of 5.
[8] Robert Worner 302 dated July 30, 2024 page 2 of 5.
[9] There is a more detailed description of Creeden's role at BOL in the FBI recording of the Richard Worner interview taken on July 30, 2024.
[10] *See* Aaron Bowman 302 dated July 30, 2024 page 2 of 3.

KC 25368576.1

## SECTION III.  THE CRITICISMS OF NEWTON JONES

It appears that the accusations against Jones rely heavily on early FBI interviews[11] with employees of BOL as documented in Form FD-302 ("302's").  In addition to McCall, Bowman and Worner, the FBI interviewed:

- Bridget Martin – Special Assistant to Newton, acting in his capacity as IP.
- Megan Elder – Head of Human Resources ("HR") at BOL.

A review of the accusations within each of these 302's follows.

### Robert McCall 302 dated February 6, 2024

McCall has been employed at BOL since 2004, initially as head of the Commercial Division, and ultimately rising to Chief Operating Officer in 2009.  Jones promoted him to his current position as President in 2011.  McCall has been responsible for the daily operations of BOL for the past 16 years.  The timing of these promotions coincides with Jones' tenure as Chairman of BOL.

### Excessive Compensation Accusation

McCall was critical of Jones compensation at BOL.  This criticism arose from Jones' dual employment status at BOL and as IP of the IBB.  In addition, McCall criticized Jones based on his remote work status, insinuating that Jones devoted minimal work hours[12] on BOL business and this commitment level was inconsistent with the absolute level of his salary and benefits package.

Excessive compensation packages would be of concern to regulators and would typically be flagged as a comment and reflected in the CAMELS rating of the bank.  Neither state nor federal regulators ever commented[13] on Jones' compensation package.

It is critical to understand the importance of CAMELS ratings to financial institutions.  A CAMELS rating is the formal supervisory tool employed by regulators to assess the overall health of an institution. This tool assesses six areas of performance and risk, rating each institution on a five-point scale ("1" strongest to "5" weakest).  These ratings are confidential, unavailable to the public, and are employed by regulators in monitoring and, if deemed necessary, intervening in the operations of a bank. CAMELS is an acronym composed of six critical review areas:

- **Capital Adequacy** – assesses the ability of the bank's capital base to absorb losses and support balance sheet growth.
- **Asset Quality** – assesses the risk levels of balance sheet assets, both loans and investments.

---

[11] These interviews were documented on FBI Forms FD-302, also referred to as "302s," which summarize the content of interviews by agents with potential witnesses.  These reports are often used as the foundation for filing initial charges and subsequently assist in determining future witness testimony at trial.

[12] McCall noted that Jones "…rarely visited Kansas City" and that Jones "Missed quite a few board meetings."  *See* McCall 302 dated February 1, 2024, page 3 of 10.

[13] The only comment ever made by the FDIC was a generic reference to "…salaries and fees received by the Directorate" in the 2016 FDIC Report of Exam dated December 12, 2016.  *See* FDIC-BOL-ROE-0000010.

- **Management** – assesses the adequacy of leadership (both at the board level and operating level), governance and risk controls.
- **Earnings** – assesses the quality and level of earnings, and the ability to cover operating expenses.
- **Liquidity** – assesses the ability to meet the cash flow needs of the bank.
- **Sensitivity to Market Risk** – assesses the institution's exposure to interest rate fluctuations or other external risks.

A rating from the five-point scale is assigned to each of the review areas denoting:

- "1" or "2" rating is indicative of a strong, well-managed institution.
- "3" rating is indicative of a bank containing moderate risk that requires closer regulatory supervision.
- "4" or "5" rating is indicative of a bank that exhibits significant problems, is at risk of failure, and is subject to explicit regulatory action.

I have reviewed four examination reports:  The annual FDIC Report of Examinations of BOL covering the operating periods ending September 30, 2016, December 31, 2019, and December 31, 2022   as well as the State of Kansas Report of Examination of BOL covering the operating period ending dated April 27, 2015 and found only one reference to Board compensation.  The 2016 annual exam suggested that the Board

***"…should continually evaluate the amount of salaries and fees received by the Directorate, as total Board compensation exceeded $1,200,000 for 2016."***

However, this issue was not noted as a formal comment requiring Board action, nor a violation of law.  Subsequent examinations had no such follow-on comments, criticisms, or other references to support McCall's claim.[14]   Examination results covering the Management component of the institution's CAMEL ratings were rated "2"[15] by the Kansas OSBC in 2015, and "2"[16] by the FDIC for the period covering 2014 through 2022.

Importantly, Robert Worner, as chair of the Board's Compensation Committee, had been directly involved in setting Jones' compensation plan.  In his 302, Worner noted that BOL had hired an independent third party to *"…determine salary estimates for Jones.*"[17]

Further, the Labor Strategy began to produce results.

---

[14] *See* FDIC-BOL-ROE-0000009/10 IBB17c_0616345, RD3_JONES_1143646 (FDIC) and IBB17C_0438452 (Kansas Office of the State Banking Commissioner -- OSBC).

