IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                                    Plaintiff,

v.

NEWTON JONES (01),                          Case No. 24-20070-DDC
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
WARREN FAIRLEY (04),
LAWRENCE MCMANAMON (05),
CULLEN JONES (07),

                                    Defendants.

## MEMORANDUM AND ORDER

From Indictment to trial setting, this case will span about 20 months.  Defendants Newton
Jones, William Creeden, Kateryna Jones, Warren Fairley, Lawrence McManamon, and Cullen
Jones attribute a chunk of that delay to the government's negligence acquiring and producing
evidence.  Because that chunk exceeds the 70 days permitted by the Speedy Trial Act (STA), 18
U.S.C. § 3161(c)(1), defendants[1] argue that the court should dismiss the Indictment.

Defendants are right about one thing:  "An infringement of the speedy-trial right requires
dismissal of the indictment."  *United States v. Lewis*, 116 F.4th 1144, 1155 (10th Cir. 2024)
(citing *Betterman v. Montana*, 578 U.S. 437, 443–44 (2016)).  But that's where the merit of their
motion ends.  As the court explains below, defendants haven't demonstrated that a speedy-trial

---

[1]     For ease of reference, the court uses "defendants" to refer to Newton Jones, William Creeden,
Kateryna Jones, Warren Fairley, Lawrence McManamon, and Cullen Jones, but not Kathy Stapp.  Ms.
Stapp entered a plea of guilty at the end of 2024.  Doc. 78.  So, she didn't participate in the motion at
issue or any of the referenced status conferences or motions after her plea on December 19, 2024.

error has occurred.  Without such an error, the court finds no basis to dismiss the Indictment.
The court thus denies defendants' Joint Motion to Dismiss Pursuant to the Speedy Trial Act
(Doc. 130).

Before reaching its analysis, the court outlines the procedural background—specifically
focusing on the various considerations that excluded time under the STA.  It then provides an
overview of the alleged discovery delays that inform defendants' dismissal motion.  Next, the
court recites the legal standard for speedy-trial-error dismissals.  Finally, the court analyzes
defendants' speedy-trial arguments under both the STA and the Sixth Amendment.

## I.        Procedural Background

A grand jury returned the Indictment on August 21, 2024.  Doc. 1.  In the case's first
status conference, on October 10, 2024, the court provisionally calculated the defendants'
speedy-trial deadline to require a trial setting by November 23, 2024.  Doc. 74 at 7 (Hr'g Tr. 7:1–
8).  In response, Newton Jones's defense counsel informed the court that all defendants had
agreed—as had the government—that a motion to designate the case as complex and exclude
time was warranted.  *Id.* at 7–8 (Hr'g Tr. 7:16–20, 7:25–8:1).  Newton Jones's counsel explained
that defendants had received one round of discovery from the government and anticipated
another round—apparently voluminous—soon, with more to come.  *Id.* at 9 (Hr'g Tr. 9:6–14).
And counsel identified "several issues" with the "quality of discovery" defendants had received,
referencing the "nature of the production" and searchability concerns, and manageability
concerns.  *Id.* at 13 (Hr'g Tr. 13:1–7, 13–15).

At the conference, the government informed the court that the second round of discovery
was scheduled to go out that week, with the third round to follow "in the next few weeks." *Id.* at
11 (Hr'g Tr. 11:1–5).  In doing so, it mentioned delays with server space and technical
difficulties.  *Id.* at 10–11 (Hr'g Tr. 10:23–11:2).  The court pressed for a more definite

timeframe, citing STA concerns. *Id.* at 11 (Hr'g Tr. 11:8–11). The government suggested it would push to produce the third round "in the next two weeks." *Id.* (Hr'g Tr. 11:12–13). Given the discovery issues identified by the parties, the court proposed a 90-day continuance. *Id.* at 14 (Hr'g Tr. 14:5–10). But it did so only after ensuring that each defendant understood that the continuance would "be on [defendants'] clock, not on the government or the court's calcul[us] of the speedy trial deadline[.]" *Id.* (Hr'g Tr. 14:12–21); *see also id.* at 15–17 (Hr'g Tr. 15:23–17:24).

On November 4, 2024—on the government's motion—the court designated this case as complex. *See* Doc. 72; Doc. 75. The court made findings under the STA's ends-of-justice provision, 18 U.S.C. § 3161(h)(7)(A), to continue the case beyond the STA's deadline. Doc. 75 at 2–4. The court found eight factors—enumerated by the government—sufficient to justify designating the case as unusual and complex. *Id.* Featuring prominently in those findings were:

- the expansive nature of the investigation into alleged financial conduct over the Indictment's lengthy span;

- the intricacies of working with a non-party—here, the International Brotherhood of Boilermakers (IBB)—who had hired an outside law firm and third-party vendor to process requested documents;

- the voluminous records from multiple sources; and

- the novel legal issues implicated by the charged conduct, defendants' compliance with the IBB's constitution, and the interplay of civil lawsuits premised on the alleged misconduct.

