IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
WARREN FAIRLEY (04),
LAWRENCE MCMANAMON (05),
CULLEN JONES (07),

      **Defendants.**

Case No. 24-20070-DDC

## MEMORANDUM AND ORDER

The court here embarks again down a well-trodden path.  Once again, a party requests

that the court issue a subpoena duces tecum under Federal Rule of Criminal Procedure 17(c) to

the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and

Helpers (IBB).  Earlier in this case, the court quashed one such subpoena, granted another as

unopposed, and granted in part, denied in part a third.  *See* Doc. 138; Doc. 140; Doc. 202.  Now,

it's time for round four.

Defendants style their current 17(c) request as an "amended motion."  Doc. 226.  It's an

appropriate title.  Defendants amend—and significantly improve on—their earlier 17(c) attempt,

crafting their amended requests with markedly increased specificity.  But specificity isn't all that

matters.  The now-familiar *Nixon* requirements also demand admissibility and relevance.  *See*

*United States v. Nixon*, 418 U.S. 683, 699–700 (1974); *United States v. Morris*, 287 F.3d 985,

991 (10th Cir. 2002).  And IBB's Response challenges defendants' newest motion on both fronts.

Doc. 234.

Evaluating defendants' forty-one subpoena requests under the three *Nixon* strictures—admissibility, relevance, and specificity—the court concludes that eight modified subpoena requests satisfy *Nixon*'s requirements. The others fail as either inadmissible—under an impeachment-evidence or privilege analysis—or irrelevant. The court explains these conclusions, below.[1]

Because all parties by now are familiar with the legal standard governing Rule 17(c) subpoenas, this Order outlines it in the broadest of brushstrokes. It applies the *Nixon* triad—admissibility, relevance, and specificity—to determine which subpoena requests survive. The court starts with the admissibility issues identified by IBB's Response, first taking up requests for impeachment evidence and then requests for materials protected by attorney-client privilege. It then evaluates the surviving requests for relevance, addressing defendants' two relevance arguments: state-of-mind evidence and advice-of-counsel evidence. The court finishes its analysis with specificity.

## I.    Legal Standard

The Supreme Court and the Tenth Circuit have limited Rule 17(c) subpoenas to those which "'expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.'" *United States v. Abdush-Shakur*, 465 F.3d 458, 467 (10th Cir. 2006) (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)). In other words, Rule 17(c) shouldn't facilitate "an additional means of discovery" or enable "a general fishing expedition." *Id.* (quotation cleaned up). So, a party seeking a subpoena under that rule must

---

[1]    Following the parties' lead, the court analyzes the subpoena requests in swaths—not each one individually. To clarify which requests the court denies under each *Nixon* requirement, the court includes charts in Appendix A. Those charts take each *Nixon* requirement, divide it by argument, and indicate which individual requests that argument implicates. The final two charts list the eight surviving requests—one showing the requests as presented by defendants and one showing the court's modifications. *See* Appendix A.

establish that the subpoenaed material is "'relevant, admissible, and specific,'" requirements

derived explicitly from *United States v. Nixon*, 418 U.S. at 699–700. *Id.* (quoting *United States*

*v. Gonzalez–Acosta*, 989 F.2d 384, 389 (10th Cir. 1993)). "Failure of one of these elements" is

dispositive. *Id.* (citing *See Morris*, 287 F.3d at 991). "Conjecture and speculation will not

provide the lift to carry a movant over the three hurdles." *United States v. Jackson*, 155 F.R.D.

664, 668 (D. Kan. 1994).

### II.    Applying the Legal Standard to Defendants' Motion

The court begins its analysis with admissibility. For those requests which survive, it then

runs them through two more tests—first, relevance, then, specificity. Just eight requests survive.

### A.    Admissibility

For the court to issue a 17(c) subpoena, it must find "a 'sufficient preliminary showing'

of admissibility." *United States v. Romero*, No. 21-cr-00559-JCH, 2023 WL 2614472, at *2

(D.N.M. Mar. 23, 2023) (quoting *Nixon*, 418 U.S. at 700). "Conclusory allegations

of . . . admissibility are insufficient." *United States v. Wittig*, 250 F.R.D. 548, 553 (D. Kan.

2008). Generally speaking, "impeachment evidence does not meet the admissibility test and may

not be the sole support for a party's demand." 25 *Moore's Federal Practice* § 617.08[3][b] (3d

ed. 2024). Similarly problematic, material protected by attorney-client privilege also precludes a

finding of admissibility. *See United States v. Xu*, No. 23-CR-133-5 (JMF), 2024 WL 4504352,

at *2 (S.D.N.Y. Oct. 16, 2024) (denying motion for 17(c) subpoena, in part, because it sought

attorney-client privileged—and thus inadmissible—materials); *see also United States v.*

*Hoeffner*, 254 F.R.D. 302, 306–07 (S.D. Tex. 2008) (quashing 17(c) subpoena where sought-

after material fell within un-waived attorney-client privilege); *United States v. Tomison*, 969 F.

Supp. 587, 598 (E.D. Cal. 1997) (same).

IBB contends that both impeachment purposes and attorney-client privilege make defendants' requested evidence inadmissible and thus prohibit issuance of defendants' proposed subpoena. Doc. 234 at 5–16. The court takes up both barriers to admissibility here, starting with requests for solely impeachment evidence.

### 1.    Admissibility:  Impeachment

Defendants explicitly identify "impeachment purposes" and witness "credibility" as grounds for some of their subpoena requests. Doc. 226 at 12, 18, 21, 22. IBB argues that impeachment evidence is presumptively inadmissible. Doc. 234 at 14–16. Defendants reply that the general rule against impeachment evidence doesn't apply here because these witnesses are almost certain to testify at trial. Doc. 235 at 6.

Recall that "prior to trial, impeachment materials may not be obtained through a Rule 17(c) subpoena because such materials fail *Nixon*'s admissibility requirement." *Wittig*, 250 F.R.D. at 553. That's so because "impeachment evidence only ripens into admissible evidence after the witness has presented direct testimony at trial." *Id.* at 554. "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Nixon*, 418 U.S. at 701. But defendants, in their Reply, suggest this general rule doesn't apply here.

In support, defendants highlight an acknowledgement our court made in *Wittig*, namely: "'some courts have concluded that when a person is almost certain to testify as a witness at trial and there is an indication of what that testimony will be, then pre-trial production [of impeachment materials] is appropriate.'" Doc. 235 at 6 (quoting 250 F.R.D. at 553). But *Wittig* didn't reach this conclusion itself—it only acknowledged that other courts had reached it. 250 F.R.D. at 553 (citing *United States v. Libby*, 432 F. Supp. 2d 26, 36 (D.D.C. 2006)). And in the

4

very next sentence, *Wittig* also acknowledged just the opposite:  that "impeachment evidence only ripens into admissible evidence after the witness has presented direct testimony at trial."  *Id.* at 554.  *Wittig* never chose a side; instead, it concluded that it couldn't permit issuance of the requested 17(c) subpoena on *Nixon*'s relevance and specificity prongs, regardless whether the "documents *might* be admissible[.]"  *Id.* (emphasis in original).  In short, our court declined to decide whether to permit requests for impeachment evidence ahead of trial.  And defendants just cite *Wittig*, never directing the court to other or more persuasive authority.  *See* Doc. 235 at 6.

