IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                              Plaintiff,

                         v.

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
LAWRENCE MCMANAMON (05),

                        Defendants.

Case No. 24-20070-DDC

**MEMORANDUM AND ORDER**

The defense has proffered Jeffrey Gaia as an expert. Gaia, a banking executive, opines about the roles of defendants Newton Jones and William Creeden at the Bank of Labor. He provides these opinions because the government accuses defendants of impropriety in their BOL positions—excessive compensation, lack of engagement, undue influence, shady transactions, and excessive travel. The government has asked the court to exclude Gaia's testimony under Fed. R. Evid. 702 as irrelevant and unreliable.[1] Doc. 212. As explained below, the court agrees with the government, but only in part. The court thus grants the government's motion in part and denies it in part.

---

[1]     The government has asked the court to conduct a hearing on its motion. The court recognizes that, in some cases, a hearing is preferable. Our Circuit doesn't require a hearing, however. *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (en banc). The court concludes that this expert in this case doesn't require a hearing. The court conducted a hearing for two other defense experts, Doc. 291, and that experience taught the court that another hearing wouldn't assist its work. If the government had more to say about Gaia, then it should have filed a brief that did more than simply recite generalized legal principles.

I.      **Background**

Jones[2] served as international president of the International Brotherhood of Boilermakers Union—IBB for short.  Creeden served as IBB's secretary-treasurer.  IBB owns stock in the Bank of Labor's holding company.  Doc. 1 at 6.  IBB also holds several accounts at the BOL.  *Id.* In addition to his IBB position, from 2009 to 2023, Jones also served as the BOL's Chairman of the Board of Directors and Chief Executive Officer.  *Id.*  And, during the same timeframe, Creeden served as a member of BOL's Board of Directors and held the title of Senior Executive Vice-President.  *Id.*

In a nutshell, the Indictment charges defendants Jones and Creeden with a racketeering conspiracy based, in part, on misuse of their positions at the BOL.  The Indictment alleges that Jones and Creeden leveraged IBB's partial ownership of the BOL to secure executive positions for themselves at the BOL.  *Id.* at 25.  Jones and Creeden allegedly enriched themselves within these positions—*i.e.*, annual salaries over $400,000, bonuses, 401(k) contributions, life-insurance coverage, cash for unused personal time, and a "golden parachute" retirement.  *Id.*  In total, over their 13 years of employment by the BOL, Creeden and Jones collected more than $3,400,000. *Id.*  And yet, according to the government, Jones and Creeden "performed little or no services as employees for the Bank of Labor."  *Id.*

The Indictment also alleges that Jones and Creeden loaned $7 million of IBB funds to the BOL without consulting IBB's Board of Trustees and Executive Council.  *Id.* at 24.  Federal law and IBB's own internal rules required Jones and Creeden to consult with the relevant bodies.  *Id.* According to the government, the loans were "not necessary to achieve the union's interests or for its benefit."  *Id.* at 24–25.

---

[2]      The court recognizes that multiple defendants in this case have the last name of Jones.  For purposes of this Order, Jones means defendant Newton Jones.

To counter these allegations, defendants have retained Jeffrey Gaia.  Gaia has 29 years of experience in the banking industry.  Doc. 221-1 at 4.  He worked at several banks and, in 2003, he co-founded a start-up community bank.  *Id.*  He served at his start-up bank as chairman and president.  *Id.*  He asserts that his responsibilities at his bank "were similar to those of Newton Jones and William Creeden at Bank of Labor."  *Id.*  The court provides an overview of Gaia's opinions, below.

### A.    The Roles of Jones and Creeden

According to Gaia, because IBB is a majority owner of the BOL, "the role of Chairman had historically been filled by" IBB's president.  *Id.* at 7.  Indeed, Jones's father previously served as president of IBB and chairman of the BOL.  *Id.*  And nothing suggests that the BOL's chairman "was ever involved operationally at the bank."  *Id.*  Instead, Gaia asserts that Jones— based on banking regulators' statements—developed strategy for the bank.  *Id.*  Meanwhile, the BOL's President, Robert McCall, handled daily operations.  *Id.*

Gaia credits Jones with introducing a new strategy at the BOL—what Gaia calls the Labor Strategy.  *Id.*  The Labor Strategy "focused on expanding relationships with local and national labor movement organizations and their members."  *Id.*  According to Gaia, Jones "leverage[d] his knowledge and labor movement relationships as" IBB's President to help the BOL's development efforts.  *Id.*  Gaia suggests that this role involved "introduction to labor leaders, attending union conferences and gatherings, and generally being visible as the 'face' of the bank."  *Id.* at 7–8.  None of these activities required permanent or significant time at the bank's headquarters, Gaia claims.  *Id.* at 8.