[15] A "2" Rating indicates that the Institution is fundamentally sound but may reflect modest weaknesses correctable in the normal course of business.  The nature and severity of deficiencies, however, are not considered material and, therefore, such institutions are stable and able to withstand business fluctuations quite well.

[16] A "2" Rating indicates that the Institution is fundamentally sound but may reflect modest weaknesses correctable in the normal course of business.  The nature and severity of deficiencies, however, are not considered material and, therefore, such institutions are stable and able to withstand business fluctuations quite well.

[17] Robert Worner 302 dated July 30, 2024 page 2 of 5.

KC 25368576.1

This improvement was due to the noticeable increase in new business generated from the Labor Division which, by mid-2022, was generating almost 30% of BOL's Contribution Margin.[18]



The Bank's rebranding, emphasizing building relationships with Labor organizations, began to deliver results. After years of slow growth in deposits, loans, and Net Interest Income, the rebranded BOL experienced meaningful balance sheet and revenue growth. And Jones' compensation was adjusted upward reflective of his contribution.

---

[18] The "Contribution Margin" was a management benchmark reported monthly to the Board. By mid-2022, The Labor Division was the fastest growing, and second largest, profit center in BOL.

KC 25368576.1



(2013 through 2022)

Importantly, the catalysts for this growth were Jones and Creeden.  In his July 30, 2024 FBI interview, Worner gave full credit for the profit improvement to Jones and Creeden, stating:

*"I believe that in the last twenty four months, the Bank has received an additional $100 million in deposits that are low cost deposits…I believe the bank has made three million in net income."[19]*

And during this same interview, when FBI investigators were skeptical of several fringe benefit additions for Jones and Creeden, Worner was equally emphatic in his support, stating:

*"We valued them as leaders…there (was) value in keeping those leaders on board…"[20]*

Payroll records for Jones have been produced dating from early 2013 through his termination in July 2023.  Typically, his annual cash compensation, including salary and taxable fringe benefits ranged from $285,000 to $322,000 for the five years ending in 2018. Commencing in 2019, Jones's W-2 wages rose to $358,000, and in subsequent years the mid-$400,000 range.  Again, regulators raised no explicit objections to this level of compensation.  In fact, regulatory ratings[21] continued to improve, most notably due to an increase in the "Earnings" component of the CAMEL rating.

McCall actually acknowledged the importance of the Labor Strategy to Bank regulators on numerous occasions, essentially validating Jones' role both in terms of developing the strategy, as

---

[19] Excerpt from the FBI recording of the Richard Worner interview taken on July 30, 2024.
[20] Excerpt from the FBI recording of the Richard Worner interview taken on July 30, 2024.
[21] The CAMEL ratings of BOL progressively improved during Jones tenure as Chairman and President.

KC 25368576.1

well as the importance of Jones's contacts throughout the labor movement.[22] It is contradictory that McCall accused Jones of being uninvolved with BOL issues while simultaneously admitting to the relevance of his role.

The facts are undeniable that the Labor Strategy was gaining traction, and the progress of this rollout was heavily dependent on the contacts, personal relationships, and understanding of the labor movement possessed by Jones and Creeden.

### *Other Criticisms of Newton Jones's Role*

Several other employee interviews commented on a lack of engagement by Jones, further contributing to the "No Show" employment accusation.  These employees include:

- Bridget Martin – Special Assistant to Newton, acting in his capacity as IP of IBB.
- Megan Elder – Head of Human Resources at BOL.

*Bridget Martin 302 dated January 31, 2024*

Martin was an employee of the IBB.  Hired in 1995, she was involved in legislative affairs before taking a position in 2000 involving the Presidential election cycle.  She returned to the IBB in the Government Affairs department, and in 2015 was subsequently named a "Special Assistant" to Newton Jones in his role as IP of the IBB, *"…one of many Special Assistants to the IP."* [23]

Martin operated under a complex time-sharing arrangement between the IBB and BOL for a number of years but generally split her time on an 80/20 basis (IBB/BOL).  She was involved in lobbying efforts on behalf of the IBB and managed its Political Action Committee.  She transitioned permanently to BOL in 2023.

Martin's efforts on behalf of BOL revolved around the bank's rebranding efforts[24] which were initiated by Jones during his tenure as Chairman of BOL.  As one of many Special Assistants to the IP, she admits that she had very limited access to Jones.[25]

Martin's 302 report documents numerous admissions by Martin that, despite her title as Special Assistant to the IP, she had very little knowledge of his activities, and virtually no contact with Jones over an extended period of time.  Consider these comments:

- Her interactions with Jones dwindled as her time with the IBB  went on.

---

[22] *See* IBB17c_1227687 which is a letter response dated May 24, 2017 from McCall to Richard E. Allen, Assistant Regional Director for the FDIC.  In this correspondence, McCall is formally responding (on behalf of the Board of BOL) to a "Matter Requiring Board Attention (MRBA)" issued by the FDIC critical of the Bank's profitability.  In this response, McCall cites the Bank's efforts to increase loan assets through its union outreach – a direct reference to Jones' Labor Strategy. An MRBA letter is a communication from bank examiners to a bank's board of directors regarding significant issues that require prompt corrective action.

[23] This reference was noted in the 302.