*Id.* Defendants joined the government's request to designate the case as complex. *Id.* at 4. The court emphasized that the number of defendants, the nature of the prosecution as demonstrated

by the length of the investigation, and the extensive amount of discovery made adequate preparation within the STA's time limits unreasonable. *Id.* And so, the court found it served the ends of justice to designate this case as complex. *Id.*

At the next status conference, on January 16, 2025, defendant Newton Jones's counsel moved for a May 11, 2026, trial setting—with defendants William Creeden, Kateryna Jones, William Fairley, Lawrence McManamon, and Cullen Jones supporting the proposed trial date. Doc. 92 at 1. The government proposed February 9, 2026, instead. *Id.* The court set the case for a jury trial on May 4, 2026, concluding—under the specific findings set forth on the record—that allowing defendants the additional time to prepare served the ends of justice. *Id.* And so, the court excluded time from January 16, 2025, until May 4, 2026, under § 3161(h)(7)(A).

Then, on February 11, 2025, defendants and the government jointly proposed a scheduling order—setting deadlines leading up to the May 4, 2026, trial date—and moved to exclude time until the trial date under the STA. *See* Doc. 99; Doc. 101. In those papers, the defendants all represented to the court that they had agreed to waive their rights under the STA "to allow defendants sufficient time to prepare this complex case for trial." Doc. 99 at 4–5.

Just days after this joint motion, the discovery difficulties escalated. The court outlines the alleged discovery delay, below, as it's presented in the parties' papers. For helpful context, the court traces the progress of discovery from the first production in September 2024 until the delay that informs this motion.

## II.    Alleged Discovery Delay

The government began producing discovery on September 27, 2024. Doc. 134 at 3. But then, defendants informed the government that they "preferred receiving the records in a different e-discovery format with load files." *Id.* at 4. On October 16, 2024, the government warned defendants that this reformatting would cause delay and so secured consent from each

defendant in writing.  *Id.*  The government then reformatted all the discovery and produced three rounds of discovery in defendants' preferred, load-files format in December 2024—on the 4th, 12th, and 16th of that month.  Doc. 130 at 3; Doc. 134 at 4.  At that point, the government "believed it had produced to the defendants all the records in its possession[.]"  Doc. 134 at 4.

On January 15, 2025, defense counsel notified the government of multiple discovery deficiencies.  Doc. 130 at 3.  They met and conferred with the government, raising the issue of securing devices individual defendants had used while employed at IBB.  *Id.*  The government, for its part, asserts that defendants had known about the devices for months.  Doc. 134 at 4.  It had informed defendants on October 25, 2024, that it hadn't collected electronic devices—which remained preserved in IBB's possession.  *Id.*  And the government asserts that counsel for Cullen Jones had informed the court that he "was working with the Boilermakers Union directly to obtain information . . . needed from his devices[.]"  *Id.* at 5.  On January 29, 2025, the government provided defense counsel a list of devices preserved by the IBB.  Doc. 130 at 3.

The government produced a fourth round of discovery on February 4, 2025.[2]  *Id.*  After reviewing the various productions, defendants discovered only a limited number of their email communications.  *Id.*  They also identified that the government had failed to secure any evidence from defendants' work devices.  *Id.* at 3–4.  Another meet and confer with the government followed, during which the government represented that it would coordinate securing images of the devices or server materials from IBB if defendants identified those reasonably relevant to the case.  *Id.* at 4.  A string of emails ensued.

On February 11, 2025, counsel for defendant Newton Jones emailed the government and suggested pulling defendants' email communications from IBB's server.  *Id.*  A few days later,

---

[2]    The government's Response explains that the "government discovered that one folder in Round 3 had not properly loaded and produced 3,071 records in Round 4 on February 3, 2025."  Doc. 134 at 4 n.1.

counsel for defendant Cullen Jones emailed the government with a list of devices believed to possess exculpatory evidence.  *Id.*  On February 28, 2025, Newton Jones's counsel again contacted the government about the device and server discovery.  *Id.*  Then, Cullen Jones's counsel reinitiated communication with the government on March 3, 2025.  *Id.*  He requested imaging of an additional device and sought confirmation of his previous requests' receipt.  *Id.* The government didn't respond to any of these emails.  *Id.*  But the government's Response asserts that it "had multiple calls and emails with counsel for the Boilermakers Union attempting to gather emails and electronics" between February and June 2025.  Doc. 134 at 7.