What's more, even the *Libby* court—who *Wittig* identified as a court who'd permitted pre-trial production of impeachment evidence—noted the split in authority.  *See* 432 F. Supp. 2d at 31 (first citing First Circuit case permitting Rule 17(c) subpoena to disclose impeachment evidence "because the putative key witness, whose general testimony is already known, is scheduled to testify," and then citing Third Circuit case "concluding that district court erred in requiring disclosure of Rule 17(c) documents that contained potential impeachment evidence before the witness who made the statement testified at trial").  Our Circuit hasn't weighed in.

But other district courts in our Circuit have.  And many of those courts have refused to allow a Rule 17(c) subpoena to request materials for impeachment purposes.  *See, e.g.*, *United States v. Pistotnik*, No. 18-10099-EFM-KGG-1, 2019 WL 2233310, at *4 (D. Kan. May 23, 2019) ("The Court holds that Pistotnik cannot use Rule 17(c) to obtain documents about the Report's authorship for the sole purpose of impeaching Dorsett."); *United States v. Hargrove*, No. 11-cr-00326-WYD, 2013 WL 3465791, at *2 (D. Colo. July 9, 2013) ("Because Hargrove's primary purpose for the booking photo . . . is impeachment of a Government witness, a Rule 17(c) subpoena *duces tecum* is not the proper medium to obtain such evidence."); *United States v. Castro-Motta*, No. 11-cr-00033-REB, 2012 WL 3400828, at *3 (D. Colo. Aug. 15, 2012)

("Construed generously, the documents sought are useful principally to undermine the reliability and credibility of both the Western Regional Lab and Ms. Huntington—in other words, for impeachment.  The documents therefore are not 'admissible as evidence' as that term is used and construed in *Nixon* and its progeny."); *but see United States v. Neal*, No. 11-cr-00163-WJM, 2011 WL 4829664, at \*2 (D. Colo. Oct. 12, 2011) (permitting 17(c) subpoena request for personnel file of one of government's two chief witnesses for impeachment purposes).

Here, the court concludes *Nixon*'s admissibility requirement precludes any 17(c) requests premised solely on impeachment or credibility purposes.  Two sets of defendants' requests are thus inadmissible.  *First*, defendants premise their requests for Tim Simmons' communications about the whistleblower letter and Article 17 charge solely on impeachment grounds—arguing that those communications "go directly to Simmons' credibility."  Doc. 226 at 18, 21.  They explain that Simmons prepared the whistleblower letter—which accused Newton Jones of "allegations identical to those now charged in the Indictment[.]"  *Id.* at 17–18.  And that "Simmons was the ultimate benefactor of . . . Newton Jones' expulsion and Simmons' eventual appointment as International President himself."  *Id.* at 18.  *Second*, defendants offer a similar rationale for requesting communications involving John Fultz, saying those communications "go directly to Fultz' credibility."  *Id.* at 22.  They explain that Fultz's involvement with the whistleblower letter and Article 17 proceedings stood "in stark contrast with Fultz' prior participation in much of the charged conduct[.]"  *Id.* at 22.  These credibility rationales don't pass muster under *Nixon*'s admissibility prong.  The court thus denies these sets of subpoena requests.

### 2.    Admissibility:  Attorney-Client Privilege and Waiver

Materials requested under Rule 17(c) also don't pass admissibility muster where attorney-client privilege protects those materials. But where the client—here, IBB—has waived that privilege, the requested materials become admissible. *See In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." (quotation cleaned up)).

Defendants invoke three different sources of privilege waiver by IBB to bump their requests over *Nixon*'s admissibility threshold. *First*, defendants point to the waiver the court already found premised on the Blake & Uhlig September 2022 memo. *Second*, defendants contend that IBB voluntarily disclosed protected materials by producing a separate memo—from 2013—about IBB employing Kateryna Jones (Exhibit 4). *Third*, defendants argue that IBB waived its privilege over communications with Mr. Elbaor when it filed a counterclaim against him in state court. The court assesses each source of waiver, and applies any waiver to defendants' 17(c) requests, source-by-source.

### a. September 2022 Memo

The first source defendants invoke trying to establish attorney-client-privilege waiver is a familiar one—the September 2022 memo. The court already has determined that the September 2022 memo resulted in a privilege waiver. *See* Doc. 177. And it defined the scope of that waiver to include other communications relating to the same subject matter as the memo. *See Burke v. Regalado*, 935 F.3d 960, 1023 (10th Cir. 2019) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." (quotation cleaned up)). Relying on the memo's stated purpose, the court identified the waived subject matters to include:

- expense reporting and reimbursement issues discussed on September 13, 2022;

7

- salary, benefits, and other expenses that a union is permitted to pay its officers and employees under the law; and

- any "Expense Policy" that the International Executive Council (IEC) may have adopted.

Doc. 177 at 12.

Defendants contend this already-determined waiver "largely" applies to requested communications between Kathy Stapp and IBB's Blake & Uhlig counsel. Doc. 226 at 8. And defendants propound a similar waiver argument for Tim Simmons's communications with IBB's counsel. *Id.* at 18–19. IBB responds that the scope of determined waiver contemplated by defendants' motion "is much broader than this Court has ruled." Doc. 234 at 9.

The court finds the scope of the already-determined waiver encompasses some of defendants' requests for counsel communications. The following requests come within that waiver ruling and thus don't fail on admissibility grounds:

- Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and representatives of Blake and Uhlig *regarding the September 20, 2022 memorandum* addressed to Kathy Stapp.

- Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the vacation payouts to Defendants in July 2023.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig *regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."*

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig *regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."*

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and Kathy Stapp regarding the *IBB's expense policies* that were the subject of a meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the early fall (August 1, 2022 – September 19, 2022), and *later reflected in a memorandum dated September 20, 2022* drafted by Blake and Uhlig and addressed to Tim Simmons and Kathy Stapp.

8

- Emails from May 1, 2022 through July 25, 2023 (date of Newt Jones' retirement) between Tim Simmons and any representative of Blake and Uhlig *regarding the memorandum dated September 20, 2022* addressed to Tim Simmons.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "*the expense reporting and reimbursement issues discussed on September 13, 2022.*"

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "*salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law.*"

Doc. 226 at 6–7, 18–19 (italics added by the court); Doc. 226-1 at 5–8 (Def. Ex. A).  All but one of these requests explicitly employs terms the court used to define the waiver's scope, as demonstrated by the court's added italics, above.  The sole exception—the second bullet point above—asks for information about "vacation payouts."  Doc. 226 at 7.  That request fits squarely within the waiver's scope—namely within the subject-matter waiver over "expenses that a union is permitted to pay its officers and employees[.]"  Doc. 177 at 12.

Three of defendants' other requests, however, stretch the boundaries of the defined waiver too far.  One such request ropes in later events not included in the court's waiver Order.  The court thus finds the following emails still protected by attorney-client privilege, thereby failing *Nixon*'s admissibility prong.

- Emails from February 1, 2023 through June 3, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the whistleblower letter and Article 17 charge.

Doc. 226 at 6.  Defendants' motion explains that the whistleblower letter and resulting Article 17 charge occurred months after the September 2022 events, following a meeting held in February 2023 in Marco Island, Florida.  *Id.* at 5.  Communications about these later events don't fall within the court's earlier waiver ruling.

9

Two other requests require modification to align with the scope-of-the-waiver limitations:

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the Fall 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and any representative of Blake and Uhlig regarding the meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the fall of 2022.