Gaia also cites the FBI's interview notes of Robert Worner, a BOL board member for more than 30 years and a career investment banker. *Id.* According to Gaia, Robert[3] told the FBI that, in 2010, "Jones introduced a 'vision' for BOL designed to accelerate its growth trajectory." *Id.* Robert told the FBI that Jones's responsibilities focused on business development, "using his long-standing relationships with other labor leaders to generate new business for BOL." *Id.*

For Creeden, Gaia calls his role "compl[e]mentary" to Jones, as "second chair." *Id.* Creeden lived in Kansas City and was more visible in the BOL's offices. *Id.* Creeden also had credit and investment experience. *Id.* Gaia cites the interview of Richard Worner, in which Richard told the FBI that Creeden possessed institutional knowledge that Jones lacked and served as the interface between Jones's strategy and implementing that strategy. *Id.*

## B.    Criticisms of Jones

Gaia then pivots to criticizing certain witnesses who criticized Jones to the FBI. *Id.* at 9. Gaia reviewed FBI interview forms—called 302s—from interviews with various BOL employees. These interviews helped form the government's accusations against Jones. The court addresses the various criticisms, in turn, below.

### 1.    Excessive Executive Compensation

McCall, President of the BOL since 2011, criticized Jones's compensation. *Id.* The Indictment also emphasizes the amount of Jones's compensation. According to Gaia, Jones's annual compensation ranged from $285,000 to $322,000 from 2015 to 2018. *Id.* at 12. In 2019, Jones made $358,000. And, after 2019, Jones made "the mid-$400,000 range." *Id.* Gaia waves away criticisms of Jones's compensation.

---

[3]    The court uses this informal name to avoid confusion, because Gaia's report refers to Robert Worner and Richard Worner. Doc. 221-1 at 8. This difference might reflect a typo, because the footnotes suggest that the FBI interviewed both Robert and Richard Worner on July 30, 2024. *Id.* The court assumes that Gaia is referring to two different people.

Gaia first explains that regulators examine executive compensation and would've flagged excessive compensation. *Id.* at 9. According to Gaia, this concern would've come up in a so-called CAMELS rating, an important rating that serves as "the formal supervisory tool employed by regulators to assess the overall health of an institution." *Id.* BOL received a "2" in the management category, which indicated that BOL was "fundamentally sound." *Id.* at 10 n.15, 16 n.37.

Gaia reviewed four examination reports from April 2015, September 2016, December 2019, and December 2022. *Id.* at 10. In these reports, Gaia "found only one reference to Board compensation." *Id.* This sole reference comes from the 2016 annual exam, which "suggested that the Board 'should continually evaluate the amount of salaries and fees received by the Directorate, as total Board compensation exceeded $1,200,000 for 2016.'" *Id.* (quotation cleaned up). Gaia emphasizes that "this issue was not noted as a formal comment requiring Board action, nor a violation of law." *Id.* And Gaia points out that subsequent examinations don't contain any references to compensation that would support McCall's claim. *Id.*

To dispel any further concerns about compensation, Gaia cites the 302 of Robert. *Id.* Robert, who chaired the Board's Compensation Committee, was "directly involved in setting Jones'[s] compensation plan." *Id.* Robert claimed "that BOL had hired an independent third party to determine salary estimates for Jones." *Id.* (quotation cleaned up).

Gaia also asserts that Jones's compensation reflected the results of Jones's strategy for BOL. Recall that Gaia has dubbed Jones's strategy for BOL "the Labor Strategy" and it involved building relationships with labor organizations. According to Gaia, the Labor Strategy produced results. When looking at the BOL, Gaia finds a "noticeable increase in new business generated by the Labor Division[.]" *Id.* at 11. To tie Jones's compensation to BOL's growth,

5

Gaia asserts that "Jones'[s] compensation was adjusted upward reflective of his contribution." *Id.* Again, Gaia credits Jones and Creeden for this growth.

Gaia points out that McCall—though McCall complained to the FBI about Jones's compensation—had told regulators that Jones's Labor Strategy was important. *Id.* at 12–13. Gaia thus opines that it "is contradictory that McCall accused Jones of being uninvolved with BOL issues while simultaneously admitting the relevance of his role." *Id.* at 13.