[24] This was the major strategic effort initiated by Jones to transform the Brotherhood Bank from a local community bank to an institution nationally recognized for its focus on labor unions.

[25] In fact, the 302 documents that her interactions with Jones dwindled over the course of her employment, and towards the end she interacted with him only once per year.

KC 25368576.1

- Martin did not know the financial status of BOL.
- She was aware of certain transactions between the IBB and BOL but did not know "what the loans…were for."[26]
- Martin did not have extensive knowledge of union travel.
- She was only aware of personnel travelling overseas from "***sidebar conversations.***"[27]
- She was aware of the existence of an international federation of unions, but not of the IBB's involvement.
- During her involvement with BOL, Martin worked directly under Michael Snowden.[28]

Taken in its entirety, Martin's 302 interview paints a picture of a relatively junior staff member who had limited exposure to Jones during her career at the IBB/BOL, and no knowledge of his role or his professional activities either as IP or Chairman / Chief Executive Officer of BOL. Based on these facts, it is my opinion that her testimony has little to no value in understanding Jones' roles at IBB or BOL and is of no relevance to the allegations against Jones.

*Megan Elder 302 dated July 30, 2024*

Megan Elder was a 19-year employee at BOL as Head of Human Resources. As of the date of her interview, she had been in this position, reporting to McCall, for approximately two years. She described her contacts with Jones as infrequent, brief encounters at conferences and BOL board meetings and indicated that Jones lacked a "***clearly defined role at BOL…outside of board/committee duties***."[29]

Further, Elder expressed concerns about Jones' employment:

- Jones did not have any daily duties or any clearly defined role at BOL as part of his employment outside of board/committee duties.
- Elder did not know Jones' employment title or role at BOL.
- Elder never determined what Jones did for the bank outside of board/committee meetings.

Jones was Chairman of the Board. As such, he had no "daily duties," just as Chairmen at other companies typically have no daily operational duties. Elder reported directly to McCall with whom she interacted on a daily basis.[30] As Head of HR, she had no real need to have meaningful contact with the Chairman and it is unlikely that she was aware of the duties of the Chairman. Accordingly, it is my opinion that her testimony which insinuated that Jones may have had a "No Show" job is unreliable.

---

[26] Martin 302 page 3 of 4.
[27] Martin 302 page 3 of 4.
[28] Michael Snowden was the Labor Market President at BOL. In his position, he led the development efforts at BOL to establish the line of business concentrating on labor unions across the country. He worked closely with Jones to develop and implement the rebranding efforts.
[29] *See* Elder 302 dated July 30, 2024, page 3 of 3.
[30] *See* Elder 302 dated July 30, 2024, page 2 of 3.

KC 25368576.1

*Undue Influence Accusation*

McCall's interview comments paint a picture of Jones, as Chairman, unilaterally making all decisions involving board membership, and he insinuates that the Board was ineffective in its governance role.[31]  By implication, this accusation presumes that Jones "called the shots" on his own compensation.  McCall also suggested that regulators were concerned at the level of control imposed by Jones over the Board.[32]  Typically, any indication of a lack of independence by Board members is flagged by regulators and included as a criticism in annual Safety and Soundness exam results.  But again, there is no evidence to suggest that regulators were concerned about Jones' influence with the Board.

There is a brief explanation in Worner's 302 which highlights the contradictory nature of McCall's claim of Jones's purported control of the board.  Specifically, Worner, as Chair of the Compensation Committee, stated that McCall would submit to Worner recommended annual salary increases for all employees, including Jones and Creeden.

Subsequently, Worner would forward these recommendations to Jones for his review.  In his July 30, 2024 FBI interview, Worner was emphatic that Jones would "tweak" a few of McCall's salary action recommendations but never adjusted McCall's recommendations for himself (Jones) or Creeden.  In my opinion, Jones consistent refusal to adjust his and Creeden's annual salary actions illustrates a level of respect for the opinions of senior leaders below him as well as a desire to avoid the appearance of self-dealing.

*Transactions from BOL to the IBB*

McCall's 302 report describes a series of transactions between BOL and the IBB.  The investigator documented what were termed "upstream" loans from BOL to the IBB and noted that these loans were issued under "Red W" (sic) restrictive guidelines[33].  I believe the term "Red W" (sic) refers to **Regulation W**, a U.S. Federal Reserve rule that governs transactions between banks and their affiliates.  All such related-party loans are subject to review by regulators during annual Safety and Soundness Exams.  Although I have not been provided every exam report, either from the FDIC and/or Kansas state banking regulators, my review of regulatory exams covering 2015, 2016, 2019, and 2022 revealed no regulatory concerns involving Reg W violations of law.

McCall described loan transactions from BOL to the IBB, stating that "Bill (Creeden) contacted BOL and requested BOL loans to fund IBB projects and real estate purchases."[34]  Furthermore, Jones and Creeden would abstain from voting on such loans.  In his 302, McCall was critical of Jones and Creeden by stating that "Jones or Bill used their authority by proxy for the loans to be approved."[35]

---

[31] McCall's 302 documents his comments as "…the reality was the Board did not really make decisions when Jones was Chairman."  Subsequently, McCall stated "Newt called the shots." McCall 302 dated February 6, 2024, page 2 of 10.