On April 4, 2025, Cullen Jones's counsel sent a follow up email.  Doc. 130 at 4.  The government responded on April 25, 2025, stating it was working to facilitate the request because the devices at issue weren't in the government's possession.  *Id.*  On May 6, 2025, the government emailed defense counsel, advising that it would ask IBB for consent to search the devices identified by defense counsel and that it was collecting additional information from IBB about defendants' emails and other server material.  *Id.* at 5.  On May 30, 2025, the government attempted to facilitate the parties' access to the emails with a formal subpoena and a contemporaneously filed abrogation motion.  Doc. 134 at 8; Doc. 107.

When defense counsel learned in early May that the government still hadn't facilitated the materials' production, they contacted IBB directly.  Doc. 130 at 5.  They asked if IBB would produce any materials voluntarily.  *Id.*  IBB's counsel advised that IBB would require a Rule 17(c) subpoena.  *Id.*  On July 9, 2025, defendants filed a Motion for Issuance of a Rule 17(c) Subpoena Duces Tecum to IBB (Doc. 126) to secure defendants' emails and other server materials.  The court granted the motion as unopposed and directed the Clerk of the Court to issue a subpoena.  Doc. 140.  Defendants later filed an opposed motion for a 17(c) subpoena.

Doc. 173. In the opposed motion, defendants tried to secure production of IBB email accounts other than defendants' accounts, as well as records, meeting minutes, Dropbox indexes, policies, and calendar events from IBB. *Id.* at 3–4. The court granted the motion as it applied to the meeting minutes but denied it otherwise as incompatible with the Supreme Court's *Nixon* factors. Doc. 202.

Now, defendants argue, the government's delay acquiring and producing evidence between February 2025 and May 2025 "substantially undermine[s] the Court's ends-of-justice findings under the [Speedy Trial] Act such that they are no longer appropriate to excuse delay in this case." Doc. 130 at 8. They contend that the "discovery delay is not reasonably related to any of the ends-of-justice findings in the Court's November 2024 order designating this case as complex." *Id.* at 9. So, with a more-than-70-day discovery delay attributable to the government, the STA compels the court to dismiss the Indictment, defendants contend.

## III.        Speedy Trial Right

A defendant's right to a speedy trial is both a constitutional and a statutory right. The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial[.]" U.S. Const. amend. VI. The speedy-trial "right attaches when the defendant is arrested or indicted, whichever comes first." *United States v. Medina*, 918 F.3d 774, 779 (10th Cir. 2019) (quotation cleaned up). And Title 18 codifies a criminal defendant's speedy trial right. *See* 18 U.S.C. § 3161(c). So, there "are two ways a defendant's right to a speedy trial may be violated. The first is if the Speedy Trial Act is violated. The second is if a defendant's Sixth Amendment right to a speedy trial is violated." *United States v. Velarde*, No. 13-CR-160-1-F, 2014 WL 11365685, at *5 (D. Wyo. Apr. 15, 2014), *aff'd*, 606 F. App'x 434 (10th Cir. 2015).

The court evaluates defendants' dismissal motion under both the STA and the Sixth Amendment. It starts with the STA.

A.    **STA Violation**

Defendants argue that, although the court made express end-of-justice findings under § 3161(h)(7)(A), the government's discovery—later—delay changed the circumstances underlying those findings.  Doc. 130 at 9.  And those changed circumstances "undermine" the findings "such that they are no longer appropriate to excuse delay in this case."  *Id.* at 8.  That's so, defendants assert, because they consented to the complexity designation and waived their speedy-trial rights while relying on the government's representation that it would produce its final round of discovery in just a few weeks.  *Id.* at 9.

The government, for its part, contends that defendants are trying to convert a purported discovery issue—governed by Federal Rule of Criminal Procedure 16—into a basis for an STA dismissal.  Doc. 134 at 1.  It emphasizes that Rule 16 only requires "the government to produce relevant statements and records 'in the government's possession, custody or control[.]'"  *Id.* at 3 (emphasis omitted) (quoting Fed. R. Crim. P. 16(a)).  And the government argues that—even were defendants to demonstrate a Rule 16 violation—dismissal is a disfavored remedy.  *Id.* at 2.