*Id.* at 6, 18. These two requests refer to a meeting that occurred in the autumn of 2022. If defendants intended to reference the meeting on September 13, 2022, these requests reside within the scope of the already-defined waiver. Even then, the waiver applies just to the "expense reporting and reimbursement issues" discussed at that meeting—but not the meeting as a whole. Doc. 177 at 12. So, to make these requests fall within the court's waiver Order, the court modifies defendants' requests in this fashion:

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and any representative of Blake and Uhlig regarding the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the fall of 2022.

To sum up, defendants have invoked the court's waiver Order to advance the admissibility of nine subpoena requests. The court concludes six of those requests fall under that waiver and thus pass *Nixon*'s admissibility test. One request—about the whistleblower letter and Article 17 charges—doesn't qualify as one on the same subject matter addressed in the September 2022 memo waiver. And two requests require further limiting to qualify as unprotected under this waiver.

Lest this parsing of requests under attorney-client-privilege waiver seems to have ended too quickly, fear not.  There's more.  Much more.  Defendants also assert that IBB waived its attorney-client privilege through the voluntary disclosure of a memo about backpay to Kateryna Jones (Exhibit 4).  The court addresses that asserted voluntary disclosure—and its accompanying subpoena request—next.

### b.   Waiver by Voluntary Disclosure of 2013 Memo

Defendants explain that IBB disclosed Exhibit 4 when it voluntarily provided the government a 2013 memo from Blake & Uhlig about Kateryna Jones's employment.  Doc. 226 at 8.  IBB's Response never addresses this waiver assertion.  *See generally* Doc. 234.

"Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." *In re Qwest*, 450 F.3d at 1185 (quotation cleaned up). "The proponent of the privilege bears the burden of establishing non-waiver." *Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-CBS, 2018 WL 839927, at *4 (D. Colo. Feb. 12, 2018).  "If a court finds that a waiver of a privilege has occurred, the waiver is to be narrowly construed, but applies to all other communications relating to the same subject matter." *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164-MLB-DWB, 2007 WL 437791, at *2 (D. Kan. Feb. 6, 2007).

Here, the 2013 memo—attached to defendants' motion as Exhibit 4—purports to "assess the various arrangements that may be entered into with foreign personnel"—specifically, Kateryna Jones.  Doc. 226-4 at 2.  And it considers "the resulting tax ramifications" of each arrangement "to the IBB." *Id.*  So, the memo speaks to IBB's withholding and reporting obligations for services rendered by a nonresident alien performing services in Ukraine. *Id.*  It then contemplates the tax ramifications for IBB were Ms. Jones to attain permanent resident

status. *Id.* at 4–5. And it weighs whether IBB should employ Ms. Jones as an employee or an independent contractor. *Id.* at 5–6. Employing the now-familiar waiver analysis, the court determines that with this disclosure IBB waived its attorney-client privilege "not only [for] the specific communication disclosed"—Exhibit 4—but also for "all other communications relating to the same subject matter." *Burke*, 935 F.3d at 1023 (quotation cleaned up). But that subject matter doesn't reach defendants' request.

Defendants argue that this memo waives attorney-client privilege for the communications contained in the following request:

- Emails from March 1, 2015 through August 24, 2015 between Kathy Stapp and any representative of Blake and Uhlig regarding the IBB's payment of backpay to Kate Jones in April 16, 2015 and August 24, 2015.

Doc. 226 at 8. But the memo doesn't discuss backpay—at all. And the court must "narrowly construe[]" the waiver. *See Heartland Surgical*, 2007 WL 437791, at *2. Trying to loop backpay into a memo about the most advantageous employment arrangements for tax purposes doesn't hit that mark. So, the court concludes that the attorney-client privilege continues to protect the requested communications. It thus rejects defendants' backpay-communications request because it fails *Nixon*'s requirements by seeking inadmissible material.

### c. Counterclaim

Finally, defendants argue that IBB waived its privilege over communications with attorney David Elbaor by filing a counterclaim in another lawsuit.[2] Mr. Elbaor filed a collection

---

[2]    Defendants also contend that Mr. Elbaor's communications with Assistant United States Attorney (AUSA) Faiza Alhambra waived IBB's privilege. Doc. 226 at 8–9. As a result, they argue, any communications with Mr. Elbaor about the legitimacy of IBB's expenses are no longer protected. *Id.* But "an attorney cannot waive the attorney-client privilege without the client's consent[.]" *In re Vargas*, 723 F.2d 1461, 1466 (10th Cir. 1983); *see also AAA Nat'l Maint. v. City and County of Denver*, No. 09-cv-00007-REB-MEH, 2009 WL 3233710, at *1 (D. Colo. Oct. 7, 2009) ("Attorney-client privilege may be waived by the client, who holds the privilege."). Here, defendants cite Mr. Elbaor's communications with AUSA Alhambra—not IBB's communications with this prosecutor. *See* Doc. 226-5 (Def. Ex. 5). Mr.

12

lawsuit against IBB in the Circuit Court for the City of Charlottesville, Virginia.  Doc. 226 at 9.

IBB answered—in part—with a counterclaim asserting that Mr. Elbaor had discovered

defendants' alleged malfeasance and didn't take any responsive action.  *See* Doc. 226-6 at 8–9

(Counterclaim ¶¶ 13–17).  Defendants argue these statements of Mr. Elbaor's discovery and

inaction constitute a disclosure.  Doc. 226 at 9–10.  And defendants contend IBB thus waived its

attorney-client privilege "over all communications relating to the same subjects . . . namely

communications involving Mr. Elbaor's investigation into the IBB's policies and procedures,

including for reimbursements and expenses."  *Id.* at 10.

IBB responds that defendants have failed to support this theory of waiver, never

providing any authority "beyond a generic citation to *Nixon*[.]"  Doc. 234 at 13.  And, IBB

argues, defendants "seem to have implicitly adopted the so-called automatic waiver rule[,]" a

theory that "has been roundly criticized."  *Id.*  But defendants reply that they don't ask the court

to find any "automatic" or implicit waiver but, instead, premise their waiver argument on

specific subject matter disclosed in the counterclaim.  Doc. 235 at 4–5.  Taking defendants at

their word, the court assesses IBB's counterclaim for explicit—not implicit—waiver of its

privilege with Mr. Elbaor.[3]

---

Elbaor was the attorney, not the client, so he didn't hold the privilege.  And defendants never attempt to show that IBB—the client—consented to Mr. Elbaor's disclosure.  So, the email detailing Mr. Elbaor's findings—as disclosed to AUSA Alhambra—didn't waive IBB's privilege over communications with Mr. Elbaor.

[3]      The court isn't persuaded that implicit waiver in the Virginia case would carry over to this one, as IBB's Response appears to suggest.  *See Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC* (*Sprint I*), No. 11-2684-JWL, 2014 WL 545544, at *7 (D. Kan. Feb. 11, 2014) ("[D]efendants have not presented any support for their inferred argument that implicit waiver (in contrast to subject matter waiver based on explicit waiver) in one case can carry over to a subsequent case.  Given the fairness consideration at issue in implicit waiver situations—i.e., manifest unfairness to the opposing party—the court is not persuaded that implicit waiver automatically carries over to subsequent cases." (footnote omitted)).  The court thus confines its analysis to subject matter waiver based on explicit waiver, as defendants have argued.