### 2.    Lack of Engagement

Other BOL employees have accused Jones of "no show" employment, accusations to which Gaia responds. Gaia addresses the criticisms of Bridge Martin and Megan Elder.

Martin, an IBB employee, worked as Jones's special assistant. *Id.* According to Gaia, Martin admitted to the FBI "that she had very limited access to Jones"; "had very little knowledge of his activities"; and had "virtually no contact with Jones over an extended period of time." *Id.* Gaia thus opines that Martin's "testimony has little to no value in understanding Jones'[s] roles at IBB or BOL and is of no relevance to the allegations against Jones." *Id.* at 14.

Elder worked as BOL's head of human resources. *Id.* Elder told the FBI that Jones didn't have daily duties or a clearly defined role at BOL. *Id.* Elder didn't know Jones's role at BOL and never determined what he did outside of board and committee meetings. *Id.* Gaia responds that, as chairman of the board, Jones didn't have daily duties. *Id.* Gaia explains that "Chairm[e]n at other companies typically have no daily operational duties." *Id.* And, as head of human resources, Gaia opines that Elder didn't have any "need to have meaningful contact with the Chairman and it is unlikely that she was aware of the duties of the Chairman." *Id.* Gaia thus concludes that Elder's testimony about Jones's "no show" job is unreliable. *Id.*

### 3.    Undue Influence

6

Gaia next addresses McCall's accusations of undue influence.  McCall implied to the FBI that Jones unilaterally made decisions about board membership and insinuated that the board was ineffective.  *Id.* at 15.  McCall also suggested that regulators were concerned about Jones's influence over the board.  *Id.*  Gaia responds that regulators flag "any indication of a lack of independence by Board members[.]"  *Id.*  Such a flag would appear "as a criticism in annual Safety and Soundness exam results."  *Id.*  Gaia then highlights that no evidence suggests that regulators ever flagged Jones's control over the board.  *Id.*

To further dispel any undue influence, Gaia cites Worner's[4] 302.  Worner told the FBI that McCall would recommend annual salary increases for all employees—Jones and Creeden included—to the compensation committee, which Worner chaired.  *Id.*  Gaia claims this process, initiated by McCall, demonstrates "the contradictory nature of McCall's claim of Jones's purported control of the board."  *Id.*  And, according to Gaia, Worner would forward the proposed salary increases to Jones, who would tweak McCall's recommendations.  *Id.*  But Jones never tweaked McCall's recommendations for himself or Creeden.  *Id.*  Gaia views this absence of tweaking as "respect for the opinions of senior leaders below him" and "a desire to avoid the appearance of self-dealing."  *Id.*

### 4.    Transactions from BOL to IBB

Gaia next opines about the transactions from BOL to IBB, which McCall criticized in his FBI interview.  McCall told the FBI that Creeden contacted BOL and requested that the BOL loan IBB money to fund IBB projects and real-estate purchases.  *Id.*  Jones and Creeden abstained from voting on these loans.  *Id.*  According to Gaia, McCall criticized "Jones and

---

[4]    It's not clear which Worner Gaia is referring to here.  *See* Doc. 221-1 at 15.

Creeden by stating that 'Jones or Bill used their authority by proxy for the loans to be approved.'" *Id.* Gaia claims the facts don't support this conclusion. *Id.* at 16.

McCall's 302 mentions loans from the BOL to IBB and "Red W" regulations. Gaia believes that "Red W" actually refers to Regulation W, a "Federal Reserve rule that governs transactions between banks and their affiliates." *Id.* at 15. According to Gaia, regulators review related-party loans annually. *Id.* And, Gaia reports, none of the 2015, 2016, 2019, or 2022 exams he reviewed mentioned any Regulation W violations. *Id.*

Gaia claims that Creeden asking BOL for an IBB loan "was a normal and customary event" given Creeden's status as IBB's treasurer. *Id.* at 16. Gaia also emphasizes that Jones and Creeden abstained from voting on the loans when the loans came to the BOL board. *Id.* And, in Gaia's view, the BOL should've handled loans to the IBB "in a manner similar to a Reg O loan" because of Jones and Creeden's dual roles at IBB and the BOL. *Id.* Reg O refers to a Federal Reserve regulation that governs banks extending credits to executive officers, directors, or principal shareholders. *Id.* at 16 n.36. According to Gaia, Reg O loans "require prior Board approval, with the related Board members abstaining from the vote." *Id.* at 16. This is exactly what happened. *Id.* Gaia also points out that regulators never raised any concerns about loans between the BOL and IBB. *Id.*