[32] McCall stated that regulators were aware that the Board "…really did not make decisions when Jones was Chairman." McCall 302 dated February 6, 2024, page 2 of 10.

[33] Robert McCall FD-302 dated February 1, 2024, page 4 of 10.

[34] Robert McCall FD-302 dated February 1, 2024, page 4 of 10.

[35] Robert McCall FD-302 dated February 1, 2024, page 4 and 5 of 10.

KC 25368576.1

These criticisms are unsupported by the facts.  Consider:

- A loan request to BOL initiated by Creeden on behalf of the IBB was a normal and customary event.  Creeden, after all, was the sitting International Secretary Treasurer of the IBB.  Securing project financing for IBB activities would generally be the responsibility of the Treasurer.
- McCall notes that such loans were presented to the Board for decisioning, and furthermore that Jones and Creeden, as sitting Board members, would abstain from voting on these loan requests.  Their decision to abstain from a decisioning vote on such transactions is normal, customary, and ethically appropriate.
- Although technically not a Reg O loan[36], loan extensions to the IBB should have been handled in a manner similar to a Reg O loan due to the dual relationship that both Jones and Creeden had with BOL and the IBB.  Under Reg O, such loan requests would require prior Board approval, with the related party Board members abstaining from the vote.  In fact, this is what happened.
- There is no evidence to suggest that regulators were concerned about these loan transactions between BOL and the IBB, nor the approval process for such transactions.[37]

Contrary to the concerns expressed by McCall with respect to the close relationship between BOL and the IBB, the regulators actually viewed this relationship, and Jones role with each organization, as a ***source of strength*** for BOL.[38]

*Transactions from the IBB to BOL*

McCall's 302 documents a loan transaction from the IBB to BOL noted as a $7 million transaction. This appears to be a reference to a series of transactions whereby the IBB down streamed cash into Bank of Labor Bancshares, Inc (Holdco) the proceeds of which were further down streamed into BOL in the form of additional equity.  As previously described,  Holdco is a wholly-owned subsidiary of the IBB, and it holds the IBB's ownership position (common voting shares) in BOL. The purpose of these loan transactions was to increase the tangible capital base of BOL necessitated by the growth of its balance sheet in the 2020-2022 period.

---

[36] A *Reg O loan* refers to any extension of credit by a bank to its **executive officers, directors, or principal shareholders (insiders)**, as defined under **Federal Reserve Regulation O (12 CFR Part 215)**. These loans are subject to strict limits, reporting, and approval requirements to prevent insider abuse and preferential treatment.
[37] Violations of Reg O by a Board of Directors would certainly be reflected in the Management rating component of a bank's CAMEL rating.  Although I have not been provided each Report of Exam for BOL covering the period from 2010 through 2022, I have reviewed the Management ratings component of BOL's annual exams for 2015, 2016, 2019, 2020 and 2022.  The Management rating in each of these exams was a "2".  As previously described, A rating of **2** denotes that a financial institution is in **fundamentally sound condition**, with only **moderate weaknesses** that are well within the bank's ability to correct.
[38] This relationship between BOL and the IBB was specifically noted as a "source of strength" within the Capital section of the FDIC's Safety and Soundness Report of Examination for 2016 and 2022.  *See* FDIC-BOL-ROE-0000008 AND FDIC-BOL-ROE-0000089/RD3_JONES_1143644.  The "source of strength" description relates to the ability, and willingness, of the IBB to protect the regulatory capital base of BOL by down streaming additional capital into BOL to support its growth.

KC 25368576.1

The structure of these transactions is typical for the industry. Often, organizations holding an ownership position in a bank hold it indirectly through a holding company. This structure is typically done to achieve favorable tax treatment involving dividend payments to the holding company. This holding company structure is common. The mechanics of this structure start with a loan transaction from the investor to the holding company. Then, the holding company injects the cash into the bank charter in the form of an additional equity contribution. So, debt at the holding company then converts to an additional equity position on a bank balance sheet. This additional equity strengthens the regulatory capital base of the bank and supports future asset growth.

Once the cash from the holding company is injected into the bank as capital, it is subject to repayment restrictions imposed by the FDIC. Since the transaction is funded via an underlying loan transaction on the holding company's balance sheet, a debt servicing obligation will be incurred by the holding company back to the debt holders. This debt service must be funded from dividend and/or return of capital payments by the bank, all of which require implicit approval from the FDIC. Acceptance of such restrictions portray to the FDIC a commitment to the bank by its investors.

Returning to the $7 million transaction noted in McCall's 302 report, it is unclear in the 302 how McCall may have described the transaction to the FBI investigators. However, it is important to note that the $7 million transaction was actually a refinance of a prior $5 million transaction from the MORE Fund. Also, McCall, and the entire BOL board, were fully aware of this transaction since it was described in total to the board in BOL's 2022 Capital Plan.[39]

The criticism of this transaction appears to relate to the approval process within the IBB, not the actual transaction as reflected on BOL's side. Criticisms involving the IBB approval process are outside the scope of this report, but it is important to note that from a regulatory perspective, the FDIC viewed the injection of this capital into BOL very favorably. Contrary to any implied insinuations in McCall's 302, there was a legitimate business reason for the transaction.