The Speedy Trial Act is meant "to protect a criminal defendant's constitutional right to a speedy trial and serve the public interest in bringing prompt criminal proceedings."  *United States v. Loughrin*, 710 F.3d 1111, 1119 (10th Cir. 2013) (quotation cleaned up).  "Under the [STA], a federal criminal trial must begin within seventy days of the filing of the indictment or from the date of the defendant's initial appearance, whichever occurs later."  *United States v. Margheim*, 770 F.3d 1312, 1318 (10th Cir. 2014) (citing 18 U.S.C. § 3161(c)(1)).  "Several 'enumerated events' are excluded from the [STA]'s prescribed seventy-day period, thus tolling the speedy-trial clock."  *Id.*  Relevant here, the district court must exclude "[a]ny period of delay resulting from a continuance . . . if the judge granted such continuance on the basis of his

findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Among the factors the district court "shall consider in determining whether to grant a continuance" is whether "the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation . . . within the time limits established by" the STA. *Id.* § 3161(h)(7)(B). "If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant." *Id.* § 3162(a)(2).

When determining whether the court's ends-of-justice findings suffice, the Tenth Circuit has "distinguished between (1) cases where the record contains an explanation of why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time and (2) those where the record contains only short, conclusory statements lacking in detail." *United States v. Madkins*, 866 F.3d 1136, 1140 (10th Cir. 2017) (quotation cleaned up). Those in the first category satisfy the STA's requirements, but those in the second category do not. *Id.* The court can look to written orders, as well as "oral and written statements of the district court and the moving party" for sufficient ends-of-justice findings. *Id.* at 1142.

Here, the court embraced eight factors—articulated by the government—to justify designating the case as unusual and complex. Doc. 75 at 2–4. Those eight factors included findings about the: (i) case's expansive investigation; (ii) Indictment's lengthy span; (iii) voluminous discovery from various sources; (iv) challenges of working with non-parties—the IBB, its outside law firm and third-party vendor, as well as other third-party international travel

and entertainment sources; and (v) novel legal issues in light of IBB's constitution and the interplay of related civil lawsuits.  *Id.*  The court also pointed to the number of defendants as a complicating factor.  *Id.* at 4.  Defendants didn't oppose the government's request to designate the case as complex.  *Id.*  Indeed, they joined the request.  Now, however, defendants argue that the government's discovery delay undermined the court's ends-of-justice findings, changing the circumstances that supported the complexity exclusion under the STA.  Doc. 130 at 9.  For support, defendants lean into a Second Circuit opinion, *United States v. Pikus*, 39 F.4th 39 (2d Cir. 2022).  *Id.* at 8–9.

In *Pikus*, the government "sporadically and haphazardly" produced discovery over a span of several years.  39 F.4th at 42.  The Second Circuit concluded that the case's delay "was primarily the result of the Government's delay in producing discovery and the district court's failure to effectively respond."  *Id.*  The district court often had excluded time by identifying the case as complex; noting the parties' negotiations; or citing pending motions—all without making any ends-of-justice finding.  *Id.* at 44, 45.  Indeed, the case had proceeded for more than two years before the district court articulated any specific ends-of-justice findings to support a complex designation.  *Id.* at 50–51.  In some instances, the district court cited pending motions or negotiations when, in fact, no motions were pending and nothing in the record indicated ongoing negotiations.  *Id.* at 45, 47, 48.  At other times, the district court made "a cursory exclusion of time on the Government's motion" or simply stated that "'[t]ime is excluded'"—with nothing more.  *Id.* at 46, 47.  Defense counsel objected more than once to the district court's exclusions of time, arguing that the government—not any of the other reasons cited by the court—had caused the case's delay.  *Id.* at 47, 49.  Defendant also moved to dismiss the indictment on speedy trial grounds twice, but the district court denied both motions.  *Id.* at 42.  The Second

Circuit concluded, based on the case's "extraordinary" delays, that "[t]hose motions to dismiss should have been granted." *Id.*

This case isn't *Pikus* 2.0. Far from it. Here, the court made specific ends-of-justice findings early in the case, after having held just one status conference. *See* Doc. 75 at 2–4. Those specific and numerous findings supported a complexity designation, and the court contemporaneously excluded time on that basis. Any alleged delay by the government in procuring discovery from IBB overlapped and ran concurrent with the time excluded for complexity. So, defendants' trial date wouldn't have changed had the government proceeded more rapidly. Indeed, the court set the trial date and excluded time on January 16, 2025—about a month before the complained-of delay even occurred. *See* Doc. 92 at 1. Unlike *Pikus*, therefore, the government didn't *cause* the delay—the complexity of the case did.