Recall that a "party waives attorney-client privilege if it discloses the substance of an otherwise-privileged communication." *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC* (*Sprint III*), No. 11-2684-JWL, 2014 WL 3611665, at *3 (D. Kan. July 22, 2014) (citing *In re Qwest*, 450 F.3d at 1185). But the privilege "protects only communications[.]" *Id.* It "does not protect underlying facts." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 385–86 (1981)). Nor does it "protect information concerning the activities of the attorney or the general topic of discussion between attorney and client, as long as the substance of the communication is not revealed." *Id.* So, disclosure of underlying facts, attorney activities, or general discussion topics don't produce a privilege waiver.

Some examples help to flesh out these distinctions. In *Sprint Communications*, United States District Judge John W. Lungstrum affirmed all but one waiver ruling made by United States Magistrate Judge James P. O'Hara. *Id.* The rulings Judge Lungstrum affirmed—and, as importantly, the one he overruled—prove instructive here. They delineate the boundaries between protected communications (whose disclosure waives privilege) and unprotected underlying facts, attorney activities, or general topics (whose disclosure doesn't waive privilege).

There, Sprint's in-house legal counsel had testified in a separate lawsuit about a Sprint investigation into possible patent infringement. *Sprint I*, 2014 WL 545544, at *1, 5. Magistrate Judge O'Hara analyzed several specific statements included in that testimony and determined that none of them waived attorney-client privilege. *First*, Judge O'Hara concluded that counsel's statement that Sprint had investigated simply pointed to an underlying fact about acts or services performed by an attorney—and thus wasn't privileged at all. *Id.* at *6. *Second*, he found that testimony that Sprint's legal team had "walked through" Sprint's claims with outside counsel revealed "nothing more than the topic of Sprint's discussions with its attorneys." *Id.* He

14

clarified that Sprint's counsel "never testified to any specific communications that were exchanged nor any legal advice that Sprint might have been given." *Id.* So, this testimony, too, didn't waive privilege. In a separate order, Judge O'Hara held counsel's testimony about two more topics also didn't waive privilege: testimony that Sprint reacted quickly, assigning a patent agent; and testimony about how Sprint had conducted a prior art search. *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC* (*Sprint II*), No. 11-2684-JWL, 2014 WL 1569963, at *5–6 (D. Kan. Apr. 18, 2014). These statements "disclosed unprotected acts by counsel and not privileged communications." *Id.* at *6. *Finally*, Judge O'Hara determined that "information that Sprint's review of prior art led it to conclude that it had a patentable invention revealed only Sprint's counsel's ultimate legal conclusion, not any substantive communication or attorney analysis behind that conclusion." *Id.* Judge Lungstrum affirmed all of these rulings. *Sprint III*, 2014 WL 3611665, at *3.

But Judge Lungstrum disagreed with Judge O'Hara in one respect, finding that "in one instance, Sprint did disclose the substance of a privileged communication between attorney and client." *Id.* Judge Lungstrum described the circumstances of that disclosure this way: "In the [separate litigation], Sprint's trial attorney stated in opening statement that Sprint believed that Vonage had infringed 43 patents, a Sprint attorney had an outside law firm look at the issue, the law firm 'agreed', and Sprint then contacted Vonage and accused it of infringement." *Id.* Judge Lungstrum concluded that this statement "disclosed the substance of legal advice received from an outside law firm, namely that outside counsel agreed that Vonage had infringed." *Id.* He then assessed the scope of this statement's waiver, limiting it "to the statement that an outside law firm gave Sprint the legal advice that Vonage had infringed 43 patents." *Id.* at *4.

15

Here, IBB's counterclaim includes statements that align with Judge O'Hara's affirmed no-waiver conclusions—not the overruled one. That is, IBB's counterclaim speaks strictly to underlying facts and attorney acts or services—but never disclosed the substance of any legal advice IBB had received. Below the court includes the entirety of the counterclaim language defendants invoke to assert a privilege waiver, adding italics to indicate the particular phrases defendants' motion identified as waiver-inducing.

> 13. At some point unknown to the IBB, Mr. Elbaor became aware of malfeasance by Mr. Jones. He also became aware of malfeasance by certain other employees and officers including Kateryna Jones, the wife of Mr. Jones, International Secretary-Treasurer William Creeden, and others.
>
> 14. The malfeasance included *using IBB resources in violation of the IBB Constitution, using IBB resources for purposes which served no benefit or purpose for the membership,* using IBB resources to protect themselves from their own unlawful conduct, *using IBB resources to pay for personal travel and other personal expenses* and using IBB resources *in violation of IBB policies.*
>
> 15. The malfeasance also included *failing to get authorization for the expenditures as required by the IBB Constitution.*
>
> 16. Mr. Elbaor became aware of the malfeasance because he began reviewing records showing that Mr. Jones, Ms. Jones, and others had committed acts which were contrary to the Constitution of the IBB, in violation of their fiduciary duty as officers and agents of the IBB, and which constituted plain embezzlement involving state and federal laws.
>
> 17. *Notwithstanding the fact that Mr. Elbaor became aware of the malfeasance of Mr. Jones and others, he continued to represent the IBB without taking any action to report the misconduct which he discovered.*

Doc. 226-6 at 8–9 (Counterclaim ¶¶ 13–17) (italics added by the court); Doc. 226 at 9. The italicized phrases fall into two categories. *First*, the italicized phrases in paragraphs 14 and 15 refer to defendants' conduct. But these statements qualify as underlying facts—not legal advice—and thus don't establish privilege waiver. *See Sprint III*, 2014 WL 3611665, at *3 ("The attorney-client privilege protects only communications and does not protect underlying facts.").

16

*Second*, the italicized language in paragraph 16 speaks to Mr. Elbaor's actions as an attorney—or, more accurately, his inaction—again failing to establish waiver. *See id.* ("[T]he privilege does not protect information concerning the activities of the attorney[.]").  Nothing in these counterclaim paragraphs comes close to the "substance of legal advice" Judge Lungstrum found when an outside law firm agreed with Sprint's counsel that patent infringement had occurred.  *Id.* Indeed, the counterclaim highlights only Mr. Elbaor's awareness and inaction, never touching on the substance of any privileged communication.  Without such substance, the counterclaim doesn't trigger an explicit waiver of privilege.

The upshot of this conclusion is that defendants' subpoena requests seeking communications with Mr. Elbaor fail.  These communications remain protected by attorney-client privilege because the counterclaim didn't waive that privilege.  And where attorney-client privilege persists, defendants can't demonstrate *Nixon*'s requisite "sufficient preliminary showing" of admissibility.  418 U.S. at 700.  The court thus denies defendants' motion to the extent it seeks communications with Mr. Elbaor.

### 3.  Admissibility Conclusions

Thus ends the court's long journey through admissibility.  To recap, *Nixon*'s admissibility prerequisite precludes defendants from requesting evidence solely for impeachment purposes or evidence protected by attorney-client privilege.  So, the court denies the following subpoena requests on admissibility grounds:

- Tim Simmons' communications about the whistleblower letter and Article 17 charge. Doc. 226 at 20 (enumerating seven requests in this category).

- John Fultz's communications.  *Id.* at 21–22 (enumerating five requests in this category).

- "Emails from February 1, 2023 through June 3, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the whistleblower letter and Article 17 charge."  Doc. 226-1 at 7 (Def. Ex. A).

- "Emails from March 1, 2015 through August 24, 2015 between Kathy Stapp and any representative of Blake and Uhlig regarding the IBB's payment of backpay to Kate Jones in April 16, 2015 and August 24, 2015." *Id.*

- Emails between David Elbaor and Kathy Stapp, Tim Simmons, Tom Baca, or John Fultz about Mr. Elbaor's investigation into the IBB's policies and procedures. *Id.* at 5–8.