### 5.     IBB's $7 Million Loan to BOL

Gaia examined the $7 million transaction mentioned in the Indictment, in which "IBB down streamed cash into BOL Bancshares, Inc. (Holdco) the proceeds of which were further down streamed into BOL in the form of additional equity." *Id.* "Holdco is a wholly-owned subsidiary of the IBB[.]" *Id.* Holdco "holds the IBB's ownership position (common voting shares) in BOL." *Id.* According to Gaia, the "purpose of these loan transactions was to increase

the tangible capital base of BOL necessitated by the growth of its balance sheet in the 2020-2022 period." *Id.*

Gaia opines that this transaction was structured in a manner "typical for the industry." *Id.* at 17. He explains how these transactions work. *Id.* He points out "that the $7 million transaction was actually a refinance of a prior $5 million transaction from the MORE Fund." *Id.* And Gaia emphasizes that McCall and the BOL board knew about this transaction. *Id.* To the extent McCall criticized the approval process to the FBI, Gaia has two responses: (i) "the FDIC viewed the injection of this capital into BOL very favorably" and (ii) "there was a legitimate business reason for the transaction." *Id.*

### 6.    Marketing and International Travel

Gaia has more to say about McCall—much more. McCall's 302 describes some expenditures: BOL-sponsored pheasant hunts attended by union-connected officials and 2014 to 2019 trips to Italy that McCall deemed "fruitless." *Id.* at 17–18. BOL reimbursed McCall for these trips, but, in McCall's view, these expenditures didn't qualify as legitimate business expenses. *Id.* at 18. Gaia admits that the Indictment doesn't include these expenditures. *Id.* He nonetheless launches into a story about Jones's active involvement in the Labor Strategy at the BOL. *Id.*

Gaia asserts that Jones and Creeden had developed many contacts in the collective-bargaining world in their roles at IBB. *Id.* Gaia mentions the BOL opening a Washington, D.C., office in 2015 "to establish relationships with national labor organizations[.]" *Id.* On the trips to Italy, Gaia notes that emails show "McCall was directly involved in planning the business agenda for these meetings." *Id.* On a 2018 trip to Italy, McCall met with a BOL customer and an Italian fishing cooperative. *Id.* In October 2019, the BOL sponsored an event that had a co-sponsor, ULLICO. *Id.* Gaia asserts that "ULLICO's national focus is identical in nature to the

Labor Strategy of BOL." *Id.* at 19.  From this, Gaia opines, "Jones'[s] strategy was not unique and untested but rather appears to be an effort to duplicate a successful nationally-focused and proven business strategy targeting the commercial and retail banking sector." *Id.*

Gaia then goes in for the kill.  He points out that "McCall was a willing participating in multiple European excursions with Jones." *Id.*  And McCall was "responsible for recommending to the [B]oard Compensation Committee annual salary increases for all BOL employees, including Jones." *Id.*  Gaia opines that McCall's "current criticisms are inconsistent with his actions over a twelve year period." *Id.*  Gaia calls McCall "an enabler, not a victim." *Id.*  As a BOL executive and board member, "McCall had a fiduciary and ethical duty . . . to act in the best interests of the company." *Id.*  So, in Gaia's view, if McCall was "truly concerned about the ethical nature of these events, his duty could have taken the form of objecting directly to Jones, reporting his concerns to internal audit, informing regulators, or ultimately resigning." *Id.*  McCall didn't do any of these things.  Gaia thus accuses McCall of electing "to 'eat at the same table' as the man he accused of defrauding BOL." *Id.*

The court now turns to Gaia's final bucket of opinions—ones describing the positive effect that Jones and Creeden had for the BOL.

### C.      Jones and Creeden's Impact at the BOL

Recall that Gaia credits Jones and Creeden with implementing the Labor Strategy. *Id.* at 22.  Gaia opines that the Labor Strategy improved the relative and absolute performance of the bank. *Id.* at 19.  Gaia uses peer-group comparisons to demonstrate this conclusion. *Id.* at 19–20.  According to Gaia, "[h]istorically, BOL was a chronic financial underperformer in its peer group." *Id.* at 20.  Gaia then provides the following data points, based on BOL's performance from 2012 to 2022:

- Earning asset yields improved from 14th to 28th percentile in BOL's peer group. *Id.*

- Net interest income improved as the Labor Strategy gained traction, and BOL rose from the 12th to the 31st percentile in its peer group.  *Id.*

- BOL's expense ratio initially rose because the Labor Strategy required new infrastructure, but since has improved dramatically and, by 2022, approached peer-group levels.  *Id.* at 21.