*Marketing and Foreign Travel Expenditures*

McCall's 302 interview also includes various non-specific accounts of the following:

- Multiple vaguely described Pheasant Hunts purportedly sponsored by BOL. Attendance included a variety of officials from the IBB, AFL-CIO, and other union-connected officials. The timeframe of these meetings was unstated. Ostensibly, the purpose of these events was to introduce BOL to the union community in support of the Labor Union business initiative.

---

[39] This transaction was fully reviewed by the BOL board on at least two separate occasions. The first review was noted in BOL's board minutes dated August 25, 2021. The second review, and approval, was noted in BOL's board minutes dated February 16, 2022 when the 2022 Capital Plan was approved. Refer to RD3_JONES_1142151 and RD3_JONES_1142225.

KC 25368576.1

- Trips to Italy, apparently from 2014 to 2019. Generally, McCall was of the opinion that the trips were fruitless. In McCall's 302, he stated that "***...after a while there wasn't going to be any relevant business.***" [40]
- He admits that he was reimbursed by BOL for all expenses related to these trips in spite of his perception that they could not be justified as legitimate business expenses. His explanation was simply *"...if you want to remain gainfully employed...you have to make a decision."* [41]

These events, and the associated expenses incurred by BOL, are not the subject of the pending charges against Jones. However, the discussion that follows continues to support the view that Jones was actively involved in the development, and rollout, of the Labor Strategy at BOL.

In their roles at IBB, both Jones and Creeden had deep and broadly-reaching contacts throughout the collective bargaining world. For example, BOL opened an office in Washington, D.C. in mid-2015. The purpose was to establish relationships with national labor organizations, many of which were either headquartered in the D.C. area or had government relations offices in the area. On August 17, 2015, BOL held a grand opening of its office, and in addition to McCall and Jones, guest speakers included Richard Trumka (AFL-CIO President), Cecil Roberts (United Mine Workers President), and Chris Decaigny (Union Labor Life Insurance Company President). Jones was instrumental in securing their participation.[42] The purpose of the event was to expand BOL's visibility to national labor organizations and their members.

McCall also criticized international travel, specifically referencing multiple trips to Italy. It appears that there were approximately three such trips from 2014 to 2019. Documentation, in the form of email correspondence, confirms that McCall was directly involved in planning the business agendas for these meetings. For example, in September 2014 McCall was involved in business discussions involving the roll-out of a branded credit card with a local labor organization in Florence, Italy.[43]

In June 2018, McCall was a participant on a trip to Verona, Italy during which he was involved in discussions between a BOL customer ("Lobsterman") and an Italian fishing cooperative.[44] In October 2019, BOL sponsored an "International Investment Forum."[45] Co-sponsors of the event included the AFL-CIO, ULLICO,[46] and FLAEI.[47]

Notably, ULLICO was organized by the American Federation of Labor (AFL) to provide life and health insurance to union members who, at the time, were often denied coverage due to the health

---

[40] Robert McCall FD-302 dated February 1, 2024, page 6 of 10
[41] Robert McCall FD-302 dated February 1, 2024, page 7 of 10
[42] The guest speakers were participants in support of BOL's Labor Strategy.
[43] *See* IBB17c_0083214
[44] *See* IBB17c_0041714
[45] *See* IBB17c_0048717
[46] Originally named Union Labor Life Insurance Company, primarily serving union members and their families.
[47] FLAEI translates to the Italian Federation of Electrical Workers, which is part of a larger union confederation that represents workers in the Italian electricity sector. Exact membership is not publicly listed but it likely represents thousands of workers throughout Italy.

KC 25368576.1

risks associated with union jobs.  Its original name reflects its labor movement roots.  ULLICO continues to follow its primary mission to serve union members and their families on a national basis.

Interestingly, ULLICO's national focus is identical in nature to the Labor Strategy of BOL. Namely, the strategy is to deliver banking services to an affinity-based group of customers associated with labor organizations and their members.  Accordingly, Jones' strategy was not unique and untested but rather appears to be an effort to duplicate a successful nationally-focused and proven business strategy targeting the commercial and retail banking sector.

Obviously, this is not an all-inclusive list of Jones' travel activities.  Contrary to McCall's criticisms, it does appear that Jones was actively involved in leading the strategic shift of BOL from a local community bank serving the needs of the greater Kansas City area to an institution with national, and potentially international, scope.

McCall was a willing participant in multiple European excursions with Jones.  He was also responsible for recommending to the board Compensation Committee annual salary increases for all BOL employees, including Jones.  In my opinion, his current criticisms are inconsistent with his actions over a twelve year period.  McCall was an enabler, not a victim.

McCall had a fiduciary and ethical duty as both a senior executive and board member of BOL to act in the best interests of the company.  If he were truly concerned about the ethical nature of these events, his duty could have taken the form of objecting directly to Jones, reporting his concerns to internal audit, informing regulators, or ultimately resigning.  But he elected none of these courses of action.

Instead, he elected to "eat at the same table" as the man he accused of defrauding BOL.