Nor does the court buy defendants' argument that the discovery delay changed the circumstances underlying its complexity findings. Doc. 130 at 9. According to defendants, the government didn't respond to their emails or communicate with IBB in a timely fashion. *Id.* at 4–5. Even if accurate, this delay doesn't alter the breadth of the investigation, the span of the Indictment, the volume of discovery, the intricacies of working with non-parties, or the novel legal issues—*i.e.*, all the court's specific ends-of-justice findings. To be sure, defendants contend they relied on the government's discovery timeline when deciding to waive their speedy-trial rights. *Id.* at 9. But that reliance doesn't alter the realities of the case that convinced the court to apply a complexity designation. So, even crediting defendants' version of the facts, "the circumstances justifying the complexity designation remain essentially unchanged." *Pikus*, 39 F.4th at 54.

The court finds no STA violation here. Nor do these facts support a constitutional speedy-trial violation, as the court explains, next.

## B.    Constitutional Speedy Trial Violation

In *Barker v. Wingo*, the Supreme Court identified a four-part balancing test for determining whether a speedy-trial error warrants an indictment's dismissal. 407 U.S. 514, 530 (1972). These so-called *Barker* factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id.* No one of the four factors alone is necessary or sufficient to find a deprivation of the Sixth Amendment speedy-trial right. *Id.* at 533. "Instead, the factors are related and must be considered together along with other relevant circumstances." *United States v. Muhtorov*, 20 F.4th 558, 634 (10th Cir. 2021) (quotation cleaned up). Applying the four *Barker* factors here, the court concludes the complained-of delay hasn't violated defendants' constitutional right to a speedy trial.

### 1.    Length of Delay

The first *Barker* factor—the length of the delay—serves as a triggering mechanism. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors[.]" *Barker*, 407 U.S. at 530. In *United States v. Margheim*, the Tenth Circuit clarified that delays approaching one year generally satisfy the requirement for presumptive prejudice. 770 F.3d at 1326. "The length of delay is measured from the time at which the speedy trial right attaches: the earlier of either arrest or indictment." *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006). Where "defendant has shown a presumptively prejudicial delay," the court then considers "'the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim[,]'" while accounting "for the

complexity of the charges." *Lewis*, 116 F.4th at 1155 (quoting *United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010)).

Here, defendants are experiencing a presumptively prejudicial delay. Defendants were indicted on August 21, 2024. Doc. 1 at 1. The court has set a jury trial for May 4, 2026. *See* Doc. 92. The "interval between accusation and trial"—about 20.5 months—thus "has crossed the threshold dividing ordinary from presumptively prejudicial delay" because it exceeds one year. *Muhtorov*, 20 F.4th at 638 (quotation cleaned up). But this delay is just months past the presumptively prejudicial threshold. *Compare Muhtorov*, 20 F.4th at 638 (concluding six-and-a-half-year delay "weighs strongly in favor of" defendant), *with Lewis*, 116 F.4th at 1160 (finding two-year delay "favors Defendants only slightly").

What's more, our Circuit has held similar time spans—a two-year interval between charges and trial—"may not be deemed a 'delay' when the charges are complex." *Seltzer*, 595 F.3d at 1176; *see also Lewis*, 116 F.4th at 1160 (finding two-year "delay was not unreasonable given the complexity of the charges"). And the court already deemed this case complex—with defendants' unanimous agreement. Doc. 75 at 4. In light of this complexity, the 20.5 month delay favors defendants "only slightly" and barely tilts the first *Barker* factor out of neutral. *Lewis*, 116 F.4th at 1160.

With that decided, the court moves on to the second *Barker* factor—the reason for the delay.

### 2.    Reason for Delay

The "'ultimate responsibility' for justifying the delay belongs to the government." *Seltzer*, 595 F.3d at 1179 (quoting *Barker*, 407 U.S. at 531). But not "all reasons for a delay are weighed the same." *Lewis*, 116 F.4th at 1155. The government bears more fault "for a

'purposeful delay or delay to gain advantage' and less for delays caused by 'negligence.'" *Id.* (quoting *Margheim*, 770 F.3d at 1326). That said, "pretrial delay is often both inevitable and wholly justifiable." *Doggett v. United States*, 505 U.S. 647, 656 (1992). To analyze this factor, the court first must quantify the delay, then weigh it. *Muhtorov*, 20 F.4th at 639.

### a.   Quantifying the Delay

The first part of the inquiry requires the court to "'divide' the overall delay into discrete 'periods during which an indictment was pending against' the defendant to provide manageable units of analysis." *Id.* at 639–40 (quoting *United States v. Black*, 830 F.3d 1099, 1113 (10th Cir. 2016)).