And, the court requires the following modifications to subpoena requests, again on admissibility grounds:

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and any representative of Blake and Uhlig regarding the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the fall of 2022.

Having completed its admissibility analysis, the court now moves to the next *Nixon* requirement—relevance. Because the sheer volume of requests—41—makes evaluating the individual relevance of each a daunting task, the court addresses the requests in tranches according to the relevance justifications defendants have supplied.

### B.    Relevance

Aside from admissibility, a court must find "a 'rational inference' of relevancy" to issue a Rule 17(c) subpoena. *Romero*, 2023 WL 2614472, at *2 (quoting *Nixon*, 418 U.S. at 700). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without evidence and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. It is thus "axiomatic that the relevance criterion can be fulfilled if the documents sought would tend to prove a material issue of the prosecution or defense." 25 *Moore's Federal Practice* § 617.08[3][b]. "To determine what evidence is relevant, [courts] first turn to the

elements of the offense." *United States v. Montelongo*, 420 F.3d 1169, 1173 (10th Cir. 2005) (quotation cleaned up).

Here, defendants' relevance arguments divide themselves into two categories: *First*, several of defendants' requests invoke the element of fraudulent intent—or defendants' state of mind—for allegedly unauthorized expenditures.[4]  They argue that the "Government must prove that Defendants had 'fraudulent intent' in making these expenditures."  Doc. 226 at 12.  And they contend that if "there is any reasonable doubt that Defendants 'in good faith believed' the expenditures were made 'for union business,' they must be acquitted."  *Id.*  *Second*, some of defendants' requests cite their reliance on advice of counsel to establish relevance.  They assert that the charged conduct—including unauthorized or unnecessary expenditures and paying people for little-to-no work—"was the subject of counsel received by Defendants[.]"  *Id.* at 7–8.  And so, defendants contend, "communications on these very topics are . . . relevant to—and necessary for—the defense."  *Id.* at 8.  The court evaluates each relevance argument, in turn.

### 1. Fraudulent Intent / Defendants' State of Mind

Defendants propound several relevance arguments premised on securing evidence about their state of mind.  These arguments primarily surface when defendants request three categories of communications involving Kathy Stapp and, for a fourth time, for communications involving Tom Baca.  *First*, defendants postulate that Ms. Stapp's communications with Legacy Professionals, LLP would reveal defendants' state of mind.  Doc. 226 at 12.  Ms. Stapp served as

---

[4]      Defendants sometimes couple their fraudulent-intent arguments with impeachment purposes. *See, e.g.*, Doc. 226 at 15–16 ("Union officers' communications regarding these issues and related interpretations are relevant here not only to impeachment of these witnesses but also to the Defendants' state of mind."); *id.* at 17 ("Such authorization—which was made without question, let alone comment from Ms. Stapp—goes directly to the Defendants' state of mind and Ms. Stapp's credibility.").  But the court already has clarified that impeachment purposes don't justify a 17(c) subpoena. *See* § II.A.1.  So, the court disregards the impeachment-purposes justification and focuses solely on fraudulent intent for those requests supported by this coupled relevance justification.

special assistant to the International Secretary Treasurer and, later, as International Secretary Treasurer for IBB.  *Id.* at 3.  And her husband served as IBB's outside general counsel.  *Id.* at 4.  Legacy Professionals performed yearly audits as IBB's certified public accountant, while also preparing IBB's financial statements, tax returns, and Department of Labor annual reports.  *Id.* at 10.  Defendants suggest that acquiring emails and notes exchanged between Kathy Stapp and Legacy Professionals may help cast doubt on the government's attempt to prove "fraudulent intent."  *Id.* at 12 (quotation cleaned up).  Apparently, Ms. Stapp communicated with Legacy Professionals often, and she was—defendants assert—deeply involved in some of their processes.  *Id.* at 12–13.  *Second*, defendants advance a similar argument when they request Kathy Stapp's communications about the whistleblower letter and the Article 17 charge.  *Id.* at 15–16.  They argue that Ms. Stapp "played a central role" in both of these events.  *Id.* at 15.  So, her communications about them would speak "not only to impeachment of these witnesses but also to the Defendants' state of mind."  *Id.* at 16.  *Third*, defendants seek documents and communications about Ms. Stapp's authorization, again arguing that these authorizations "go[] directly to Defendants' state of mind and Ms. Stapp's credibility."  *Id.* at 17.  *Finally*, defendants tender state-of-mind relevance arguments to secure Tom Baca's communications with counsel and his communications about hiring his son and international travel.  *Id.* at 23–24.

All requests where defendants premise relevance on their state of mind suffer the same infirmity:  the requested communications didn't involve defendants.  What Ms. Stapp or Mr. Baca shared with a third party—even if related to the Indictment's charges—doesn't shed any light on *defendants*' intent.  Instead, they reveal, at most *Ms. Stapp*'s or *Mr. Baca*'s intent.  Defendants never suggest that they saw these communications or were privy to their contents, making their probative value about defendants' fraudulent intent minimal at best.

20

Take Ms. Stapp's communications with Legacy Professionals as an example.  Let's say Ms. Stapp confirmed in an email to Legacy Professionals that a given expenditure had received the necessary IBB approvals.  That email could demonstrate Ms. Stapp's view of the expenditure's legitimacy.  But it wouldn't demonstrate that the defendants shared—or even knew about—Ms. Stapp's view.  Indeed, defendants never suggested personal awareness of any of those third-party communications.  To be sure, defendants repeatedly emphasized Ms. Stapp's direct and intimate involvement with Legacy Professionals and its auditing process.  *See, e.g.*, Doc. 226 at 12–14.  But defendants never hint that they were privy to the content of those communications.  *See id.*  To prove defendants' fraudulent intent was more probable or less probable, one would need to consult communications with defendants themselves.  And defendants already gained access to their communications when the court granted their 17(c) subpoena request for production of their own email accounts.  *See* Doc. 140.  The same holds true for the other communications sought for state-of-mind purposes.  Apart from demonstrating an awareness of those other communications, it's not clear how they could reveal *defendants*' lack of fraudulent intent in receiving or using IBB funds.

Other courts have reached similar conclusions when assessing the relevance of third-party communications to a separate individual's state of mind.  *See United States v. LaGuardia*, No. 21-2206, 2022 WL 17684596, at *3 (2d Cir. Dec. 15, 2022) ("The emails were minimally probative because the communications between Schnell and third parties show little if anything about *LaGuardia's* state of mind." (emphasis in original)); *United States v. Bingert Sturgeon*, No. 21-CR-91-1-RCL, 2023 WL 3203092, at *8 (D.D.C. May 2, 2023) ("Similarly, communications to which defendants were not privy would be entirely irrelevant to their state of mind."); *Ayers v. Lee*, No. 14cv542-BGS (NLS), 2017 WL 2472840, at *3 (S.D. Cal. June 8, 2017) ("Plaintiffs

attempt to explain the relevance of all communications made by former Defendant Lee . . . maintain[ing] that such communications would provide highly probative evidence of Defendant Ettore's state of mind . . . . Given that the communications sought are for the admitted purpose of establishing Defendant Ettore's state of mind, the only relevant communications at issue would be those between former Defendant Lee and Defendant Ettore." (quotation cleaned up)).  Consider, for instance, how one district court distinguished between communications relevant to and communications irrelevant to a defendant's intent:

> Sheppard argues [that communications sent between President Trump's former staff on the day of January 6, 2021, are] certainly relevant and admissible to negate his intent.  It may be that former President Trump's statements or actions that Sheppard perceived or of which he was otherwise aware are relevant to the question of intent.  Nothing in this opinion limits his ability to testify or put forth evidence of former President Trump's speech and its effect on his mental state.  But that information is already within his possession—there is nothing the government could turn over that would speak specifically to his intent.  He was not aware of the communications sent between President Trump's former staff on January 6.  Hence, they have no bearing on his intent.