- Operating income increased 43%, "driven by the successful rollout of the Labor Strategy."  *Id.* at 22.

In sum, Gaia opines that Jones, Creeden, and their Labor Strategy, "had a meaningful, beneficial and long-term impact on" the BOL.  *Id.*

Concluding its summary of Gaia's opinions, the court now evaluates the government's challenge to these opinions, beginning with the governing legal standard.

## II.      Legal Standard

Under Rule 702, the court bears a "gatekeeping obligation" to determine whether expert testimony is admissible.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  When it performs this gatekeeping role, the court has broad discretion.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).  Courts exercise this discretion under the standard adopted in Fed. R. Evid. 702, a rule providing:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

11

Fed. R. Evid. 702.

"Rule '702 requires the district court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Earls*, 129 F.4th 850, 862 (10th Cir. 2025) (quoting *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019) (per curiam)). Courts perform the Rule 702 inquiry in two stages. *First*, the court must "decide whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting *Bill Barrett Corp.*, 918 F.3d at 770). *Second*, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Nacchio*, 555 F.3d at 1241 (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (citing *Nacchio*, 555 F.3d at 1241). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

## III.  Analysis

Of the many ways to challenge an expert, the government has opted to deploy two against Gaia: relevance and reliability. Doc. 212 at 2–7. The court addresses each one, in turn, below.

### A.  Relevance

The government asserts that Gaia's opinions are irrelevant. Doc. 212 at 5. The touchstone of relevance is whether an expert is helpful. Fed. R. Evid. 702(a) requires that an expert "help the trier of fact to understand the evidence or to determine a fact in issue[.]" "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue[.]" 29 *Wright & Miller's Federal Practice & Procedure* § 6265.2 (2d ed. 2026). "The most important factor in

12

determining whether expert testimony will 'help' is the jury's need for expert testimony to accurately determine the facts." *Id.* So, "expert testimony helps where it clarifies esoteric matters beyond the ken of most lay people." *Id.* On the other hand, "expert opinion testimony may not be helpful where there is other evidence or other means to put the jury in a position to accurately decide the facts." *Id.* The government's attacks on the relevance of Gaia's opinions fall into three categories: the BOL's performance, the $7 million loan, and witness credibility. The court considers each one, in turn, below.

The government first asserts that the BOL's performance is irrelevant because it bears no connection with whether Jones and Creeden arranged for no-show employment at the BOL. *Id.* at 5. In a similar vein, the government argues that the Labor Strategy's success is irrelevant. *Id.* at 6. In essence, the government wants the jury to analyze Jones and Creeden's efforts at the BOL in a vacuum. The court rejects this approach. Accusing the leadership of a bank of no-show employment opens the door to a lot of evidence. Gaia asserts that not only did Jones and Creeden perform work, they performed work that improved several metrics for the BOL. And it's natural for a jury to wonder if a leaderless organization floundered. So, evidence of the BOL's success will help the jury understand whether Jones and Creeden did their jobs.

Next, the government argues that Gaia's opinion about the FDIC's favorable opinion of the $7 million loan from IBB to the BOL is irrelevant. *Id.* at 7. The government asserts—and Gaia admits—that the concerns about this loan arise from the approval process, not the transaction itself. *Id.*; *see also* Doc. 221-1 at 17. So, in the government's view, evidence about the transaction itself is irrelevant. Again, the government wants the jury to examine the transaction in a vacuum. But Gaia provides helpful context about this transaction—*i.e.*, the structure of the transaction was "typical for the industry" and the "transaction was actually a

13

refinance of a prior $5 million transaction[.]" Doc. 221-1 at 17. By accusing defendants of impropriety with this transaction, the government has opened the door to important context surrounding the transaction. The court finds this evidence relevant because it "clarifies esoteric matters beyond the ken of most lay people." *Wright & Miller* § 6265.2.