### SECTION IV.  JONES'AND CREEDEN'S POSITIVE IMPACT AT BOL

Putting aside the accusations against Jones, his tenure did, in fact, alter the performance history of BOL.  The Labor Strategy, rolled out in the early 2010's, gathered momentum over the course of the next ten years, and both the relative performance[48] and absolute performance of the bank improved.

This progress is best measured through "Peer Group" comparisons.  Peer Group comparisons are a common comparative method used by regulators to assess financial performance of an institution.  Bank regulators[49] define *peer groups* as standardized categories of banks grouped by common characteristics, the most common of which is **asset size**, but sometimes grouped by other features.  These groups are used in reports published by these regulators (like the Uniform Bank Performance Report -- UPBR) to compare institutions with similar characteristics.

---

[48] Relative performance as measured against its FDIC Peer Group.

[49] Regulators include the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of the Currency (OCC), the Federal Reserve (FED) and the Office of Thrift Supervision (OTS).

KC 25368576.1

There are seven Peer Groups, segmented by Asset Size. During the period in question, BOL was in Group 3, defined as institutions with assets from $300 to $1000 million. There are approximately 1300 individual banking institutions in this group. And Peer Group analysis is consistently used by regulators to assess individual bank performance and to identify potential outliers and risk trends. Historically, BOL was a chronic financial underperformer in its peer group.

*Earning Asset Yields*

Earning Asset Yields improved, albeit modestly. BOL's relative performance as measured against its Peer group, while still low, improved from the 14th to the 28th percentile. Improvements in this measure occur slowly over time, as new loan production at higher yields replace older, lower-priced assets This has the effect of incrementally averaging up the portfolio yield. Since this measure changes incrementally over time, the important aspect to consider is less about percentile ranking, but rather more about progress in moving up in the rankings. It is analogous to the metaphor of turning an aircraft carrier – it can be done, but it needs a wide berth.



*Net Interest Income*

As new loan production from Labor sources increased, Net Interest Income improved both from higher-yielding loan, as well as a greater volume of loan balances. Net Income improved as deposits grew, and these deposits were employed to fund new loan growth. As the Labor Strategy gained traction, BOL's performance relative to its Peer Group markedly improved, rising from the 12th to the 31st percentile ranking.

KC 25368576.1



*Expense Ratio*

BOL's Expense Ratio (Expenses as a % of Assets) initially rose as the Labor Strategy built out its infrastructure but has been improving dramatically as the new staff began to produce new loans and deposits.  By 2022 this measure  was rapidly approaching Peer Group levels.  Expense levels have been a historical concern of regulators.



KC 25368576.1

*Operating Income*

The Labor Strategy has significantly improved operating margins of BOL. A 43% increase in Operating Income during the past 10 years has been driven by the successful rollout of the Labor Strategy.



*Summary*

The Jones/Creeden era was marked by a dramatic change of strategy, one designed to address historical trends of slow growth and marginal profitability. Notably, regulators had expressed a continuing concern over a lack of consistent and meaningful profitability, as noted in formal regulatory notices contained in "Matters Requiring Board Attention."

Jones and Creeden devised and implemented the Labor Strategy. This strategy, and their individual and collective actions to implement it, had a meaningful, beneficial and long-term impact on the institution.

JEFFREY P. GAIA

DATED NOVEMBER 25, 2025

KC 25368576.1

<u>**EXHIBIT (I)**</u>

**CURRICULUM VITAE**

**Jeffrey P. Gaia**
3955 E Sierra Vista Drive
Paradise Valley, Arizona 85253
(602) 741-4242

<u>**General Summary:**</u>

"C" level senior executive with thirty four years of diversified experience including both line and staff assignments. Significant domestic and international experience.   Proven ability to successfully lead franchises through periods of organizational change and strategy redirection.

<u>**Selected Professional Accomplishments:**</u>

- Co-founder of a "de novo" community bank (The Biltmore Bank of Arizona) which grew to $300 million in assets prior to its sale in 2012.
- Developed and executed comprehensive business strategies for major line and staff units which resulted in significant improvements in business franchise value and operating results.
- Directly responsible for restructuring the mortgage banking subsidiary of Banc One Corporation from a portfolio lending focus to a secondary market-based operation. Improved pre-tax income by $55 million in an eighteen month period.
- Directly responsible for successfully restructuring an $800 million asset, thirty five branch, bank subsidiary of Banc One Corporation.  Achieved a 1.51% ROA and record earnings in the first year of assignment.
- Directly responsible for establishing a "de novo" corporate treasury function for a UK-based group of subsidiaries of Citibank N.A. to support a $4.3 billion balance sheet. Developed and executed state-of-the-art asset/liability management strategies to support this retail-based franchise.
- Developed innovative and cost-effective long-term funding strategies in both domestic and international capital markets.  Structures included Eurocurrency floating rate notes, fronted and parallel loans, fixed and floating rate mortgage-backed structures, and unrated domestic private placements.
- Organized and managed major line businesses and staff units comprised of headcounts of up to 2,500 with operating budgets in excess of $200 million.