Here, defendants simplify the court's task by premising their dismissal motion on a single, discrete period of delay: February 2025 to May 2025—which they characterize as "the delay from Defendants' first request to the Government for specific, additional IBB material [until] the date the government advised it had not yet taken any action to secure, image or produce those materials[.]" Doc. 130 at 10. Defendants thus carve out a chunk of already-excluded time and contend that this chunk—from February 2025 to May 2025—is attributable to the government's discovery delays. This chunk of time forms the sole basis for defendants' dismissal motion. So, the court weighs only the delay of the single, discrete period identified by defendants.[3]

### b.   Weighing the Delay

---

[3]   The court recognizes that defendants' motion employs a modifier—"[a]t the very least"—when it identifies the delay period. Doc. 130 at 10 ("At the very least, the delay from . . . February 14, 2025, to May 6, 2025 . . . should be included in the speedy trial calculation."). This modifier could suggest defendants want the court to weigh other discrete periods, as well. But defendants' arguments provide no basis for the court to include any other discrete period. Their motion premises its requested relief solely on the discovery delay during the identified interval. *See generally* Doc. 130. It's not the court's job to assemble arguments and assert them. So, the court weighs only the discrete period defendants identify as attributable to the government's discovery delay.

For each discrete period, the court must "decide whether the government or the criminal defendant is more to blame for the delay." *Lewis*, 116 F.4th at 1156 (quotation cleaned up). "The root cause of the delay is . . . important." *Muhtorov*, 20 F.4th at 640. A "shorter (yet nefariously motivated) delay counts more heavily against the responsible party than a longer (yet innocuously caused) one." *Lewis*, 116 F.4th at 1156. So, a "'deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.'" *Muhtorov*, 20 F.4th at 641 (quoting *Barker*, 407 U.S. at 531). But a "'more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* (quoting *Barker*, 407 U.S. at 531). Also important for the court's analysis here: our Circuit will "hold the defendant accountable for self-inflicted delays, including those attributable to . . . seeking continuances." *Lewis*, 116 F.4th at 1155; *see also United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006) (finding "little merit in defendant's assertion of his Sixth Amendment right to a speedy trial in the wake of the government's legitimate request for a continuance when the defendant has sat on his hands for seven months and requested several continuances of his own").

Here, defendants face an uphill battle to tip the second *Barker* factor in their favor. For starters, they have agreed to every continuance the court has granted. *See* Doc. 74 at 7–8 (Hr'g Tr. 7:1–8:1) (defense counsel informing the court that all defendants had agreed with government's motion to designate case as complex and exclude time); *Id.* at 14, 15–17 (Hr'g Tr. 14:12–21; 15:23–17:25) (court ensuring each individual defendant understood that the continuance from October 10, 2024 to January 16, 2025 would "be on [defendants'] clock, not on the government or the court's calcul[us] of the speedy trial deadline."); Doc. 75 at 4

(defendants joining government's complex-designation request); Doc. 92 at 1 (defendants proposing a trial date one week later—May 11, 2026—than the court's trial setting—May 4, 2026); Doc. 99 at 1 (all defendants asking court to adopt proposed deadlines and exclude time until May 4, 2026, trial date). That unanimous agreement puts defendants in a nigh impossible spot to win their argument; any delay appears largely self-inflicted.

What's more, the alleged discovery delay identified by defendants runs concurrently with time already excluded for case complexity. The Circuit, in *Lewis*, questioned defendants' attempt to assign an entire 14-month delay to the government when defendants didn't mention or explain "how th[at] timeline overlapped with [defendants'] review of" other voluminous discovery. 116 F.4th at 1163. It concluded that the discovery period "might have lasted just as long"—given that voluminous discovery review—whether the government had behaved negligently in its discovery production or not. *Id.* It thus seemed likely to the Circuit that the voluminous discovery review happened "in tandem" with the government's negligence, undercutting defendants' position attributing the entire delay solely to the government. *Id.* at 1163–64; *see also Muhtorov*, 20 F.4th at 649 (finding that where government's actions "did not extend the pretrial period" because defendant "would not have faced trial earlier than he did but for" the government's actions, second *Barker* factor doesn't tip in favor of defendant (quotation cleaned up)).

So too, here. The complex case designation suggests that any negligence attributable to the government for not answering defense counsel's emails in February and March and not successfully facilitating with IBB before May occurred "in tandem" with already-excluded time to review other voluminous discovery. *Lewis*, 116 F.4th at 1163. Defendants "would not have

faced trial earlier than [they will] but for" the government's discovery delay. *Muhtorov*, 20 F.4th at 649 (quotation cleaned up).