*United States v. Sheppard*, No. CR 21-203 (JDB), 2022 WL 17978837, at *15 (D.D.C. Dec. 28, 2022) (quotation cleaned up).  According to *Sheppard*, then, communications are relevant to a defendant's intent to the extent the defendant had perceived or was otherwise aware of those communications at the time of the conduct at issue.  But communications about the same topic of which a defendant wasn't aware "have no bearing on his intent."  *Id.*

Apply *Sheppard*'s reasoning here.  Defendants haven't demonstrated that they had perceived or were otherwise aware of the third-party communications they seek.  Indeed, any communications with Ms. Stapp or Mr. Baca in which defendants directly participated are already in their possession via an earlier subpoena.  *See* Doc. 140 (granting 17(c) subpoena to IBB requesting production of defendants' email accounts over the span of the Indictment).  The requested communications involve Ms. Stapp or Mr. Baca and third parties—not defendants.

22

Without demonstrating defendants were aware of the requested communications, "they have no bearing on [their] intent." *Sheppard*, 2022 WL 17978837, at \*15.  And defendants provide no other reason that these third-party communications reveal defendants' state of mind—only conclusory statements that they will.  *See, e.g.*, Doc. 226 at 12 (asserting that Ms. Stapp's communications with Legacy Professionals provide "direct evidence of the Defendants' state of mind" but then simply listing the Indictment's allegations and the government's burden to prove fraudulent intent without elucidating how the requested evidence may make defendants' fraudulent intent more or less probable).  So, the court denies the subpoena requests premised on defendants' state of mind as irrelevant—with one exception.

One of defendants' requests seeks Tom Baca's communications about international travel. It involves communication with a defendant, Newton Jones.  It reads:

- "Emails between Tom Baca and Newt Jones or Kathy Stapp regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended."  Doc. 226-1 at 6 (Def. Ex. A).

Because this request seeks—in part—communications with a defendant, the same relevance concerns don't inhere in it.  So, modified to include only communications involving a defendant, the court determines this request passes the relevance threshold.

With that conclusion, the court moves on to defendants' other relevance argument— reliance on counsel's advice.  As explained below, this second relevance argument mirrors the state-of-mind argument in many respects, but with one crucial divergence.

### 2.  Reliance on Counsel's Advice

One might assume that a similar analysis—with a similar result—would apply to defendants' second relevance argument:  relevance premised on their advice-of-counsel defense. After all, "[g]ood faith reliance on counsel is a defense to the mens rea element of a criminal

prosecution[,]" not a "complete defense[.]" *United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005).  So, an advice-of-counsel defense essentially goes to the fraudulent intent element. That being the case, it would stand to reason that the court's relevance conclusions about fraudulent intent—as explained in the previous section—would apply here as well.  And the elements of an advice-of-counsel defense further bolster that reasoning.

"'In the Tenth Circuit, to establish a good faith reliance on counsel defense, the defendant must show (1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice.'" *United States v. Wesberry*, 656 F. App'x 895, 899 (10th Cir. 2016) (quoting *Wenger*, 427 F.3d at 853).  Under the third element, a defendant would need to demonstrate he received counsel's advice to establish its relevance for an advice-of-counsel defense.  *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 250 F.R.D. 575, 581 (D. Colo. 2007) ("[I]nformation not communicated to the party . . . is not relevant to the advice of counsel defense and is not crucial to [defendant's] preparation of its case."); *In re Smirman*, 267 F.R.D. 221, 225 (E.D. Mich. 2010) ("Considering that the crux of an advice-of-counsel defense is the knowledge of the alleged infringer . . . the only relevant materials are those that were ultimately provided to Defendant.").  So, in much the same way the previous section required defendants' awareness of any requested communications to establish relevance, a similar analysis is appropriate here.

Here, all three of defendants' requests premise their relevance on advice of counsel involving third-party communications—not communications with defendants.  Those requests include:  communications between IBB counsel and Kathy Stapp, Tim Simmons, or Tom Baca. Doc 226 at 4, 6, 18–19, 23.  But one of these requests differs, and in an important respect, from

24

the others:  the request for communications between IBB counsel and Ms. Stapp.  According to

defendants' motion, Ms. Stapp served as a source of information for defendants, not simply as a

recipient of the information herself.  Her role as a source suggests that defendants were aware of

the advice Ms. Stapp received from IBB's counsel.  Defendants never indicate any such

awareness with the other three advice-of-counsel-based requests.  And, as clarified in the

previous section, when assessing the relevance of evidence to questions of fraudulent intent,

awareness is key.

Defendants portray Ms. Stapp as a conduit for counsel's advice.  Not only was she

intimately involved in communicating with IBB's counsel, but she apparently passed that

information along to defendants, "regularly serv[ing] as a go-between for the IBB and Blake &

Uhlig when legal questions or issues arose."  Doc. 226 at 4.  Defendants contend that the

racketeering conspiracy allegations in the Indictment were all "the subject of counsel received by

Defendants, *which regularly flowed through Ms. Stapp*."  Doc. 226 at 8 (emphasis added).  And

they emphasize in their reply that "Kathy Stapp was central to the advice given to and received

by the IBB (*and, in turn, Defendants as officers of the IBB*)."  Doc. 235 at 9 (emphasis added).

They describe her role as "central," and highlight that she was the direct recipient of the

September 2022 memo.  Doc. 226 at 4.  Indeed, they characterize her as "a go-between for

advice-of-counsel[.]"  *Id.* at 6.  Defendants' unequivocal assertion that Ms. Stapp functioned as

an information pipeline for counsel's advice necessarily shifts the relevance analysis.

Recall that third-party communications "have no bearing on" a defendant's intent where

that defendant wasn't aware of those communications.  *Sheppard*, 2022 WL 17978837, at *15.

But "statements or actions that [a defendant] perceived or of which he was otherwise aware are

relevant to the question of intent."  *Id.*  Defendants imply that they were aware of the content of

at least some of Ms. Stapp's communications with counsel.  And so, those communications become relevant to whether they can overcome "the mens rea element of [their] criminal prosecution" by presenting a "good faith reliance on counsel[.]"  *Wenger*, 427 F.3d at 853.  The court thus finds requests for Ms. Stapp's communications with IBB's counsel clear *Nixon*'s relevance hurdle.  To the extent those requests aren't barred by privilege, they may serve to make it "more or less probable" that defendants satisfied the charged conduct's intent element.  Fed. R. Evid. 401; *see also Montelongo*, 420 F.3d at 1173 (looking first to charged conduct's elements to assess relevance).