Finally, the government argues that Gaia improperly opines on the credibility of other witnesses. This argument finds more success. "The credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) (quotation cleaned up). This is so because "such testimony [1] usurps a critical function of the jury, [2] is not helpful to the jury, which can make its own determination of credibility, and [3] the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." *United States v. Hill*, 749 F.3d 1250, 1261 (10th Cir. 2014) (quotation cleaned up).

Take, for example, *United States v. Samara*, 643 F.2d 701 (10th Cir. 1981). In that case, the government prosecuted the defendant, an attorney, for unpaid taxes and adduced evidence from defendant's clients who had paid him for his services. *Id.* at 702. This evidence demonstrated defendant's gross receipts. *Id.* The *Samara* defendant proffered an expert to rebut this evidence. *Id.* at 705. The expert prepared "a summary purporting to show that certain items should be deleted from the government's showing of gross receipts" because of "witness credibility"—*i.e.*, "felony convictions and lack of documentation." *Id.* Our Circuit determined that the district court properly had rejected this defense expert because (i) the witnesses the expert had attacked "were subject to defense cross-examination" and (ii) an expert "may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." *Id.* (quotation cleaned up).

14

So too here.  Gaia attacks McCall, Martin, and Elder.  Gaia opines that McCall contradicted himself by telling regulators about the importance of Jones's Labor Strategy, only to later accuse Jones of being uninvolved.  Doc. 221-1 at 12–13.  Gaia criticizes McCall for flagging the Italy trips to the FBI but willingly going on those trips.  *Id.* at 19.  And, of course, there's Gaia's big swing:  McCall was a fiduciary, so, if he had concerns, he should've done something about them.  *Id.*  But McCall didn't.  These opinions plainly attack McCall's credibility.  For Martin, Jones's special assistant, Gaia also opines that she knew little about his activities, and therefore, her "testimony has little to no value in understanding Jones'[s] roles at IBB or BOL and is of no relevance to the allegations against Jones."  *Id.* at 14.  And Gaia concludes that Elder, IBB's head of human resources, had little contact with Jones, so her accusation that Jones had a no-show job is unreliable.  *Id.*  The government is correct.  Gaia is opining on witness credibility.  And under binding Circuit precedent, he can't do so.

To avoid this result, defendants try to draw a line between (i) an expert opining about a witness's credibility about the facts and (ii) an expert challenging the reliability of another witness's opinion.  Doc. 221 at 6.  Unfortunately for defendants, there's no support in the case law for this distinction.  *Hill*, which steps through our Circuit's caselaw on this issue, never differentiates between a witness's credibility and the reliability of a witness's opinion.  *See* 749 F.3d at 1258–60.  Defendants grasp at our Circuit's line of cases that allow for an expert to opine on the reliability of eyewitness identifications.  Doc. 221 at 6.  But this area of expertise has developed from research that identified "factors that are helpful to evaluating the reliability of an eyewitness's identification of a suspect[.]"  *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).  Experts on the reliability of eyewitness identification evaluate "cross-racial identification, identification after a long delay, identification after observation under stress,

15

and such psychological phenomena as the feedback factor and unconscious transference." *Id.* (quotation cleaned up).  Gaia, in contrast, has no such research-based factors on which to base his opinion about the reliability of McCall, Martin, and Elder.  He merely takes a different view of the facts and, in so doing, attempts "to usurp the exclusive function of the jury to weigh the evidence and determine credibility." *Samara*, 643 F.2d at 705 (quotation cleaned up).

The court thus finds Gaia's criticisms of McCall, Martin, and Elder's credibility irrelevant.  And it excludes them on this basis.

### B.    Reliability

The government also launches a broad attack against Gaia's methodology, calling it clearly "insufficient and unreliable[.]"  Doc. 212 at 5.  For experts in nonscientific topics, "the meaning of a 'reliable method' is unclear." *Atchison v. Jackson*, No. 21-cv-286-JDR-SH, 2026 WL 36454, at *4 (N.D. Okla. Jan. 6, 2026).  "The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to nonscientific testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13:CV-439 MCA/LF, 2017 WL 4410780, at *3 (D.N.M. Sept. 30, 2017) (quotation cleaned up).  Put simply, in "a non-scientific context, the reliability of an expert's methodology often will be a function of accepted practice in the area of expertise in question." *Wright & Miller* § 6268.1.  "Rule 702 does not exclude witnesses from relying on their experience when opining on an issue where that experience is relevant." *Atchison*, 2026 WL 36454, at *4.