<u>**Business Experience:**</u>

**2003 – 2014  The Biltmore Bank of Arizona**

<u>Chairman and President – March 2003 to 2014</u>
Full P&L responsibility for a $300 million community bank.  I was a co-founder of this "de novo" institution in 2003 and led the organization from its initial application for a bank charter through

KC 25368576.1

its sale in December 2012. The Bank targets small and mid-sized businesses within the greater Phoenix area. Responsibilities included both operational and strategic issues.

## 2001 – 2003  California Bank & Trust (CBT)

<u>Managing Director</u>
Full P&L responsibility for an 80 branch banking network spread from Orange County, California to Northern California. CBT is an $11 billion subsidiary of Zions Bancorp. Line of business responsibility included Business Banking (small business), SBA Lending, Retail Banking and Consumer Lending.

1993 – 2001  Bank One Corporation (acquired by JP Morgan Chase)

<u>President, Bank One Business Banking Division – December 1997 to January 2001</u>
Full P&L responsibility for Bank One's national line of business targeting small business enterprises located in the 13 state corporate footprint. Directly managed a balance sheet of $35 billion in footings ($20 billion of deposits and $15 billion of loans) with pre-tax earnings of $450 million. Major responsibilities included both strategy development and execution. Led the effort to develop one of the first web-based small business portals in the financial services industry.

<u>Chairman and President, Banc One Mortgage Corporation – October 1994 to November 1997</u>
Chairman and President of the national mortgage banking subsidiary of Bank One Corporation. The franchise generated 1996 originations of $3.5 billion, a servicing portfolio of $25 billion, and an operating expense base of $125 million. Improved pre-tax operating results by $55 million from 1995 to 1996 through a rigorous assessment, and subsequent restructuring, of the origination activities of the business. Developed an integration strategy (in conjunction with the Bank One Retail Operating Group) to position the mortgage product as a "gateway" for cross-selling of high-margin Bank products.

<u>Chairman and President, Bank One, Utah – January 1993 through September 1994</u>
Chairman and Chief Executive Officer of Bank One, Utah, an $800 million asset subsidiary of Bank One Corporation. Full P&L responsibility for this state franchise, including managing a $40 million operating budget for this 30 branch statewide franchise. Directly responsible for the major restructuring of this operation which resulted in record earnings in 1993 of $12.4 million (a 1.51% return on assets), and significant market share gains in core deposits and loans. Also, responsible for successfully identifying, negotiating, and closing several portfolio and/or bank acquisitions which significantly enhanced local market share and profitability of the Utah franchise.

## 1988 – 1993  Valley National Corporation (acquired by Bank One Corporation)

<u>Senior Vice President, Risk Control Division – March 1992 through December 1992</u>
Chief Loan Examiner for Valley National Corporation (VNC). Responsible for managing the ongoing regulatory relationships with the Office of the Comptroller of the Currency (OCC) and Federal Deposit Insurance Corporation (FDIC). Member of the Executive Management Committee, Corporate Credit Policy Committee, and Senior Loan Committee. Reported to the Chairman of the Board of VNC.

KC 25368576.1

<u>Senior Vice President, Special Credits Division – July 1990 through February 1992</u>
Business manager for a classified asset portfolio of approximately $470 million. Portfolio consisted of commercial, corporate, and real estate credits. Responsible for development and execution of workout strategies relating to this portfolio. Member of the Corporate Credit Policy Committee, Senior Loan Committee, and Special Credits Committee. Reported to the Senior Executive Vice President/Chief Credit Officer of the Bank.

<u>President, Valley National Mortgage Company – April 1989 through June 1990</u>
Business manager of the mortgage banking subsidiary of VNC. Complete P&L responsibility for this business with 1990 originations of $450 million, a $13 million expense base, and a $2 billion servicing portfolio. Increased origination levels by 390%. Developed and executed a strategic plan which streamlined sales and production functions, redefined our product and pricing strategies, and resulted in an earnings improvement from monthly operating losses of ($300) thousand to a monthly profit of $200 thousand (a 20% return on equity). Increased market share from 1% to 8.8% statewide. Reported to the Executive Vice President, Retail Banking Group.

<u>Senior Vice President, Corporate Treasury Division – October 1988 through March 1989</u>
Division manager responsible for long-term capital planning, investment banking relationships, asset/liability management, product profitability/cost of funds analysis, and structured finance activities. Developed and executed state-of-the-art asset/liability management strategies to manage the interest rate and liquidity risks of an $11.5 billion balance sheet. Member of the Corporate ALCO Committee. Reported to the Executive Vice President, Chief Financial Officer of the Bank.

**1985 – 1988  Citicorp**

<u>Vice President and Regional Treasurer, Citibank Savings – April 1987 through October 1988</u>
Regional Treasurer for a group of UK-based subsidiaries representing Citibank's consumer franchise in the United Kingdom. Directly responsible for establishing a "de novo" corporate treasury function tasked with interest rate and liquidity management responsibilities to support a $4.3 billion balance sheet. Developed and executed asset/liability management strategies to support the core earnings stream of a diverse portfolio of consumer assets. Directed and executed $450 million of mortgage securitizations to restructure the portfolio and meet corporate earnings and return objectives. Reported to the Regional Business Manager and managed a group with a headcount of 16 and an operating budget of $2 million.