And that's not the only thing that makes defendants' position a tricky one. Defendants contend the government caused a delay by not facilitating production of material from IBB more quickly. But the record suggests that defendants could have contacted—and eventually did contact—IBB themselves, instead of waiting on the government. Indeed, defendants were able to secure, for example, all their email accounts from IBB through a Rule 17(c) subpoena duces tecum. *See* Doc. 126; Doc. 140. So, defendants' choice to rely on the government instead of availing themselves of other available means necessarily tempers any blame for the delay they attribute to the government's negligence.

Finally, defendants—by their own admission—"do not suggest any intentional delay[.]" Doc. 130 at 13. Instead, they catalogue that "multiple emails went unanswered and the government failed to take any action to address the IBB discovery for months after Defendants' request." *Id.* In so doing, defendants concede that the government's behavior—at most—constitutes negligence, not a "'deliberate attempt to delay the trial in order to hamper the defense[.]'" *Muhtorov*, 20 F.4th at 641 (quoting *Barker*, 407 U.S. at 531). And a delay caused by a "'neutral reason such as negligence . . . should be weighted less heavily[.]'" *Id.* (quoting *Barker*, 407 U.S. at 531). So, even if the court finds the government negligent, it tips the scales in defendants' favor only modestly.

This second factor doesn't favor defendants. They largely inflicted this delay on themselves. And, during the complained-of chunk of time, they still would've needed time to review the voluminous materials in this case. Defendants also failed to help themselves by reaching out to IBB. Defendants admit that the government—at most—negligently caused the

delay, and negligence simply doesn't get them very far.  On to factor three:  defendants asserting their speedy-trial rights.

### 3.    Assertion of Speedy-Trial Rights

Defendants must bear the burden of showing that they desired a speedy trial.  *Muhtorov*, 20 F.4th at 650.  Courts consider "whether the defendant actively asserted his right, or rather, whether the defendant's behavior during the course of litigation evidenced a desire to go to trial." *Lewis*, 116 F.4th at 1156 (quotation cleaned up).  Courts "weigh the frequency and force of [defendants'] objections to the delay."  *Margheim*, 770 F.3d at 1328 (quotation cleaned up).  A defendant's "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  *Barker*, 407 U.S. at 532.  What's more, "assertion of the right to a speedy trial is not satisfied merely by moving to dismiss after the delay has already occurred." *Margheim*, 770 F.3d at 1328 (quotation cleaned up).

Here, the court's review of the record indicates that defendants first asserted their speedy-trial rights in the at-issue Motion to Dismiss (Doc. 130)—never before.  As the court outlined above, *see* § III.B.2.b., defendants have agreed to each continuance the court has granted.  They knowingly and voluntarily waived their speedy-trial rights to secure additional preparation time. *See* Doc. 99 at 4–5 (specifying on February 11, 2025 that each defendant "agrees to waive [his/her] rights under the Speedy Trial Act . . . to allow defendants sufficient time to prepare this complex case for trial").  This conduct "indicate[s] a contrary desire to delay proceedings." *Muhtorov*, 20 F.4th at 652.  To be sure, defendants asserted their speedy-trial rights in their Motion to Dismiss (Doc. 130).  But that came after the complained-of delay (from February 2025 to May 2025) had occurred.  Defendants thus are a day late and a buck short; asserting speedy-trial rights "merely by moving to dismiss after the delay has already occurred" doesn't

suffice. *Margheim*, 770 F.3d at 1328 (quotation cleaned up). This factor thus weighs against finding a constitutional violation. The final factor—prejudice to the defendants—registers a similar outcome.

### 4.    Prejudice to the Defendants

"The individual claiming the Sixth Amendment violation has the burden of showing prejudice." *United States v. Toombs*, 574 F.3d 1262, 1275 (10th Cir. 2009). Where there's an "extreme delay, the defendant need not present specific evidence of prejudice and instead may rely on the presumption of prejudice created by the extreme delay." *Id.* (citing *Doggett*, 505 U.S. at 655). A delay qualifies as "extreme" when it extends beyond six years. *Lewis*, 116 F.4th at 1166. But a "two-year delay . . . does not trigger that presumption." *Id.*; *see also Toombs*, 574 F.3d at 1275 (finding twenty-two-month delay "does not constitute extreme delay"). And so, defendants here get no presumption and, instead, "each have to make a particularized showing of prejudice caused by the pretrial delay." *Lewis*, 116 F.4th at 1166 (quotation cleaned up). The Supreme Court has identified three categories under which a defendant can demonstrate specific prejudice: (i) oppressive pretrial incarceration; (ii) anxiety and concern of the accused; and (iii) impairment of the defense. *Muhtorov*, 20 F.4th at 654 (quoting *Barker*, 407 U.S. at 532). Defendants invoke the third category, and the third category only.