The same doesn't hold true, however, for Mr. Simmons's and Mr. Baca's communications with counsel.  Defendants never establish such a conduit role for either one.  Defendants assert that Mr. Simmons "was directly involved" in the process that led to the September 2022 memo and was one of the memo's direct recipients.  Doc. 226 at 18, 19.  And they assert that memo process included "procurement of legal advice."  *Id.*  Finally, defendants argue that the communications between Simmons and IBB's counsel "are clearly relevant to Defendants' knowledge and intent when Defendants, who were also employees of the IBB at the time, are receiving and reasonably relying on that same advice."  *Id.* at 19.  But defendants never suggest that *they* were aware of the content of Simmons' communications, or that he was a source of that advice—only that they received the same advice, presumably from another source.  And defendants say even less about having developed an awareness of counsel communications with Baca—indeed, they say nothing about it at all.  *See* Doc. 226 at 23.

The court concludes that communications between IBB's counsel and Ms. Stapp survive *Nixon*'s relevance requirement.  But communications between IBB's counsel and Mr. Simmons or Mr. Baca do not because defendants never assert defendants' awareness of those

26

communications that would permit the court rationally to infer relevance.  The court thus denies

the subpoena requests for communications with counsel apart from those involving Ms. Stapp.

Finally, defendants' subpoena requests include two requests for defendants'

communications with IBB's counsel.  *See* Doc. 226-1 at 7–8 (Def. Ex. A).  Defendants neglect to

include any discussion of these two requests in their motion.  *See generally* Doc. 226.  And IBB

never responds to them, either.  *See generally* Doc. 234.  But the court already found them

admissible because they qualify for the waiver of attorney-client privilege under the court's

abrogation Order assessing the September 2022 memo.  *See* § II.A.2.a.  And none of the

relevance concerns surrounding awareness emerge when defendants request their own

communications.  So, the court concludes these two requests clear *Nixon*'s admissibility and

relevance hurdles, as well.

Before addressing *Nixon*'s final category, the court pauses to take stock.  Overlaying the

court's admissibility conclusions and the court's relevance conclusions, only the following

subpoena requests—some of which the court modified—reach *Nixon*'s final hurdle:

- Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and representatives of Blake and Uhlig regarding the September 20, 2022 memorandum addressed to Kathy Stapp.

- Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the vacation payouts to Defendants in July 2023.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."

- Emails between Tom Baca and Newt Jones regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended.

With the surviving requests identified, the court next assesses them under *Nixon*'s final requirement: specificity.

## C.    Specificity

The parties virtually ignore the specificity requirement—which garnered more than its share of the spotlight in the court's earlier Orders. *See* Doc. 202 (denying most of defendants' Rule 17(c) subpoena requests on specificity grounds); Doc. 138 (quashing government's 17(c) subpoena largely on specificity grounds). Indeed, IBB concedes that defendants "have now refined their requests to much more limited parameters[.]" Doc. 234 at 1. And the court already has deemed these requests greatly improved on the specificity front. IBB does identify a couple points of contention, however. It suggests that defendants' requests for communications involving "**any** representative of Blake and Uhlig—notably not just the attorneys—for as much as a year and a half" "stray far afield from the standard[.]" *Id.* at 11 (emphasis in original). So, IBB challenges both the breadth of the people involved and the length of the requested timeframe on specificity grounds.

"*Nixon* mandates that the party requesting the information identify the item sought and what the item contains, among other things." *Morris*, 287 F.3d at 991. And our Circuit has weighed in, assessing both breadth and length of requests in the specificity context. Start with breadth. According to our Circuit, the specificity requirement indicates "that requests for an entire file are evidence of an impermissible fishing expedition." *Id.* In *Morris*, for example, the Circuit held that the district court hadn't erred when it concluded that a request for "all records, documents, reports, telephone logs . . . surrounding the investigation of the FBI undercover agent's shooting" of defendant "lacked specificity and constituted an impermissible fishing expedition[.]" *Id.* And it warned against "attempt[ing] to use the Rule 17(c) subpoena for impermissible discovery purposes." *Id.* But courts have approved requests more narrowly tailored by limiting both breadth and length. For example, a request for "records about only one vehicle from only one day" proves sufficiently specific under *Nixon*. *Romero*, 2023 WL 2614472, at *3.

Here, defendants' requests fall somewhere in between the requests in *Morris* and *Romero*. As IBB highlights, *Morris*-like language pops up when defendants ask for communications with "any representative of Blake and Uhlig[.]" Doc. 226-1 at 7 (Def. Ex. A). Like "all," the word "any" manifests a broader swath of communications than *Nixon* contemplates. Such a request engages in an impermissible fishing endeavor so jealously guarded by *Nixon*. The court thus modifies defendants' requests, replacing "any representative of Blake and Uhlig" with "IBB counsel from Blake and Uhlig," as often as it occurs. This revision also aligns with defendants' professed purpose in securing these communications—to use in an advice-of-counsel defense.

Next, take IBB's challenge to the requests' length. The court considers the specified date ranges understandable in light of the Indictment's timespan (2009–2023). To be sure, many of

29

the requests' date ranges span multiple months—a far cry from the singular day found sufficiently specific in *Romero*.  But considering the expanse put in issue by the Indictment, limiting requests to a matter of months qualifies as reasonably specific.

The court thus grants in part defendants' request for a subpoena duces tecum just for the requests identified in the Conclusion, and as modified by the court.

## III.    Conclusion

The court thus concludes defendants have shouldered their burden for the proposed subpoena items listed below, as modified by the court.  It authorizes the Clerk of the Court to issue a subpoena duces tecum under Fed. R. Civ. P. 17(c) to IBB for these enumerated requests.  But defendants have failed to shoulder their burden in all other respects.  The court thus grants defendants' motion in part but denies it in all other respects.  Defendants retain the administrative responsibilities to prepare the subpoena approved by this Order, present it to the Clerk, and effect service.

- Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and IBB counsel from Blake and Uhlig regarding the September 20, 2022 memorandum addressed to Kathy Stapp.

- Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and IBB counsel from Blake and Uhlig regarding the vacation payouts to Defendants in July 2023.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and IBB counsel from Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between Kathy Stapp and IBB counsel from Blake and Uhlig regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and IBB counsel from Blake and Uhlig regarding the expense and

reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and IBB counsel from Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and IBB counsel from Blake and Uhlig regarding "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."

- Emails between Tom Baca and Newt Jones regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Amended Motion for Issuance of Rule 17(c) Subpoena Duces Tecum to IBB (Doc. 226) is granted in part and denied in part, as described in this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is authorized to approve a Rule 17(c) subpoena seeking production in advance of trial of the materials enumerated in the court's Conclusion to this Order. It is defendants' responsibility to prepare and present such a subpoena for review and approval by the Clerk and to effect service.

**IT IS SO ORDERED.**

**Dated this 12th day of March, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

**Appendix A**

| Subpoena Requests Denied on *Nixon*'s Admissibility Prong |
|---|
| **1.   Requested for Impeachment Purposes** |

**John Fultz**

• Emails from February 1, 2023 through April 30, 2023 between John Fultz and Tim Simmons/Kathy Stapp/Tom Baca/or Arnie Stadnick regarding the Article 17 charge Mr. Fultz lodged against Newton Jones on April 17, 2023.

• Emails from February 26, 2023 through April 30, 2023 between John Fultz and Tim Simmons/Kathy Stapp/Tom Baca/or Arnie Stadnick regarding the February 26, 2023 IEC meeting in Marco Island, Florida.

• Copies of the handwritten letter that Kathy Stapp mailed to John Fultz and Tim Simmons in approximately April, 2023 (might also exist in Simmons or Stapp's account).

• Emails from April 1, 2022 through December 12, 2023 between John Fultz and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.