The court notes that the government hasn't challenged Gaia's qualifications.  And he worked for many years as a bank chairman.  Doc. 221-1 at 4.  Gaia also describes how his role shifted from daily operations to strategy over time. *Id.*  He asserts that his "responsibilities, broadly speaking, were similar to those of Newton Jones and William Creeden at Bank of

16

Labor." *Id.* So, to the extent that Gaia's reliability depends on his knowledge and expertise, the court doesn't have any concerns—nor did the government identify any.

The government argues that Gaia's opinions are "simply speculative statements" and merely "a re-imagining of the bank and Jones'[s] performance in the most self-serving manner possible." Doc. 212 at 5. The court doesn't see it that way at all. Gaia didn't conjure his opinions out of thin air. He reviewed BOL employees' statements to the FBI, grand-jury testimony, and reports by regulators. Doc. 221-1 at 27–28. These documents, combined with Gaia's experience, suffice to render his opinions reliable—with one exception—as discussed below.

For his opinion that BOL was a slow-growth bank, Gaia cites BOL's position in its peer group and asserts that its profit performance "was the subject of continued concern from regulators." *Id.* at 7. For his opinion that Jones focused on strategy and Creeden helped implement that strategy, Gaia cites (i) a 2015 state bank examination report that says as much and (ii) a board member's FBI interview describing Jones's role as strategic. *Id.* at 7–8. For his opinion that Jones developed and drove the Labor Strategy, he cites a 2015 state bank exam report. *Id.* at 7. He also cites Robert's statements to the FBI about Jones's vision for the BOL, *id.* at 8, and Richard's statement to the FBI about the value of Jones's leadership, *id.* at 12.

For his opinion that the Labor Strategy positively affected the BOL, Gaia cites figures showing that BOL's labor division grew the fastest of any BOL business from November 2020 to April 2022. *Id.* at 11. Further demonstrating the BOL's success, Gaia provides figures showing positive trends in BOL's earning asset yields, net interest income, expense ratio, and operating income. *Id.* at 20–22. And he puts those figures into perspective by comparing BOL's earning asset yields, net interest income, and expense ratio to its peer group. *Id.* at 20–21.

17

Gaia's opinion that regulators would have flagged Jones's undue influence on the board is based on his understanding of annual safety and soundness exams—*i.e.*, such an exam would've flagged any indication of a lack of board independence. *Id.* at 15. For his opinion that the loan transactions from BOL to IBB were arm's length ones, Gaia reviewed bank-examiner reports from 2015, 2016, 2019, and 2022 and found no Regulation W concerns. *Id.* Gaia also suggests that the BOL should've applied Regulation O to the loan and that the BOL followed Regulation O's requirements. *Id.* at 16. And for his opinion about the $7 million transaction from IBB to the BOL, Gaia cites common industry practices, explains that the $7 million transaction was a refinance, and mentions that the FDIC viewed the transaction "very favorably." *Id.* at 17. All of this suffices to render Gaia's opinions reliable.

The sole issue the court finds unreliable is Gaia's opinion that Jones and Creeden's compensation grew proportionally to the success of their Labor Strategy. Gaia provides a chart showing that when BOL's net interest income and total deposits increased, Jones's wages increased. *Id.* at 12. This chart suffices to make Gaia's opinion about Jones's wages reliable. But the charts and income figures make no mention of Creeden. *See id.* at 12–13. Yet Gaia wants to opine about the compensation of both Jones and Creeden. The court finds that Gaia hasn't provided enough information to make his opinion about Creeden's salary compared to BOL's growth reliable, so it bars him for testifying to this opinion.

In sum, the court finds that Gaia has provided a logical basis for his opinions—except his opinion about Creeden's salary, as just mentioned. And when "a logical basis exists for the expert's opinion[,] the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony." *Fish v. Kobach*, 304 F. Supp. 3d 1027, 1041 (D. Kan. 2018) (quotation cleaned up); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,

18

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## IV.    Conclusion

The court grants the government's request to exclude Gaia's opinions—in part.  It bars Gaia from testifying about the credibility of other witnesses.  And it bars him from testifying that Creeden's BOL salary rose proportionally to the BOL's improved financial status.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the part of the government's Motion in Limine to Preclude Certain Expert Testimony (Doc. 212) directed at Gaia is granted in part and denied in part.  The court now has ruled the entirety of that motion.

**IT IS SO ORDERED.**

**Dated this 1st day of May, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

19