<u>Vice President, Citicorp Homeowners, Inc. – July 1986 through March 1987</u>
Department Head of the Financial Control, Planning and Analysis Group within the Citicorp Consumer Mortgage Bank (CMB). Reported to the President of the mortgage bank with responsibility for managing a group of 28 financial analysts and structured product specialists. Direct responsibilities included rigorous financial analysis, budgeting and forecasting, accounting support, and strategic planning for the nation's largest mortgage operation.

<u>Manager, Asset Pricing and Planning – May 1985 through June 1986</u>
Unit head of a small, highly analytic group within the Treasury Department of Citicorp Homeowner's Inc. Reported to the Department Head of Asset/Liability Management. Direct responsibilities included development of funding strategies to support the liquidity requirements

KC 25368576.1

and interest rate risks of an $11 billion balance sheet. Funding strategies achieved pre-tax interest expense savings of $40 million in 1985. Also responsible for managing the pricing function for first mortgage portfolio products and the development of analytic models for the asset/liability management process.

**1984 – 1985  Amedco, Inc.**

Vice President, Finance – March 1984 through April 1985
Chief Financial Officer for Amedco Development and Management, Inc., a wholly-owned subsidiary of Amedco, Inc. Directly responsible for securing financing for large ($20-$30 million) health care-related projects. Typically, these projects were financed through tax-exempt public debt instruments requiring extensive interface with the external financial community, including securities underwriters, commercial banks, and legal counsel. Responsibilities also included management of a staff which performed feasibility and capital budgeting analysis of proposed projects.

**1979 – 1984  Monsanto Company**

Area Finance Manager, Canada/Latin America – August 1981 through March 1984
Responsible for the development and implementation of long-range financial plans, and the formation of treasury policies, for nine wholly-owned subsidiaries with sales in excess of $500 million. Successfully placed long and short-term public debt and commercial loan transactions in excess of $250 million as a major element of several financial restructurings which were necessitated by severe foreign currency exchange rate movements in the early 1980's. Developed several innovative off-balance sheet transactions which significantly enhanced Monsanto's 1982 and 1983 reported earnings, including a $100 million arbitrage transaction with the Royal Bank of Canada which netted Monsanto a $1.5 million gain. Also developed complex currency remittance mechanisms, including one such transaction in conjunction with Helena Rubenstein, Inc. and Salomon Brothers which was highlighted in a 1984 Wall Street Journal article dealing with blocked currencies.

Internal Auditor – June 1979 through August 1981
Performed financial and operational audit reviews of major plant sites and corporate staff functions. Acquired significant accounting and control experience during audit reviews of both domestic and international locations.

**Education:**
MBA – St. Louis University (Magna cum Laude), 1979
BS, Business Administration – University of Missouri (Cum Laude), 1976
12 credits completed toward PhD at St. Louis University

**Professional Accomplishments:**
Selected by American Banker for the 1992 listing of 40 Top Bankers under 40 years of age.
1993 Corporate Hispanic Advocate of the Year Award by the United States Hispanic Chamber of Commerce

KC 25368576.1

1994 United States Small Business Administration Region VII Minority Small Business Advocate of the Year
Chairman – 1994 Salt Lake Valley United Way Campaign
Former Director, Utah Bankers Association

## EXHIBIT (II)

# DOCUMENTS RELIED ON TO FORM OPINIONS

Aaron Bowman 302 dated July 30, 2024
Bridget Martin 302 dated 01/31/2024
FDIC Call Reports for Bank of Labor year end 2013 through 2022
FDIC PEER GROUP ANALYSIS
FDIC-BOL-ROE-0000001/41
FDIC-BOL-ROE-0000009/10
FDIC-BOL-ROE-0000010
FDIC-BOL-ROE-0000089/
FDIC-BOL-ROE-1143639/1143670
Grand Jury Testimony of Jeremy Newman dated January 11, 2024 volumes 1 and 2
Grand Jury Testimony of John Fultz dated April 4, 2024 pages 1-189
https://aflcio.org/trumka-boilermakers-convention-your-values-are-exactly-right-place
IBB17c_0041714
IBB17c_0048717
IBB17c_0083214
IBB17c_0083837
IBB17c_0438441/0438467
IBB17c_0438452 (2015 Kansas State Banking Exam)
IBB17c_0445186/0445189
IBB17c_0616343/346
IBB17c_0616345
IBB17c_0741255/0741274
IBB17c_1227687
IBB17c_1230993/995
IBB17c_2351580/589
IBB17c_2793591/2793593
Megan Elder 302 dated July 30, 2024
RD3_JONES_0000091 (FDIC 2022 Exam)
RD3_JONES_11355761
RD3_JONES_1139589/1139602
RD3_JONES_1139606/609
RD3_JONES_1139607/608
RD3_JONES_1139644

KC 25368576.1

RD3_JONES_1142928/929
RD3_JONES_1143644
RD3_JONES_1143646
RD3_JONES_1333367-1333376
RD3_JONES_1333391/1333401
Robert McCall 302 dated February 1, 2024
Robert Worner 302 dated July 30, 2024

KC 25368576.1