"Impairment of the defense can be the result of lost witnesses, defense witnesses who are unable to recall accurately events of the distant past, or lost evidence." *Id.* (quotation cleaned up). To establish impairment from lost testimony, a defendant must "explain how the lost testimony was material or meaningful" to establish "that the defendant is not speculating about the testimony by merely conjuring up potential witnesses." *Id.* (quotation cleaned up). To establish impairment resulting from lost evidence, a defendant must "demonstrate with

specificity how the evidence would have aided his defense[.]" *Medina*, 918 F.3d at 781. What's more, a defendant must show that "the government's delay in bringing the defendant to trial caused the evidence to be actually lost" and that "the defendant took appropriate steps to preserve the evidence." *Id.*

An inability to demonstrate prejudice "is nearly fatal to a claim." *United States v. Nixon*, 919 F.3d 1265, 1278 (10th Cir. 2019) (quotation cleaned up); *see also United States v. Frias*, 893 F.3d 1268, 1275 (10th Cir. 2018) (rejecting Sixth Amendment speedy-trial claim when prejudice was absent even though all other factors supported defendant).

Here, defendants contend that going five months without the requested material left them "unable to begin preparing a defense in earnest." Doc. 130 at 13. And they argue—considering the lengthy timespan of the Indictment—that the delay heightens the risk of "prejudice from unavailable witnesses" and "being unable to defend themselves due to evidence lost over time." *Id.*

But such generalized assertions of prejudice don't satisfy the Circuit's standards. Defendants have neither identified any unavailable witnesses nor why those witnesses' testimony was "material or meaningful." *Muhtorov*, 20 F.4th at 654 (quotation cleaned up). Defendants thus engage in "conjuring up potential witnesses" and "speculating about the testimony"— something that our Circuit forbids. *Id.* (quotation cleaned up). Defendants also haven't identified any specific lost evidence—only the heightened risk of it—nor have they "demonstrate[d] with specificity how the evidence would have aided [their] defense[.]" *Medina*, 918 F.3d at 781. And even if they had done all these things, they fail to show the government's delay caused these alleged impairments. Indeed, the delay would have occurred regardless, given the complex-case designation and the fact that the complained-of delay ran in-tandem with

20

already-excluded time.  Defendants thus wholly fail to demonstrate prejudice under our Circuit's strictures.  So, the fourth *Barker* factor favors the government.

Now, the court must balance the four factors.

### 5.    Balancing the *Barker* Factors

The twenty-month delay from Indictment to trial triggers a *Barker* analysis under the first factor.  But the delay's relatively modest length—particularly given the complexity of the case— lessens the first factor's weight.  Defendants find no help from the second *Barker* factor—the reason for delay.  And the third *Barker* factor—defendants' assertion of their speedy-trial rights—weighs against finding a constitutional violation, as well.  Indeed, "*Barker* counsels [courts] not to find a violation of the right to a speedy trial when the defendant's actions indicate he had no desire for a speedy trial." *Batie*, 433 F.3d at 1293.  Defendants' actions here unquestionably show little to no real desire for a speedy trial.  Perhaps most devastating to defendants' motion, however, is the fourth *Barker* factor.  Defendants fail to identify prejudice with any of our Circuit's requisite specificity.  And "in most circumstances, failure to specify prejudice will eviscerate the defendant's claim." *Margheim*, 770 F.3d at 1329.

With the first factor teetering near neutral and the last three factors weighing against finding a violation, the court finds no violation of defendants' constitutional speedy-trial right. The court thus denies defendants' Motion to Dismiss (Doc. 130).  Defendants haven't demonstrated a speedy-trial error under either the STA or the Sixth Amendment.

### F.    Alternative Relief

Defendants request, in the alternative, that the court stay all pretrial deadlines until the government has produced the necessary discovery.  Doc. 130 at 13.  But the court already

granted a subsequent request by defendants—premised on the state of discovery—to extend pretrial deadlines. *See* Doc. 195; Doc. 199. The court thus denies this request as moot.

## IV.      Conclusion

The government's alleged discovery delays don't warrant dismissal of the Indictment under the STA or the four *Barker* factors. The court thus denies defendants' motion. The court also denies as moot defendants' alternative request for an extension of pretrial deadlines. The court already has granted defendants their requested relief.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Joint Motion to Dismiss Pursuant to the Speedy Trial Act, or in the Alternative to Stay Proceedings (Doc. 130) is denied.

**IT IS SO ORDERED.**

**Dated this 5th day of February, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