• Kathy Stapp's communications to John Fultz following the Marco Island Conference in which she claimed "whistleblower protection," as specified by Kathy Stapp in her proffer to the government on August 18, 2023.

**Tim Simmons (communications about whistleblower letter & Article 17 charge)**

• Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp or Tom Baca regarding the whistleblower letter Simmons drafted and submitted on March 25, 2023.

• Drafts, handwritten notes, and electronically stored information regarding the March 24, 2023 whistleblower letter.

• Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp regarding the February 26, 2023 IEC meeting in Marco Island, Florida, and handwritten notes from in person discussions.

• Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp regarding Newton Jones' travel to and from the Ukraine.

• IBB records provided to Tim Simmons by Kathy Stapp following the February 26, 2023 IEC meeting in Marco Island, Florida, as referred to in Mr. Simmons' grand jury testimony, which served the basis of Mr. Simmons' whistleblower letter and Article 17 charge.

• Drafts, handwritten notes, and electronically stored information regarding the April 17, 2023 Article 17 charge.

• A handwritten letter from Kathy Stapp to Timothy Simmons regarding an internal investigation, in approximately April 2023.

32

| Subpoena Requests Denied on *Nixon*'s Admissibility Prong |
|---|
| 2.      Requested Material Remains Privileged |
| **Kathy Stapp**<br>• Emails from February 1, 2023 through June 3, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the whistleblower letter and Article 17 charge.<br>• Emails from March 1, 2015 through August 24, 2015 between Kathy Stapp and any representative of Blake and Uhlig regarding the IBB's payment of backpay to Kate Jones in April 16, 2015 and August 24, 2015.<br>• Emails from April 17, 2022 through December 12, 2023 between Kathy Stapp and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.[5]<br>**Tim Simmons**<br>• Emails from April 1, 2022 through December 12, 2023 between Tim Simmons and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.<br>**Tom Baca**<br>• Emails from April 1, 2022 through December 12, 2023 between Tom Baca and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses. |

---

[5]      Defendants' Exhibit A lists this request twice. *See* Doc. 226-1 at 3, 4. The court just lists it once but notes the duplication to account for the total number of requests (41).

| **Subpoena Requests Denied on *Nixon*'s Relevance Prong** |
|---|
| **1.  Requested to Establish Fraudulent Intent** |

**Kathy Stapp (communications with Legacy Professionals)**

• Emails between Kathy Stapp and any representative of Legacy Professionals, LLP ("Legacy"), and any of Kathy Stapp's notes, regarding the topics listed below for the following time periods, which reflect the time period between each Legacy engagement letter and the last Legacy letter for each year: July 12, 2017, through November 22, 2017; June 20, 2018, through November 2, 2018; July 10, 2019, through November 26, 2019; August 10, 2020, through December 4, 2020; July 12, 2021, through November 16, 2021; July 1, 2022, through December 13, 2022; and May 24, 2023, through June 3, 2023:

    o credit card testing,
    o direct expense testing,
    o salary testing,
    o vacation accruals,
    o journal entry testing,
    o investment income schedules,
    o relocation expense testing,
    o healthcare reviews,
    o fraud risk inquiries, and
    o the IBB's financial reporting system.

**Kathy Stapp (communications about whistleblower letter & Article 17 charge)**

• IBB records provided by Kathy Stapp to Tim Simmons after the February 26, 2023 IEC meeting in Marco Island, as referred to in Mr. Simmons' grand jury testimony (and see GJEX 7), and that served the basis of Mr. Simmons' whistleblower letter and Article 17 charge.

• Emails between Kathy Stapp and Tim Simmons or John Fultz regarding Kathy Stapp's handwritten letter to Mr. Simmons and Mr. Fultz in approximately the spring/summer 2023.

**Kathy Stapp (communications about authorization)**

• Kathy Stapp's "email to herself" and the "numerous messages/texts/calls" regarding Newt Jones' bill from the IBB Conference in February 2023 at Marco Island, Florida, as specified by Kathy Stapp in her proffer to the government on August 18, 2023.

• Emails between Kathy Stapp and Jim O'Leary regarding the foreign assignment letter dated March 18, 2022 designating Jim O'Leary for travel to Paestum, Italy.

• Emails between Kathy Stapp and Michael Snowden regarding the foreign assignment letter dated April 10, 2019 designating Michael Snowden for travel to Italy.

• Emails between Kathy Stapp and Sara Baez or Carolyn Nitcher regarding Newt Jones' out-of-pocket expenses for 2018, as reflected in a June 3, 2019 email from Sara Baez to Carolyn Nitcher, in the weeks leading up to June 3, 2019.

• Emails from June 1, 2023 through July 31, 2023 between Kathy Stapp and Debbie Goodwin regarding Defendants' vacation payouts in July 2023.

**Tom Baca**

• Emails between Tom Baca and Kathy Stapp regarding the hiring, salary, and benefits for John Baca, from three months preceding the date John Baca was hired.

• Emails between Tom Baca and Kathy Stapp regarding a January 31, 2020-February 10, 2020 trip to London, England that Mr. Baca attended.

• Emails between Tom Baca/Kathy Stapp/John Baca regarding a November 27, 2015 trip to Paris, France that John Baca attended.

• Emails and documents regarding Mr. Baca's trip to Germany to visit with Siemans in or around March 2024.

| Subpoena Requests Denied on *Nixon*'s Relevance Prong |
| --- |
| **2.    Requested to Support Advice-of-Counsel Defense** |
| **Tim Simmons (communications with counsel)** <br> • Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and Kathy Stapp regarding the IBB's expense policies that were the subject of a meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the early fall (August 1, 2022 – September 19, 2022), and later reflected in a memorandum dated September 20, 2022 drafted by Blake and Uhlig and addressed to Tim Simmons and Kathy Stapp. <br> • Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and any representative of Blake and Uhlig regarding the meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the fall of 2022. <br> • Emails from May 1, 2022 through July 25, 2023 (date of Newt Jones' retirement) between Tim Simmons and any representative of Blake and Uhlig regarding the memorandum dated September 20, 2022 addressed to Tim Simmons |

| Granted Subpoena Requests (before court's modifications) |
| --- |
| **Kathy Stapp** <br> • Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the Fall 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys. <br> • Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and representatives of Blake and Uhlig regarding the September 20, 2022 memorandum addressed to Kathy Stapp. <br> • Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the vacation payouts to Defendants in July 2023. <br> • Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022." <br> • Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law". <br> **Defendants** <br> • Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022." <br> • Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and any representative of Blake and Uhlig regarding "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law." <br> **Tom Baca** <br> • Emails between Tom Baca and Newt Jones or Kathy Stapp regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended. |

| Granted Subpoena Requests (showing court's modifications) |
|---|
| **Kathy Stapp** |
| • Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and ~~representatives of~~ IBB counsel from Blake and Uhlig regarding the September 20, 2022 memorandum addressed to Kathy Stapp. |
| • Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding the vacation payouts to Defendants in July 2023. |
| • Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022." |
| • Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion see Indictment at p. 3) between Kathy Stapp and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law". |
| • Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding ~~the Fall 2022~~ the expense and reimbursement issues discussed at the September 13, 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys. |
| **Defendants** |
| • Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022." |
| • Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between any Defendant and ~~any representative of~~ IBB counsel from Blake and Uhlig regarding "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law." |
| **Tom Baca** |
| • Emails between Tom Baca and Newt Jones ~~or Kathy Stapp~~ regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended. |